1  Eric L. Cramer (*pro hac vice forthcoming*)
   BERGER MONTAGUE PC
2  1818 Market Street, Suite 3600
   Philadelphia, PA 19103
3  Telephone: (215) 875-3000
   Facsimile: (215) 875-4604
4  ecramer@bm.net

5  Michael J. Gayan
   CLAGGETT & SYKES
6  4101 Meadows Lane, Suite 100
   Las Vegas, NV 89107
7  Telephone: (702) 333-7777
   Fax: (702) 655-3763
8  mike@claggettlaw.com

9  [Additional Counsel Listed on Signature Page]

10

11                  **UNITED STATES DISTRICT COURT**

12                      **DISTRICT OF NEVADA**

13  Phil Davis, on behalf of himself and all others        Case No.:
    similarly situated,
14                                                          **ANTITRUST CLASS ACTION COMPLAINT**
                           Plaintiff,
15
              v.
16
    Zuffa LLC, TKO Group Holdings, Inc. (d/b/a
17  Ultimate Fighting Championship and UFC), and
    Endeavor Group Holdings, Inc.,
18
                           Defendants.
19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

I.    NATURE OF ACTION AND SUMMARY ................................................................2

II.   JURISDICTION AND VENUE ...........................................................................13

III.  DEFINITIONS.................................................................................................13

IV.   PARTIES .......................................................................................................15

V.    CLASS ACTION ALLEGATIONS .......................................................................19

VI.   THE UFC'S MONOPOLY AND MONOPSONY POWER ........................................20

    A.    The UFC's Monopoly Power in the Relevant Output Market ...........................21

        1.    The Relevant Output Market ....................................................................21

        2.    The Relevant Geographic Market .............................................................23

        3.    The UFC's Monopoly Power with Respect to Promoting Live Professional MMA Bouts. ...........................................................................24

    B.    The UFC has Monopsony Power in the Relevant Input Market .......................28

        1.    The Relevant Input Market.......................................................................28

        2.    The Headliner Submarket ........................................................................31

        3.    The Relevant Geographic Market .............................................................31

        4.    The UFC has Monopsony Power with Respect to Professional MMA Fighter Services. ..............................................................................33

    C.    Overview of the MMA Industry and the UFC's Dominance ...........................37

    D.    The UFC's Complete Control of Its Sport Is Unique in the Context of Big-Time Professional Sports..............................................................................38

VII.  THE UFC'S ANTICOMPETITIVE SCHEME AND ITS RESULTING ANTITRUST INJURIES TO PLAINTIFF AND MEMBERS OF THE CLASS...............................39

    A.    The UFC's Anticompetitive Scheme to Acquire, Maintain, and Enhance Monopsony Power .............................................................................39

        1.    The UFC Has Leveraged Its Monopoly and Monopsony Power to Deny Necessary Inputs to Would-Be Rival MMA Promoters.........................39

        2.    The UFC Impaired and then Acquired Its Largest Would-Be Rivals, Giving It Dominant Shares of the Relevant Input and Output Markets.............47

        3.    The UFC Relegated all Remaining MMA Promoters to "Minor League" Status....................................................................................50

i

B.    The UFC's Exclusionary Scheme Substantially Foreclosed Competition in the Relevant Input and Output Markets. ...................................................................54

C.    Endeavor's Participation in the Scheme and Its Effect on Fighter Pay ...........................56

D.    Plaintiff and Members of the Class Suffered Antitrust Injury............................................58

VIII.    INTERSTATE COMMERCE ...................................................................................................59

IX.    CLAIM FOR RELIEF FOR MONOPSONIZATION UNDER SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2...........................................................................................59

X.    DEMAND FOR JUDGMENT...................................................................................................61

ii

Plaintiff Phil Davis ("Plaintiff") is a Professional MMA Fighter under contract with the Professional Fighters League ("PFL"), an MMA Promoter that organizes and promotes live Professional MMA Bouts in the United States and abroad. Defendants Zuffa LLC ("Zuffa"), TKO Group Holdings, Inc. (d/b/a Ultimate Fighting Championship and UFC) ("TKO"), and Endeavor Group Holdings, Inc. ("Endeavor," and with other defendants, collectively "Defendants") own and operate the Ultimate Fighting Championship ("UFC"). The UFC is the world's dominant mixed martial arts ("MMA") Promoter. Through the continuing anticompetitive Scheme alleged in this Complaint (the "Scheme") in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, the UFC maintains monopoly power in the output market for Promotion of live Professional MMA Bouts, and monopsony power in the input market for Professional MMA Fighter services. The UFC's Scheme impairs Professional MMA Promotions like PFL in their ability to attract a critical mass of top-level MMA Fighters necessary to compete with the UFC at the top tier of the sport of Professional MMA, and otherwise substantially forecloses competition in the markets relevant to this case. The UFC's Scheme further restrains top-level fighters such as Mr. Davis from applying their trade by preventing these fighters from competing for titles in a free and unfettered market. As a result of the UFC's Scheme, rival MMA Promotions have been foreclosed, and as a result, would-be top-level MMA Fighters at PFL and other non-UFC MMA Promotions have had their careers impaired and their pay suppressed below the compensation that would prevail in a more competitive market.

Plaintiff files this Class Action Complaint against Defendants on behalf of himself and a proposed class of Professional MMA Fighters at non-UFC MMA Promotions, pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure. Plaintiff seeks injunctive relief to halt Defendants' continuing Scheme, and to create conditions for free and fair competition among Professional MMA Promotions and among top-level MMA fighters, thereby benefitting Plaintiff and the class of non-UFC Professional MMA Fighters. Plaintiff complains and alleges as follows based on: (a) his personal knowledge; (b) the investigation of Plaintiff's counsel; and (c) information and belief:

# I.    NATURE OF ACTION AND SUMMARY

1.    The UFC is the world's dominant mixed martial arts ("MMA") Promoter. The UFC holds monopoly power in the output market for Promotion of live Professional MMA Bouts, and monopsony power in the input market for Professional MMA Fighter services. As detailed in two class actions brought by UFC Fighters, the UFC acquired and maintained its dominant market position not through competition on the merits, but through a lengthy, illegal, and ongoing Scheme to eliminate competition from would-be rival MMA Promoters. *See Le v. Zuffa*, No. 2:15-cv-01045 (D. Nev.); *Johnson v. Zuffa*, 2:21-cv-01189 (D. Nev.).

2.    The UFC, which (through the conduct alleged herein) now controls approximately 90% of the revenues derived from live Professional MMA bouts (regardless of whether the geographic market is the U.S., North America, or the entire world), and has the vast majority of top-ranked Professional MMA Fighters signed to exclusive deals, promotes and distributes professional live MMA bouts through various venues, in the U.S. and internationally. As part of the anticompetitive scheme alleged herein, the UFC has acquired, driven out of business, foreclosed the entry of, and/or substantially impaired the competitiveness of multiple actual and potential MMA Promotion rivals. As a result, the only remaining promoters of MMA bouts are fringe competitors—which, as a general matter, do not and cannot successfully compete directly with the UFC—and/or entities that have essentially been conscripted by the UFC, through the scheme alleged herein, into acting as the UFC's "minor leagues."

3.    As set forth in more detail below, the UFC acquired and maintained monopoly power in the Relevant Output Market and monopsony power in the Relevant Input Market through a series of exclusionary acts (the Scheme), including (a) direct acquisitions of actual or potential rivals (who were forced to sell to the UFC because they found it impossible to compete profitably due to the UFC's anticompetitive scheme), as well as (b) a multifaceted scheme to impair and foreclose competition by leveraging the UFC's market dominance—including its tight-fisted control over the supply of Professional MMA Fighters—to block actual or potential rivals from accessing inputs (such as, e.g., Professional MMA Fighters) necessary to compete successfully in the market for promoting live Professional MMA bouts and the market for Professional MMA Fighter Services. The UFC has locked up a critical mass of the supply of top-level Professional MMA Fighters through, first, a series of

acquisitions designed to remove competing rivals and would-be rivals and thereby championship titles from the marketplace by acquiring the contracts of Professional MMA Fighters and shuttering the acquired promotions; and second, by, inter alia, forcing all UFC Fighters to enter into long-term exclusive contracts that bar them from working with would-be rival MMA Promotion companies all but indefinitely.

4.    The UFC's Scheme has stifled competition by systematically preventing other MMA Promoters from accessing the key input necessary for a Promotion to succeed: a critical mass of highly ranked Professional MMA Fighters, and by preventing highly ranked Professional MMA Fighters from exercising their trade without restraint. By controlling rank and title, foreclosing competition from rival MMA Promotions, and by requiring long-term exclusivity, the UFC now dominates the Relevant Input and Output markets. After acquiring rivals one by one, culminating in the UFC's acquisition of Strikeforce, and closing each acquired rival down, the UFC controlled virtually all fighters ranked 1-15 in every weight class. Joe Silva wrote Lorenzo Fertitta and Dana White an email with the subject line, "We Own MMA," the body of which was just a listing of rankings. By starving would-be competitors of top talent—including by requiring all UFC Fighters to sign long-term (in fact, effectively perpetual), exclusive, highly restrictive, contracts and then coercing the Fighters to renew their contracts before they can ever become free agents—the UFC has relegated all other Promoters to "minor league" status, struggling for revenues and viewership and effectively acting as "feeders" to the UFC. Likewise, by requiring all UFC fighters, the top-talent in the sport, to sign its highly restrictive, effectively perpetual contracts as a condition precedent to competing for the only titles that matter (the UFC's titles), the UFC has deprived all top-level fighters (regardless whether signed to the UFC) of the ability to exercise their trade in competing for titles in a competitive market. As this Court found in certifying the proposed Bout Class in *Le v. Zuffa, LLC*, "In addition to the ways in which the provisions of the exclusionary contracts permitted Zuffa to increase its market dominance, Plaintiffs have also established that Defendants used a variety of ruthless coercive techniques to prevent fighters from becoming free agents—rendering these contracts effectively perpetual."[1]

---

[1] Order at 36, *Le v. Zuffa*, No. 2:15-cv-01045-RFB, ECF No. 839 (D. Nev. Aug. 9, 2023) ("Class Cert. Order").

5.      Famed boxing promoter, Lou DiBella, President of boxing promotion DiBella Entertainment[2] explained the importance of controlling titles in combat sports in sworn testimony in *Le v. Zuffa*:

> "*Q: If Dibella Entertainment issued its own titles and ranks of boxers would that increase the control that Dibella Entertainment would have over the boxers?*
>
> *A. Obviously.*
>
> *Q. Why is that obvious?*
>
> *A. The entity—you would have total control. The entity paying the fighter would be the one determining who the champion is, determining who the challengers would be and basically, would put it into a, you know, a near total control over the Fighter.*"

6.      The legislative history of the Muhammad Ali Act is instructive, as boxing experienced a near identical recipe for monopoly decades ago. "Historically, promoters in the industry have required an exclusive long term promotional contract with a boxing challenger as a condition precedent to permitting a bout against another boxer that the promoter has under contract. The Committee believes, and hearing witnesses and industry members strongly concur, that this tactic is the key contracting practice that has been used by promoters to gain undue control over boxers and championship titles, to the clear detriment of the sport. Promoters have used this practice to extract 'exclusive promotional options' from boxers who already have a promoter, and who would not otherwise enter into a contract with a new promoter. The athletes would be better served, as would open competition in the sport, if boxers were free to contract with those promoters they personally choose, rather than being coerced to contract with a promoter who is in the position of barring a lucrative bout."[3] The legislative testimony on the business practices in boxing continued by stating: "This practice of coercing options from boxers is also utilized by promoters and sanctioning organizations against 'mandatory challengers'—those boxers who are rated by a sanctioning organization as the top contender in a weight division. The top-rated contender is supposed to be assured of having a bout against the champion of that division, within a specific period of

---

[2] Deposition of Louis John DiBella, *Le v. Zuffa, LLC*, No. 15-cv-1045 (D. Nev.) (Aug. 29, 2017), at 62:10-23.

[3] https://www.congress.gov/106/crpt/srpt83/CRPT-106srpt83.pdf, at. 8-9.

4

time. Despite the fact that top-rated challengers have clearly earned the right to compete for a title, sanctioning organizations have abetted restrictive contracting practices by allowing promoters of championship bouts to require options from them. As one hearing witness noted, this is akin to forcing a professional tennis player or golfer to sign an exclusive, long term contract with the promoter of whatever event they were seeking to win. The athlete would then only be able to compete when the promoter approved, against only those opponents who also were forced to agree to terms with that promoter. In self-governed and well organized sports industries such as tennis and golf, such a business practice would be strongly challenged as an unreasonable restraint of trade. In professional boxing, it is business as usual."[4]

7.    The legislative history continued by stating: "This practice also has enabled a single promoter to gain control over a majority of championship bouts in a weight division because it results in one promoter having control over both the champion and the challenger. No matter which boxer wins a title bout, the promoter remains in control over who may compete for that title, since he has both contestants under exclusive contract. If a boxer who seeks to challenge a champion (or a more established boxer) refuses to provide long term contractual rights to the promoter, the boxer will be denied the right to compete in the bout. This practice frustrates the years of determined training and arduous competition that boxers endure, for they will be denied the opportunities that their successes in the ring have earned. No boxer will ever be able to compete for the title in that division unless they sign away future promotional rights to that promoter. The promoter thus has gained total control over an entire segment of a major professional sports industry. This contracting practice allows a promoter to achieve a monopoly on a substantial portion of championship-level competition in that particular weight division."[5]

8.    The UFC has in fact perfected the model used to monopolize boxing—by removing the sanctioning body entirely. The UFC, while sanctioned as a professional sport by athletic commissions throughout North America, nevertheless operates as reality show. Contractual servitude dictates ascension to title status at the whim of the promoter of the event—not merit in competition, which is the antithesis of sport. The following chart is illustrative of this phenomenon—as fighters move up in rank

---

[4] *Id.*

[5] *Id.*

and closer to title contention, the number of fights remaining on their contracts increases because the UFC will not allow them to ascend otherwise:

| Bouts Remaining[1] | |
| --- | --- |
| **Ranking** | **Average Remaining Bouts** |
| Champions | 6.5 |
| Ranked 1 - 5 | 5.5 |
| Ranked 6 - 10 | 3.6 |
| Ranked 11 - 15 | 3.2 |
| Total Ranked | 4.2 |

(1) Note: in total, 13 ranked fighters have 1 bout remaining.
(2) Golf and Tennis based off select WME IMG events.

Indeed, as fighters enter the peaks of their careers (and the value of their services to MMA Promoters increases), the UFC's Scheme increases the fighters' contractual servitude. This is the result of the UFC requiring contractual extensions in order for the UFC to offer a UFC Fighter the opportunity to participate in a bout that will allow the Fighter to ascend the rankings and compete for titles. In an email to Jon Fitch's manager, a plaintiff in the original *Le v Zuffa* lawsuit, matchmaker Joe Silva wrote: "A title fight is an opportunity for him, not the other way around. If he becomes the champ it makes him more valuable, not just fighting for it. Plus you know I would renegotiate with him BEFORE GIVING HIM A TITLE FIGHT TO MAKE SURE HE IS TIED UP." [Emphasis added]. In legitimate combat sports, title shots are earned, not granted based upon contractual servitude. In fact, the practices of the UFC, such as using their control over titles to coerce fighters into long term, exclusive contracts, were once common in boxing and recognized as anti-competitive. These practices were eventually ended through an antitrust case, *International Boxing Club v. United States*, 358 U.S. 242 (1959), and then later the passage of federal regulation with the Muhammad Ali Boxing Reform Act of 2000.[6]

9.      Indeed, this Court found: "Unlike the limited competition in the input/output markets of MMA, boxing today has multiple prominent promoters who compete with each other to sign the best boxers, including titleholding championship boxers and contenders for titles, and who can promote PPV

---

[6] 15 U.S.C. §§ 6301 *et seq.*

ANTITRUST CLASS ACTION COMPLAINT

matches that attract large audiences. There are at least five different boxing promoters who are prominent enough to promote major championship fights each year, and probably more than ten. There are at least twenty boxing promoters in the United States today who have promoted nationally televised events, and of those, more than five have promoted at least one PPV event. These promoters compete with each other to sign boxing talent. It would appear based upon the record and experts that the MMA industry could evolve to such a competitive industry through the reduction of barriers to entry and restrictions on anticompetitive conduct within the industry."[7]

10.    By eliminating or substantially impairing competition among MMA Promoters for Professional MMA Fighter services, the UFC's Scheme directly suppresses the wages and opportunities of *all* Professional MMA Fighters.  Defendants' Scheme deprives those Fighters who compete for non-UFC MMA Promotions of the opportunity to compete against the highly ranked Fighters held under the UFC's exclusive, restrictive contracts, leading to artificially suppressed viewership, revenues, and, in turn, Fighter pay. Moreover, by restricting Fighters' abilities to compete and advance their careers in a competitive market, the UFC's Scheme artificially limits their career opportunities and diminishes their chances to successfully pursue their chosen profession. In the words of UFC President and CEO Dana White, other Promotions are "all the Triple-A [*i.e.*, the minor leagues] to the UFC." MMA Fighters thus face a Sophie's Choice: compete at a reduced wage against lesser competition for a starved minor league Promotion, or sign a restrictive, long-term contract with the UFC—and still receive artificially suppressed pay.

11.    Plaintiff Phil Davis is a Professional MMA Fighter who fights for the Professional Fighters League ("PFL"), an MMA Promoter that organizes and promotes live Professional MMA Bouts in the United States and abroad. Davis fought for Bellator from 2015 to 2023, and has fought for the PFL since PFL's 2023 acquisition of Bellator. Davis obtained a top-5 ranking the UFC's Light Heavyweight Division in 2014, with a victory over future Light Heavyweight champion Glover Teixera. But Davis's next fight, his last on his UFC contract, resulted in a loss to UFC Fighter Ryan Bader. In the years that followed, Davis fought fifteen times for Bellator before PFL acquired Bellator, and then once for PFL in

---

[7] Class Cert. Order at 56 n.46.

May 2025. Davis continued to retain a top-10 rank through the industry website FightMatrix.com. Throughout that time period, all or nearly all (depending on the month) of the other top-10 light heavyweight fighters were locked into exclusive, highly restrictive deals with the UFC. As a result, neither PFL nor any other non-UFC MMA promotion had the ability to sign a critical mass of top-ranked professional MMA fighters. Absent a critical mass of top-level MMA fighters, no rival MMA promotion could provide sufficient top-level talent to compete against Fighters like Davis. Without the ability to pit top-level fighters against each other regularly, non-UFC MMA promoters could not attract sufficient audiences, severely circumscribing the ability of all fighters at non-UFC promotions, including Davis, from participating in lucrative bouts against other top-ranked light heavyweight Fighters.

12.    Davis brings this action for injunctive relief on behalf of himself and a proposed class of similarly situated Fighters who currently fight for MMA Promoters other than the UFC (the "Class," defined in more detail below), seeking an end to Defendants' illegal, exclusionary practices that prevent rival non-UFC MMA promotions from attracting a critical mass of top-level fighters, and thereby blocking all MMA fighters from advancing their careers in a competitive marketplace. Davis also seeks an injunction that would force the UFC to make business changes in order to ameliorate the harm done to the marketplace. The UFC's exclusionary conduct applies generally to the Class, and the Class requires uniform relief from the same challenged practices.

13.    The UFC controls at least 90% of the revenues derived from live Professional MMA Bouts—regardless of whether the geographic market is the United States, North America, or the entire world—and has the vast majority of top-ranked Professional MMA Fighters signed to exclusive contracts. It has monopoly power in the United States and North America for producing live MMA Events, and monopsony power in the market for the services of Professional MMA Fighters. The UFC maintained and acquired its monopoly power and monopsony power through a deliberate, unlawful Scheme to prevent other MMA Promoters from gaining a foothold in the market for promoting live Professional MMA Events.

14.    Professional MMA Fighters must build followings among the MMA fanbase and attract audiences and viewership to succeed. They do so by proving themselves against established Fighters and rising through the rankings. A good showing against a highly ranked opponent increases a Fighter's rank

and visibility, enabling the Fighter to command larger purses, increased sponsorship and advertising income, and other compensation. This system culminates in the opportunity to compete for "titles" crowning the best Fighter in each weight class. But through the Defendants' anticompetitive acts described below, the UFC has gained effectively perpetual control over the vast majority of highly ranked Fighters, meaning that (a) aspiring Fighters seeking to compete at the top-levels of the sport must fight for the UFC to advance in their careers, and (b) would-be competing non-UFC MMA Promoters cannot access the talent they need to get off the ground or grow to become part of the top-tier of Professional MMA promoters with the ability to promote lucrative, championship level events.

15.    The combined effect of the UFC's Scheme (its acquisitions, long-term exclusive contracts, and coercive actions) is that the UFC exerts control over the vast majority of top Professional MMA Fighters for essentially the entire length of the primes of their careers. Other MMA Promoters have no chance to sign the vast majority of them, and, as a result, cannot mount competitive MMA Events and lucrative bouts or title fights that will attract large audiences. Deprived of the means to challenge the UFC, these other MMA Promoters must either fold or submit to serving as low-revenue, low-paying "feeder" leagues to the UFC, effectively acting as a proving ground for potential future UFC Fighters— or a pre-retirement destination for those the UFC has declined to keep. As the Court found in granting class certification in *Le v. Zuffa*, the UFC's control over "the critical input" of top-ranked Professional MMA Fighters "prevents any meaningful competition in the market," because would-be competitors are unable to "access[] a talent pool capable of attracting enough commercial interest to turn a profit." Order at 32, 57, *Le v. Zuffa*, No. 2:15-cv-01045-RFB (D. Nev. Aug. 9, 2023) ("Class Cert. Order").

16.    The UFC has undertaken this Scheme with the anticompetitive purpose and result of foreclosing any meaningful competition in the Relevant Input and Output Markets. The *Le* Court found that the UFC "understood their actions were having an anticompetitive effect on rivals *and engaged in this conduct for that very reason*." *Id.* at 57 (emphasis added); *see id.* at 40 ("The record establishes that undermining competitors was important to Zuffa leadership and an essential part of its strategy to establish market dominance."). As the UFC's then-CEO Lorenzo Fertitta texted Dana White in 2014, the UFC's goal was to "keep taking these fuckers oxygen till they tap out. We have sacrificed too much to let anyone get traction now." In this text, Fertitta confirmed, the "fuckers" were competing MMA Promoters,

while the "oxygen" was the top-level Fighters these would-be rivals required to compete.

17.    The UFC's many years of unchallenged market dominance are well-documented in the *Le* and *Johnson* actions. *See, e.g.*, Class Cert. Order at 27-28 (finding that the UFC controlled as much as 99 percent of the market for elite Fighter services). And despite Defendants' oft-repeated litigating position that competition is right on the horizon, the UFC's dominance has only grown since those actions were filed, as each supposed rising competitor has floundered and/or failed. For instance, in a 2015 motion to dismiss in *Le*, Defendant Zuffa pointed to Resurrection Fighting Alliance ("RFA"), Legacy Fighting Championship ("Legacy"), Titan Fighting Championship ("Titan"), and Bellator MMA ("Bellator") as viable competitor MMA Promotions. But none of those MMA Promoters was able to mount a significant competitive threat to the UFC. By 2016, Resurrection and Legacy had merged, after which the merged company rebranded as Legacy Fighting Alliance. And in 2017, Legacy's CEO, Ed Soares, emphasized that Legacy was the "NCAA of MMA," that there was no "competition" with UFC, and that Legacy Fighters were "fighting for an opportunity to get seen and to get noticed and to go up to the upper organization [UFC] to make money." And even before Zuffa cited Titan in that 2015 motion to dismiss, Titan had positioned itself as an explicit UFC "feeder" and Titan even airs events on the UFC's "Fight Pass" channel. *See* Class Cert. Order at 25 n.24 (describing these purported competitors as "small regional outfits that do not compete with the UFC for talent").

18.    Bellator, for which Plaintiff Davis fought from 2015 to 2023, provides an even starker example of the effectiveness of the UFC's anticompetitive Scheme. Founded in 2008, Bellator was a small-scale fringe Promoter—less than 5% the size of the UFC by revenue[8]—that consistently struggled to achieve profitability and, because of the Scheme, was never able to access top-level talent. Indeed, Zuffa's bankers, in consultation with Zuffa reported that as of 2013, Bellator's "most recent event … attracted only 4,000 people" and that "none of the Bellator fighters are household names." Class Cert. Order at 29-30. Nonetheless, as late as October 2023, Zuffa urged that Bellator was the most "significant

---

[8] Expert Report of Hal J. Singer, Ph.D., *Le v. Zuffa, LLC*, No. 15-cv-1045 (D. Nev.) (Aug. 17, 2017), at Tbl.3.

competitor to the UFC," and that it "has continued to grow since 2017."[9] But that same month, Bellator's parent company, Paramount Global, announced that it would no longer air Bellator fights due to low viewership. In November 2023, facing an "imminent demise," Bellator was forced to sell to PFL. PFL was, itself, a small MMA Promoter that was relaunched from the previously failed MMA Promoter known as the World Series of Fighting.

19.    In short, as Dana White aptly summarized in 2023, "There's been plenty of people that have opened the checkbook, you know, to be a competitor. It's not about money. . . . Most of these other guys are all running charities, and not businesses. And like I said, you can only do that for so long before it runs out and it ends."

20.    Dana White repeatedly dismissed the idea that Bellator was a competitor, stating in 2020: "Everybody they have . . . we let go of," and responding to reports of their pending sale in September 2023: "Why, on God's green fucking earth, would anybody buy Bellator?" In December 2023, after PFL's purchase of Bellator was announced, White described the acquisition as "[o]ne shitty organization that sells no tickets and nobody watches buy[ing] another shitty organization that sells no tickets and nobody watches." Similarly, in November 2023, Mark Shapiro ("Shapiro")—the President and COO of Defendant TKO, the UFC's parent organization—described the "pipeline" from PFL to the UFC:

> Not only do we have over 600 fighters, we have the premiere fighters. I mean, ultimately, [PFL and Bellator fighters are] trying to get to the UFC, which is akin to the XFL trying to ultimately get their players into the NFL. I mean, that's what we are. Those are pipeline and feeder properties.

21.    The outcome of the UFC's use of its Scheme to maintain its stranglehold over the MMA industry has been predictable: The UFC's revenues and profits have soared, while potential rivals have floundered and died, never becoming competitively significant. In 2016, the UFC reported $695 million in total revenue; by 2023, this number had *doubled* to a record $1.3 billion, driven by "skyrocket[ing]" live event and sponsorship revenues and record media rights deals. Moreover, in the time the UFC's

---

[9] Renewed Motion for Summary Judgment ("MSJ") ¶ 18, *Le v. Zuffa, LLC*, No. 15-cv-1045, ECF No. 878 (D. Nev. Oct. 24, 2023); Motion to Reopen Discovery at 6, *Le v. Zuffa, LLC*, No. 15-cv-1045, ECF No. 884 (D. Nev. Oct. 24, 2023). The *Le* Court recognized that, although Bellator was the UFC's "primary domestic competitor during the Class Period," it never achieved more than a tiny fraction of the UFC's market share. *See* Class Cert. Order at 25 n.24, 29.

11

revenues have doubled, its profit margin has more than *tripled*, jumping from $119 million in 2015 to $387 million in 2022—a margin of 34%. In its most recently filed 10K, TKO reported EBITDA margins for the UFC at a staggering 57% for year ending December 31, 2024 and 58% for year ending December 31, 2023.[10] Meanwhile, Zuffa's purported competitors have struggled to cobble together MMA Events attractive to MMA audiences because, as a result of the Scheme alleged herein, they have been unable to access a critical mass of top Professional MMA Fighters. As a result of the alleged Scheme, all historical UFC rivals have ultimately failed, and the current purported rivals are doing no better than their failed predecessors.

22.     As described below, the UFC did not acquire and does not maintain its monopoly power in the Relevant Output Market and monopsony power in the Relevant Input Market lawfully. The UFC's anticompetitive and illegal Scheme through which it controls a dominant share of the Relevant Input and Output Markets reaches virtually every aspect of the sport.

23.     As a direct result of the UFC's prior and ongoing anticompetitive actions alleged herein, Plaintiff Davis has had and will continue to have fewer opportunities to compete against top Fighters and advance his career. His future earnings and opportunities under his current contract with PFL (and any future MMA Promoter) will be similarly suppressed. By depriving Davis's MMA Promotions of access to a critical mass of top Fighters necessary to mount a successful production, and by refusing to co-promote events with PFL or other MMA Promotions, the UFC's anticompetitive Scheme has stunted Plaintiff's career and robbed him of the opportunity to compete for a competitive wage. He and all similarly situated members of the proposed Class have suffered financial harms, diminished career opportunities, and antitrust injuries—and will likely continue to suffer such injuries—as a direct result of the anticompetitive conduct challenged in this Complaint. On behalf of the proposed Class, Davis now seeks injunctive relief that will forbid the UFC's illegal practices and, at long last, bring competition to the market for Professional MMA Fighter services.

---

[10] TKO Group Holdings, Inc., Form 10-K, at 53 (Jan. 31, 2025), *available at* https://d18rn0p25nwr6d.cloudfront.net/CIK-0001973266/7e51d90c-4c6a-4b3f-93a8-dd4d5c2ac60b.pdf.

## II.    JURISDICTION AND VENUE

24.    This action is brought under Section 2 of the Sherman Act, 15 U.S.C. § 2, and section 16 of the Clayton Act, 15 U.S.C. § 26.

25.    Plaintiff has been injured, and is likely to continue to be injured, as a direct result of Defendants' unlawful conduct.

26.    The United States District Court for the District of Nevada has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a).

27.    Venue is proper in this District under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 22. The UFC's operations are headquartered in this District at 6650 S Torrey Pines, Las Vegas, NV, 89118, and the UFC conducts substantial business in this District. The UFC has promoted live Professional MMA events in this District, and sold or licensed promotional, merchandising, or ancillary materials throughout this District. Venue in this District is also proper pursuant to 28 U.S.C. § 1391.

28.    The UFC has acquired, enhanced, and is illegally maintaining monopsony power in the Relevant Input Market and monopoly power in the Relevant Output Market through the anticompetitive Scheme alleged herein.

## III.    DEFINITIONS

29.    As used herein:

a.    "Card" means the identification of all of the bouts that occur during a single MMA Event. The Card typically consists of the Main Card and the Undercard. The last fight on the Card is the Main Event and is typically a high-profile fight between two well-known and highly ranked Fighters.

b.    "Class Period" means the period from May 13, 2021 until Defendants' ongoing illicit Scheme alleged herein ceases.

c.    "Exclusive Promotional and Ancillary Rights Agreement" means a contract between a UFC Fighter and Zuffa, pursuant to which Zuffa is the exclusive Promoter of a UFC Fighter's bouts for a period of time, and the UFC Fighter grants certain ancillary rights to Zuffa in perpetuity.

d.    "Mixed Martial Arts" or "MMA" means a competitive individual sport in which competitors use interdisciplinary forms of martial arts that include, *e.g.*, jiu-jitsu, judo, karate, boxing, kickboxing, taekwondo, and/or wrestling to their strategic and tactical advantage in a supervised match.

13

Scoring in live Professional MMA Bouts is based on state athletic commission-approved definitions and rules for striking (blows with the hand, feet, knees or elbows) and grappling (submission holds, chokeholds, throws or takedowns).

e. "MMA Industry" means the business of promoting live MMA Bouts and may also include the Promotion of Pay-Per-View MMA events to generate Pay-Per-View revenues and ticket sales as well as ancillary activities such as: the sale of live and taped television programming, video-on-demand, merchandise (videos, DVDs, video games, apparel, hats, sporting equipment, etc.), event and Fighter sponsorships, and the collection of MMA-related copyright and trademark royalties.

f. "MMA Promoter" or "MMA Promotion" means a person or entity that arranges live MMA Bouts for profit.

g. A "non-UFC MMA Promoter" means any MMA Promoter other than the UFC that had at least one Professional MMA Fighter ranked in the FightMatrix database under contract to compete for it, and who did compete in a bout for it, during the Class Period as well as any MMA Promoter other than the UFC that was tracked on FightMetric during the Class Period.

h. "Pay-Per-View" or "PPV" means a type of pay television or broadcast service by which a subscriber of an Internet or television service provider can purchase events to view live via private telecast or Internet broadcast. The events are typically purchased live but can also be purchased for several weeks after an event first airs. Events can be purchased using an on-screen guide, an automated telephone system, on the Internet or through a live customer service representative.

i. "Professional MMA Bout" means a head-to-head fight between two Professional MMA Fighters.

j. "Professional MMA Event" means a competition at which Professional MMA Fighters compete against one another, including live events that spectators pay to attend, PPV events, and broadcast events available through broadcast or cable television transmission (whether live or previously taped). A Professional MMA Event typically consists of several Professional MMA Bouts.

k. "Professional MMA Fighter" means a person who is compensated as a combatant in a Professional MMA Bout by an MMA Promoter that either: had at least one MMA Fighter ranked in the FightMatrix database under contract to compete for it, and who did compete in a bout for it during the

Class Period, or; was tracked on FightMetric during the Class Period.

l.    "UFC Fighter" means a person who is paid by the UFC for participating in one or more Professional MMA Bouts promoted by the UFC.

**IV.    PARTIES**

30.    **Zuffa, LLC.** Zuffa LLC is a Nevada limited liability company founded in 2000 and headquartered in Las Vegas, Nevada. During the Class Period, Zuffa engaged in the business of, among other things, promoting live Professional MMA Bouts in the United States and elsewhere, under the trade names of the Ultimate Fighting Championship® or UFC®. Under the UFC trademark, which is wholly owned by Zuffa, Zuffa promotes Professional MMA Events for live audiences as well as live television, Internet and PPV broadcasts; and licenses, markets, sells and distributes UFC Licensed Merchandise and/or Promotional Materials including, but not limited to, tickets to bouts, live and taped television programming, broadcasts over an Internet subscription service, sponsorships and other merchandise including video games, action figures, gyms, fitness products, athletic equipment, apparel, footwear, hats, photographs, toys, collectibles, trading cards and digital media products.

31.    **Zuffa Parent, LLC.** During the Class Period, Zuffa Parent, LLC (n/k/a TKO Group Holdings, Inc.), owned and operated the Ultimate Fighting Championship ("UFC"), the world's dominant professional mixed martial arts ("MMA") organization. Zuffa is in the business of, among other things, promoting live Professional MMA Bouts in the United States and elsewhere, under the trade names of the Ultimate Fighting Championship® or UFC®. Under the UFC trademark, Zuffa promotes Professional MMA Events for live audiences as well as live television, Internet and PPV broadcasts; and licenses, markets, sells and distributes UFC Licensed Merchandise and/or Promotional Materials including, but not limited to, tickets to bouts, live and taped television programming, broadcasts over an Internet subscription service, sponsorships and other merchandise including video games, action figures, gyms, fitness products, athletic equipment, apparel, footwear, hats, photographs, toys, collectibles, trading cards and digital media products.

32.    **Endeavor Group Holdings, Inc. ("Endeavor")**. Defendant Endeavor is a sports, events, media, and talent company that owned and operated Zuffa Parent. Endeavor owned and operated the UFC from approximately July 2016 to April 2023. During that time, Endeavor produced and distributed

1    UFC programming, managed UFC live events and experiences, and licensed UFC media and sponsorship

2    rights, among other roles. Endeavor produced more than 40 live UFC events annually which are

3    broadcast in over 160 countries and territories to approximately 1 billion TV households as well as other

4    editorial video content for the UFC.[11]

5    33.    Endeavor and its employees held promoters' and matchmakers' licenses in various states

6    to organize and produce UFC's live events.[12]

7    34.    Endeavor also sold global media and sponsorship rights for the UFC and licenses the

8    UFC's intellectual property.[13] In 2021, Endeavor entered into a "record seven-year deal with

9    ESPN/ESPN+ for UFC's linear and pay-per-view rights in the US."[14]

10    35.    Endeavor also owned and operated the UFC's FIGHT PASS streaming platform and the

11    UFC Performance Institute, which offers specialized training to athletes.[15]

12    36.    First Zuffa Parent,[16] and then TKO,[17] paid Endeavor $25-$35 million every year for these

13    and other UFC-related services that Endeavor provided to the UFC.

14    37.    In July 2016, Endeavor acquired Zuffa Parent, LLC, together with affiliates of Silver Lake

15    Partners ("Silver Lake") and Kohlberg Kravis Roberts & Co. L.P. ("KKR"), for approximately $4 billion

16    (the "UFC Acquisition"). Following the UFC Acquisition, Endeavor owned 50.1% of Zuffa Parent, LLC.

17    As a result of the UFC Acquisition, Endeavor had a controlling financial interest over the business and

18    affairs of Zuffa Parent, LLC, it consolidated Zuffa Parent, LLC's financial results with its own from the

19    date of the UFC Acquisition, and owned 50.1% of Zuffa Parent, LLC's common equity.

20    ───────────────

21    [11] See Endeavor Group Holdings, Inc., Amendment No. 1 to Form S-1 Registration Statement (Apr. 20, 2021), https://www.sec.gov/Archives/edgar/data/0001766363/000119312521122043/d67085ds1a.htm at 108.

22    [12] Id. at 159.

23    [13] Id. at 4-7, 109, 121, 148.

24    [14] Id. at 150.

25    [15] Id. at 5, 49, 108, 150-51.

26    [16] See Endeavor Group Holdings, Inc., Amendment No. 1 to Form S-1 Registration Statement (Apr. 20, 2021), https://www.sec.gov/Archives/edgar/data/0001766363/000119312521122043/d67085ds1a.htm at 108.

27    [17] See TKO Group Holdings, Inc, Annual Report (8-K) at 134 (Sept. 12, 2023), available at https://investor.tkogrp.com/financials/sec-filings/sec-filings-details/default.aspx?FilingId=16926499.

38.     In February 2021, Endeavor entered into an agreement with Silver Lake and KKR to acquire the outstanding equity in Zuffa Parent, LLC contingent upon Endeavor's initial public offering ("Endeavor IPO"), among other conditions.[18] On March 31, 2021, Endeavor filed a Form S-1 Registration Statement with the United States Securities and Exchange Commission ("SEC") in connection with its planned Endeavor IPO.[19] On April 28, 2021, Endeavor completed the Endeavor IPO and acquired the remainder of Zuffa Parent, LLC. Following the Endeavor IPO, Endeavor owned 100% of Zuffa Parent, LLC.

39.     On April 3, 2023, Endeavor entered an agreement through which TKO Group Holdings, LLC, a subsidiary of Endeavor, would acquire a 51% controlling interest in Zuffa Parent, LLC and World Wrestling Entertainment, LLC, both of which would be owned and operated by TKO Operating Company, LLC. On September 12, 2023, the merger transaction was consummated and TKO Group Holdings, Inc. was listed publicly on the New York Stock Exchange.

40.     Endeavor and/or its subsidiaries maintain a controlling non-economic voting interest in Defendant TKO Group Holdings, Inc. On March 24, 2025, Silver Lake and its co-investors took Endeavor private by acquiring 100% of the outstanding shares in Endeavor they did not already own, excluding the equity interests of Ari Emanuel ("Emanuel"), Patrick Whitesell ("Whitesell"), and Shapiro, which were rolled over into the surviving entity; those equity interests continue to be owned by Emanuel, Whitesell and Shapiro. Throughout the Class Period, at least through and including March 2025, Emanuel served as the CEO of Endeavor. Endeavor continues to own a controlling interest in TKO.

41.     **TKO Group Holdings, Inc. ("TKO").** On September 12, 2023, TKO became the owner and operator of the UFC and, through TKO OpCo, owns all of the assets of the UFC. TKO was incorporated as a Delaware corporation in March 2023 and was formed for the purpose of facilitating the business combination of the UFC and World Wrestling Entertainment, LLC (f/k/a World Wrestling Entertainment, Inc.) ("WWE") businesses under TKO Operating Company, LLC, which owns and operates the UFC and WWE businesses.

---

[18] *See id.* at 11-12, 80-83, 213-15.

[19] Endeavor Group Holdings, Inc., Form S-1 Registration Statement (Mar. 31, 2021), https://www.sec.gov/Archives/edgar/data/1766363/000119312521102184/d67085ds1.htm#rom67085_1.

42.     Although separate legal entities, Endeavor and TKO are (or as of March 24, 2025, were) operated and managed by many of the same senior executives and directors: they share a CEO (Emanuel), a President and COO (Shapiro), a Chief Administrative Officer and Senior Counsel to both companies' boards (Seth Krauss), and three directors (Emanuel, Shapiro, and Egon Durban). Andrew Schleimer is the CFO of TKO and UFC and was Deputy CFO of Endeavor from February 2021 to September 2023.

43.     Throughout the Class Period, Defendants Zuffa, TKO, and Endeavor had common and overlapping senior executives and directors. All of Defendants' actions described in this Complaint are part of, and in furtherance of, the unlawful anticompetitive scheme alleged herein, and were authorized, ordered, and/or performed by Defendants' various owners, shareholders, officers, agents, employees, or other representatives, including but not limited to, Endeavor CEO Emmanuel, former Zuffa owners Lorenzo Fertitta and Frank Fertitta, and UFC president Dana White, while actively engaged in the management of the UFC's affairs, within the course and scope of their roles or duties of employment, or with the actual, apparent, or ostensible authority of Endeavor, Zuffa, and the UFC, during the Class Period.

44.     All of Defendants' actions described in this Complaint are part of, and in furtherance of, the unlawful anticompetitive Scheme and illegal restraints of trade alleged herein, and were authorized, ordered, and/or performed by Defendants' various owners, shareholders, officers, agents, employees, or other representatives, including but not limited to, Endeavor CEO Emmanuel, former Zuffa owners Lorenzo Fertitta and Frank Fertitta, and UFC president Dana White, while actively engaged in the management of the UFC's affairs, within the course and scope of their roles or duties of employment, or with the actual, apparent, or ostensible authority of Endeavor, Zuffa, and the UFC.

45.     **Plaintiff Phil Davis**, a resident of Chula Vista, California, is a Professional MMA Fighter and a proposed representative of the proposed Class. Davis began his Professional MMA career in 2008. He competed for Bellator MMA from 2015 to 2023 and now competes for PFL. Davis is scheduled to compete for the PFL's Light Heavyweight World tournament champion on June 27, 2025. Despite being deprived of the ability to ascend the rankings and compete for meaningful titles and highly lucrative bouts by the UFC's stranglehold over the vast majority of highly ranked opponents, Davis remains

ranked in the top 10 all light heavyweight Professional MMA Fighters in the world, and is ranked 18th all-time in that weight class. He has a career record of 25 wins and 7 losses as a Professional MMA Fighter.

## V.    CLASS ACTION ALLEGATIONS

46.    Plaintiff brings this action individually and as a class action pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure on behalf of the Class consisting of:

> All persons who competed in one or more live Professional MMA bouts for a non-UFC Promoter, where such bout or bouts have taken place or was/were broadcast in the United States from May 29, 2021, until the scheme alleged herein ceases ("Class Period"). The Class excludes (a) all persons who are currently under contract with the UFC, (b) all members of the proposed class in *Johnson v. Zuffa, LLC*, No. 21-cv-01189 (D. Nev.), and (c) all members of the proposed class in *Cirkunovs v. Zuffa, LLC,* No. 25-cv-00914 (D. Nev.).

47.    There are multiple questions of law and fact common to the Class that predominate over any questions solely affecting individual members, including but not limited to:

a.    whether the Relevant Geographic Market is the United States, or alternatively, North America;

b.    whether the market for Professional MMA Fighter services, *i.e.*, the Relevant Input Market, is an appropriate relevant market for analyzing the claims in this case;

c.    whether the UFC possesses monopsony power in the Relevant Input Market;

d.    whether, through the conduct alleged herein, the UFC willfully acquired, maintained and enhanced that monopsony power;

e.    whether the UFC engaged in unlawful exclusionary conduct to impair the opportunities of actual or potential rivals in the Relevant Input Market;

f.    whether the UFC entered into exclusionary agreements with actual or potential rival MMA Promoters, MMA venues, or other entities, that foreclosed the UFC's actual or potential rivals from competing in the Relevant Input Market;

g.    whether the terms in the UFC's Fighter contracts requiring exclusivity are, when taken together, anticompetitive;

h.    whether Defendants' exclusionary Scheme had anticompetitive effects in the

19

Relevant Markets;

        i.     whether Defendants' actions alleged herein caused injury to Plaintiff and the members of the proposed Class; and

        k.     the propriety of declaratory and injunctive relief.

48.     The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable. Although the precise number of such individuals is currently unknown, Plaintiff believes that the number of members in the Class is, at minimum, in the hundreds, and that the members reside across the United States, including in this District.

49.     Plaintiff's claims are typical of those of the Class he seeks to represent. Plaintiff, like all other members of the Class, was injured by the UFC's illegally obtained monopsony power that resulted in artificially suppressed compensation for competing in Professional MMA Bouts in the Relevant Input Market fought or broadcast in the United States.

50.     Plaintiff is a more than adequate representative of the Class and his chosen Class Counsel (the undersigned) are more than adequate attorneys. Plaintiff has the incentive, and is committed to prosecuting this action, for the benefit of the Class. Plaintiff has no interests that are antagonistic to those of the Class. Plaintiff has retained counsel highly experienced in antitrust and class action litigation.

51.     This action is maintainable as a class action under Fed. R. Civ. P. 23(b)(2) because Defendants have acted and refused to act on grounds that apply generally to the Class, and final injunctive and declaratory relief is appropriate with respect to the Class as a whole.

52.     Plaintiff and members of the Class have all suffered, and will continue to suffer, antitrust injury as a result of the Scheme alleged in this Complaint, which involved Defendants' acquisition, enhancement, and/or maintenance of monopsony power in the Relevant Input Market.

## VI.    <u>THE UFC'S MONOPOLY AND MONOPSONY POWER</u>

53.     On December 5, 2024, Shapiro, then President and Chief Operating Officer of Defendants Endeavor Group Holdings, Inc. and TKO Group Holdings, Inc., asserted that the UFC (and by extension, Endeavor), control MMA:

> *When you control and own the league like we do with the . . . UFC, we're the owner, commissioner, and the coach all in one . . . We're only limited by our creativity.*

A.    **The UFC's Monopoly Power in the Relevant Output Market**

1.    **The Relevant Output Market**

54.    The Relevant Output Market is the promotion of live Professional MMA Bouts involving Professional MMA Fighters who are ranked in the FightMatrix ranking database.[20]

55.    Promoters of live Professional MMA Bouts arrange contests between Professional MMA Fighters who compete in one-on-one fights known as bouts.

56.    Live Professional MMA Bouts are held in venues for which admission tickets are sold. Revenues from the promotion of live Professional MMA Bouts may also include broadcast of the event on PPV, television, or over the Internet as well as through the sale of live and taped television programming, video-on-demand, merchandise (videos, DVDs, video games, apparel, hats, sporting equipment, etc.), event sponsorships, and the collection of MMA-related copyright and trademark royalties.

57.    The successful promotion of a live Professional MMA Event requires a critical mass of top Professional MMA Fighters—*i.e.*, those Fighters who have reputations for winning professional bouts, as reflected in MMA Fighter rankings published by FightMatrix and other MMA publications, and who have gained notoriety with the MMA fanbase and thus who can attract a wide audience. It also requires access to the highest ranked professional MMA fighters and the ability to freely compete for titles. Mixed Martial Artists are skilled athletes who typically train for years before competing professionally. A successful promotion of a live Professional MMA Event also requires a suitable venue, access to PPV or television distribution outlets, sponsors, and endorsements.

58.    MMA is a unique blend of various martial arts disciplines, including, *e.g.*, boxing, Muay Thai (kickboxing), judo, wrestling, Brazilian jiu-jitsu, taekwondo and karate. The rules of MMA differentiate it from other combat sports (such as boxing, which does not allow kicks, takedowns, chokeholds, joint-locks, or any strikes below the waist). Similarly, wrestling does not allow striking of any kind (kicks, punches, etc.), and does not have an outlet for elite amateur wrestlers to continue their

---

[20] The number of Fighters ranked in FightMatrix varies by weight class, with the most common men's weight classes ranking between the top 250 and top 750 Fighters in that weight class, and the most common women's weight classes ranking between the top 50 and top 100 Fighters.

1  athletic careers as wrestlers professionally.

2      59.    MMA is distinct from "professional" wrestling as currently promoted under the umbrella

3  of World Wrestling Entertainment ("WWE"). Professional wrestling is now acknowledged to be

4  "staged"—that is, scripted entertainment involving acting with the outcome of individual matches

5  predetermined. Combat sports such as boxing or those that are limited to a single martial art, such as

6  judo, are not adequate substitutes for live Professional MMA. There is no meaningful market substitute

7  amongst the television-viewing and ticket-paying audience for the sport of MMA. Single-discipline

8  combat sports, such as boxing and kickboxing, do not qualify as economic substitutes because they do

9  not enjoy reasonable interchangeability of use and cross-elasticity of demand amongst the consuming

10  audience.

11      60.    Boxing does not combine different elements from a diverse set of martial arts, as it is

12  limited to only strikes with the hands above the waist of an opponent, and hence does not provide a

13  viewing experience akin to MMA. Indeed, while state athletic gaming commissions (or equivalents

14  thereof) sanction both boxing and MMA events, such commissions impose strict requirements that define

15  each sport separately. Such distinctions include the method of scoring, weight classes, the duration and

16  number of rounds, and the methods of combat that may be employed. For example, scoring in live

17  Professional MMA Bouts is based on athletic commission-approved definitions and rules for striking

18  (blows with the hand, feet, knees or elbows) and grappling (submission, chokeholds, throws or

19  takedowns), most forms of which are prohibited in boxing.

20      61.    Promotion of live Professional MMA Events is not reasonably interchangeable with

21  promoting any other sport or entertainment, including boxing and/or kickboxing. For instance, raising the

22  prices for live MMA Events above competitive levels by a small but significant amount for a substantial

23  period of time would not cause so many consumers to switch to other sporting events or entertainment

24  options that such price inflation would be unprofitable. *See* Class Cert. Order at 25 n.25.

25      62.    Because an MMA Promoter cannot meaningfully compete with the UFC without

26  accessing a critical mass of high-quality Professional MMA Fighters, the Relevant Output Market is

27  appropriately limited to the Promotion of live Professional MMA Bouts involving Fighters who are

28  ranked by FightMatrix, an independent, third-party ranking system. As the Court observed in approving

FightMatrix-based market definitions in *Le*, the numerous regional Promoters that organize fights between non-ranked MMA Fighters "consider themselves to be a minor league to the major league" of the UFC and "do not compete with the UFC" for talent or viewers. *See* Class Cert. Order at 25-26 & n.24. The inclusion of all ranked MMA Fighters in the Relevant Markets is, if anything, quite conservative: As the *Le* Court found, it is not merely ranked Fighters—of which there are as many as 750 in some weight classes—but *top*-ranked Fighters that drive viewership and revenues. *See* Class Cert. Order at 32 ("Control of Fighters who are Headliners is essential within MMA for revenue purposes."). Including MMA Promoters that promote Bouts between low-ranked Fighters, but which do not have access to a sufficiently deep pool of top-ranked Fighters to challenge the UFC for viewers and revenues, in the Relevant Output Market is likely overbroad and thus conservative.

### 2.    The Relevant Geographic Market

63.    The Relevant Geographic Market for the Relevant Output Market is the United States, and, in the alternative, North America. *See* Class Cert. Order at 26. In other words, the Promotion of live MMA Bouts in the United States—and in the alternative, North America—is the appropriate market for analyzing the claims in this case. For purposes of geographic boundaries of the Relevant Output Market, Bouts that take place outside of the United States (or in the alternative, outside of North America), but which are typically broadcast live (or subject to a delay to account for differences among time zones) via television, Internet and/or PPV into the United States (or in the alternative, North America), are in the Relevant Geographic Market. A bout which neither takes place in the United States nor is broadcast into the United States is not in the geographic market.

64.    MMA events involving Professional MMA Fighters are typically broadcast in the United States on national television and reported on by national broadcasters (ESPN, FOX Sports, etc.) in national media outlets. United States consumers do not view MMA events staged or broadcast outside of the United States as reasonable substitutes for events staged in the United States or broadcast into it. Barriers associated with language, travel, and other costs separate non-U.S.-promoted bouts from bouts promoted in the United States. The time difference of events broadcast from many time zones away also frequently makes these events unappealing to a U.S. audience. The PPV, broadcast, and other rights to MMA Promotions are sold separately in each country and region. Consumers in the United States would

not view events which are neither fought nor broadcast widely in the United States, and would not see such non-United States events as reasonable substitutes for bouts fought or broadcast in the United States. A small but significant increase in ticket prices for bouts fought or viewable in the United States would not cause so many consumers to switch to bouts not fought or broadcast in the United States to make such an increase unprofitable.

65.    The United States is the only geographic area in which MMA Promoters operating in the United States can practically turn for supplies and inputs necessary for promoting and broadcasting profitable live MMA Events to United States consumers. Staging a live event in the United States requires a venue in the United States. Broadcasting an event on television or PPV in the U.S., even if it takes place outside of the U.S., requires contracting with United States television broadcasting and/or PPV companies with licenses to operate in the United States. Bouts in the United States typically require mainly U.S.-based medical staff, judges, referees, and athletic commissions.

66.    In the alternative, if the geographic market extends beyond the U.S., it would include only the rest of North America, which has the same time zones as does the U.S., and includes countries that abut the United States geographically, cutting down on travel and other costs.

### 3.    The UFC's Monopoly Power with Respect to Promoting Live Professional MMA Bouts

67.    At all relevant times, the UFC had monopoly power in the Relevant Output Market, *i.e.*, the market for promoting live Professional MMA Bouts in the United States. In the alternative, even if the Relevant Output Market included North America, or indeed, the entire world, the UFC would have monopoly power.

68.    Defendants obtained and maintain the UFC's monopoly power in the Relevant Output Market through the anticompetitive conduct alleged herein. The UFC possesses the ability to control, maintain, and increase prices associated with the promotion of live Professional MMA Bouts above competitive levels and to impair and exclude competitors from promoting live Professional MMA Bouts whether the Relevant Output Market is limited to the United States or, in the alternative, North America, or the entire world. The UFC has the ability to foreclose, and has in fact substantially foreclosed, would-be rivals from the market for promoting live Professional MMA Bouts taking place or broadcast in the

United States, North America, or the world.

69.     The UFC has, and has exercised, this power to impair and exclude competition in the Relevant Output Market no matter how it is geographically defined, including the ability to preclude or delay new entry into the Relevant Output Market, to raise would-be rivals' costs in that market, to impair the opportunities and efficiencies of would-be rivals, and to control prices and exclude competition.

70.     As a result, the UFC is, by far, the dominant provider of live Professional MMA Events in the Relevant Output Market. As UFC executives frequently emphasize, the UFC is now the equivalent of a major sports league—with the critical distinction that the UFC is not a joint venture of 30 competing entities but a single, dominant monopolist. As early as 2008, UFC co-founder Lorenzo Fertitta stated: "We are like football and the NFL. The sport of mixed martial arts is known by one name: UFC." UFC President and CEO Dana White echoed these remarks in 2010: "There is no competition. We're the NFL. You don't see people looking at the NFL and going, 'Yeah, but he's not the best player in the world because there's a guy playing for the Canadian Football League or the Arena League over here.' We're the NFL. *There is no other guy*." Crucially, and unlike the NFL which is comprised of 32 different owners, the UFC is not a league at all. It is an individual sport with one dominant promotion that restrains virtually all highly ranked professional MMA Fighters to fighting for only its title.

71.     Fifteen years later, nothing has changed—the UFC's dominance has, in fact, only grown. In November 2023, on a TKO earnings calls with Wall Street analysts, Endeavor and TKO President and COO Shapiro publicly compared the UFC to other MMA Promoters in a similar fashion stating: "We have no issue with Bellator, PFL, name your league. . .. Not only do we have over 600 fighters, we have the premiere fighters. I mean, ultimately, you're trying to get to the UFC, which is akin to the XFL trying to ultimately get their players into the NFL. I mean, that's what we are. Those are pipeline and feeder properties."

72.     In March 2024, Shapiro went even further, stating that the "UFC is now not only mainstream, it's one of the four majors"—a reference to the traditional four major American sports: NFL, MLB, NBA, and NHL. According to Shapiro, the UFC has now displaced the NHL; in his words, from a ratings perspective, "we dwarf them."

73.     Because, as alleged below, the UFC possesses monopsony power in the Relevant Input Market, *i.e.*, the market for Professional MMA Fighter services, the UFC has been able to use that dominance to restrict access and limit expansion of actual or potential rivals in the Relevant Output Market. Through its acquisitions, exclusive contracts with MMA Fighters, and coercive tactics, the UFC has deprived potential and actual competitors of the most important input for a successful Professional MMA Promotion: the services of a critical mass of highly ranked Professional MMA Fighters. *See* Class Cert. Order at 31 ("These barriers to entry made it prohibitively expensive and difficult for new entrants in the input (and output) market to effectively compete with Zuffa.").

74.     As a result of its anticompetitive conduct alleged herein, the UFC receives at least 90% of all revenue generated by MMA events in the United States, North America, and throughout the entire world. As the *Le* Court recognized, this is "more than double the percentage recognized by scholars and the Ninth Circuit as establishing" monopoly power. Class Cert. Order. at 29.

75.     Barriers to entry in the Relevant Output Market are high. There are natural barriers to entry, including that establishing and maintaining a rival MMA Promotion requires a substantial investment of capital to be able to promote Professional MMA Bouts involving Professional MMA Fighters successfully. But these natural barriers to entry do not explain the UFC's continued, durable monopoly. Over the last two decades, several aspiring MMA Promoters backed by individuals or entities with nearly limitless financial resources, including billionaires Mark Cuban and Donald Trump, large corporations such as Paramount Global[21] (which backed Bellator), and, most recently, Saudi Arabia's Public Investment Fund (which backs PFL), have been unable to get their Promotions off the ground in the MMA Industry.

76.     These MMA Promotions and others failed or were relegated to the sidelines because of *artificial* barriers to entry enacted and enforced by the UFC. *See* Class Cert. Order at 31 ("Given the artificial and intentional nature of these barriers, they are not self-correcting through natural market forces."). Most significantly, the UFC denied these MMA Promoters access to a critical mass of highly ranked MMA Fighters necessary to build a successful MMA Promotion, because they had (and continue

---

[21] Viacom, which previously owned Bellator, merged with CBS in 2019 to become Paramount Global.

to have) virtually all the top Fighters locked into long-term exclusive contracts. Successfully promoting live MMA Events requires the ability to secure appropriate venues, generate ticket sales, sign up sponsors and get endorsements, and sell pay-per-view/broadcast distribution rights. Lacking the ability to attract a wide viewing audience with bouts between top MMA Fighters, other MMA Promoters are unable to secure these necessary elements to compete with the UFC.

77.    As a result, other MMA Promoters' only hope of survival is to capitulate, decline to compete directly with the UFC, and operate as subservient "feeder leagues." Many MMA Promoters, including Invicta FC, Titan FC, Cage Fury, and Jungle Fight, include a clause in their Fighter contracts that allows Fighters to leave if they are offered a contract with the UFC, known as "UFC-out" clause. This signals to the UFC that the Promoters will not even attempt to compete against the UFC and will instead serve as feeder leagues. *See* Class Cert Order at 28 n.30 ("The fact that these 'minor league' contracts typically contain 'UFC-out' clauses is further proof of their proper exclusion from the relevant input market."). Other Promoters state explicitly that they cannot, and will not, attempt to compete with the UFC. Alliance MMA stated in its SEC filings that it "is our intention to serve as a developmental organization for the UFC and other premier national MMA Promotions in the same fashion as college athletic programs serve as 'feeders' to professional sports leagues . . . . Should the UFC . . . view us as a threat they could use their significantly greater resources to frustrate our business and growth strategy and materially and adversely affect our business."[22] Similarly, Legacy Fighting Alliance's CEO, Ed Soares, has emphasized that Legacy is the "NCAA of MMA," that there was no "competition" with UFC, and that Legacy Fighters were "fighting for an opportunity to get seen and to get noticed and to go up to the upper organization [UFC] to make money."

78.    Prospective market entrants cannot enter the Relevant Output or Input Markets unless they have access to a critical mass of talented Professional MMA Fighters. Actual or potential rival Promoters cannot attract and do not have access to the necessary critical mass of talented Professional MMA Fighters unless they can demonstrate that they can promote a series of profitable bouts that will result in potentially competitive compensation and public exposure to the Fighters. And potential rivals cannot

---

[22] Alliance MMA, Form 10-K (Dec. 31, 2016), *available at* https://thequarterly.org/sec-filings/amma/2016/10-k.html.

promote high-viewership, high-revenue bouts because the UFC has unlawfully gained control over nearly all of the top MMA Fighters' careers—leading to a vicious, self-reinforcing cycle of illicit market dominance. *See* Class Cert. Order at 25 n.23 (describing the substantial overlap and strong connection between the Relevant Output and Relevant Input Markets as somewhat unique to MMA and resulting "the fact that it is common in this industry for the buyers on the input side of the market (fighter services) to generally also be sellers on the output side of the market (bout events)").

79.   These barriers to entry are willfully maintained by Defendants to suppress competition in the Relevant Markets. Because of the artificial, intentional nature of these barriers, they are not self-correcting through natural market forces.

80.   Defendants' use of monopoly power in the Relevant Output Market contributes to anticompetitive effects in the Relevant Input Market. Defendants used their monopoly power to inflate prices to view UFC events, including through PPV, linear TV, and streaming services. By inflating those prices, Defendants reduced output—and vice versa. When the price of viewing live events is artificially inflated, fewer consumers buy viewing rights and fewer networks buy broadcasting rights, and restricted output.

**B.**   **The UFC has Monopsony Power in the Relevant Input Market**

**1.**   **The Relevant Input Market**

81.   The Relevant Input Market is the market for the services of Professional MMA Fighters who are ranked in the FightMatrix ranking database. MMA Promoters purchase the services of Professional MMA Fighters, typically paying compensation in exchange for participating as a combatant in a live Professional MMA Bout.

82.   Professional MMA Fighters are elite athletes who typically train for years before competing professionally. In live Professional MMA Bouts, Professional MMA Fighters compete by using multiple disciplines of martial arts, including wrestling, judo, jiu-jitsu, Muay Thai, karate, taekwondo and boxing. Such bouts are registered with, sanctioned by and conducted according to rules promulgated by the Athletic Commission (or equivalent thereof) for the jurisdiction in which the bout is held.

83.     Athletes who have trained for, and now engage in, sports other than MMA, including professional boxing, and those who engage in a single martial art, such as judo, are not substitutes for Professional MMA Fighters. For instance, boxers and those who engage in a single martial art are generally not trained in the additional forms of martial arts (which may include wrestling, judo, jiu-jitsu, taekwondo, Muay Thai and karate) necessary to become and successfully compete as a Professional MMA Fighter. *See* Class Cert. Order at 26 n.25 ("[T]raining to become an MMA Fighter tends to be specific to MMA and not generally transferrable to and from other combat sports.").

84.     Importantly, there are no reasonably interchangeable sports to which Professional MMA Fighters can turn when demand and compensation for Professional MMA Fighters is artificially suppressed below competitive levels. Other martial arts disciplines do not have the audiences necessary for Fighters to earn competitive wages or even generally to be paid at all. For this and other reasons, no material number of Professional MMA Fighters could successfully transition to other sports sufficient to prevent a monopsonist in the market for Professional MMA Fighter services from artificially suppressing Professional MMA Fighter compensation by even a small but significant amount for a substantial period of time.

85.     For instance, with respect to judo, tournaments occur infrequently, and the major ones (World Championships, Olympics) are for "amateur" Fighters, that is, unpaid athletes. Brazilian Jiu Jitsu ("BJJ") is a popular amateur sport, but there are very few tournaments that offer more than nominal prizes (as opposed to awarding salaries or prize money to competitors) and even those occur rarely. Karate and Muay Thai, much like BJJ and judo, are mainly amateur disciplines. Muay Thai and kick-boxing are striking disciplines that do not employ any of the grappling techniques in which MMA Fighters must be proficient in order to successfully compete. None of these sports would be plausible alternatives for Professional MMA Fighters who are facing artificial suppression of their compensation by a monopsonist in the market for Professional MMA Fighter services.

86.     Neither boxing nor "professional" WWE wrestling provides a reasonable alternative for Professional MMA Fighters. Professional boxing requires years of intensive, specialized and limited training in a striking art that MMA Fighters do not undergo. While Professional MMA Fighters do train in boxing, that is but one of many martial arts disciplines Professional MMA Fighters must practice, and

it is not (and, indeed, cannot be) their sole focus. As a result, an insufficient number of Professional MMA Fighters could successfully transition to boxing to prevent a monopsonist in the market for Professional MMA Fighter services from artificially suppressing Professional MMA Fighter compensation below competitive levels by even a small but significant degree for a substantial period of time.

87.     Although professional wrestling does pay compensation to its "wrestlers," professional wrestling events are staged, and depend predominantly on acting ability. It is extremely unusual for an athlete to possess the right combination of skills to excel in both MMA and professional wrestling, and furthermore, professional wrestling is not a sport at all requiring competition between athletes. For this reason alone, professional wrestling is not a reasonable substitute for MMA. An insufficient number of Professional MMA Fighters could successfully transition to professional wrestling to prevent a monopsonist in the market for Professional MMA Fighter services from artificially suppressing MMA Fighter compensation by even a significant degree for a substantial period of time.

88.     Because other sports are not plausible alternatives for Professional MMA Fighters, reducing the compensation of Professional MMA Fighters below competitive levels by even a small but significant degree for a substantial period of time will not cause sufficient numbers of Professional MMA Fighters to switch to other sports or professions to make the Professional MMA Fighter compensation suppression unprofitable. Quite simply, MMA is a highly specialized and unique sport engaged in by elite athletes with years of cross-disciplinary training.

89.     As discussed above, defining the Relevant Input Market to include fighters who are ranked in the FightMatrix database is an appropriate and conservative limitation. As described above, the UFC has virtually every top-ranked Fighter signed to an exclusive contract, and any would-be rival that hoped to compete with the UFC's dominance would require a critical mass of highly ranked Fighters. While unranked Fighters may compete for small, regional Promotions, unranked "Fighters with these minor league promoters are excluded from the Relevant Input Market definition because they are not reasonable substitutes for the market of individuals from which Zuffa and its competitors draw." Class Cert. Order at 25 n.24.

### 2. The Headliner Submarket

90.     Within the Relevant Input Market is a submarket for Headliner MMA Fighter services (the "Headliner Submarket"), in which MMA Promoters purchase the services of Professional MMA Fighters ranked in the top-15 in any of the ten major MMA weight classes as ranked by the website FightMatrix.com.[23]

91.     There are no close substitutes for MMA Promoters for their purchases of "Headliner" MMA Fighters' services. MMA Promoters rely on these Headliner MMA Fighters to draw audiences and viewers to the promoters' Live MMA Events. For the same reason, fighting as a "Headliner" is the primary career objective of Professional MMA Fighters; an objective that can only be achieved by defeating other highly-ranked MMA Fighters.

92.     As a Sports Business Journal analysis concluded:

> History tells us that for a pay-per-view to do big numbers, it needs marquee names: Chuck Liddell, Brock Lesnar, Rampage Jackson and Georges St-Pierre. Even if you don't know an arm bar from a rear naked choke, you've probably heard of those four, who from 2006 to today carried the highest pay-per-view averages of any main event fighter in MMA. During that span, those four fighters [] accounted for 17 of the 25 highest-selling pay-per-views. They held 11 of the top 14 slots, eight of the top 10, and six of the seven events that have exceeded a million . . . Exciting fights and a strong UFC brand can drive ratings and sell tickets, but sales estimates from the last nine years make it clear that it's the name at the top of the card that sells pay-per-views.

93.     The services of these headliner MMA Fighters are critical both to MMA Promoters' success in the Relevant Output Market and for MMA Promoters to be attractive purchasers of Professional MMA Fighters' services in the Relevant Input Market, making these services a unique, critical input for MMA Promoters competing in the Relevant Markets. These headliner services cannot be substituted with lower-ranked, non-headliner MMA Fighters.

### 3. The Relevant Geographic Market

94.     The Relevant Geographic Market for the Relevant Input Market and Headliner Submarket is the United States, and in the alternative, North America. *See* Class Cert. Order at 26.

---

[23] The Headliner Submarket includes MMA Promoters with MMA Fighters ranked in the top-15 in men's weight classes Heavyweight, Light Heavyweight, Middleweight, Welterweight, Lightweight, Featherweight, Bantamweight, and Flyweight, as well as women's Strawweight and Bantamweight.

95.     A monopsonist in the Relevant Input Market would need to control only the market for Professional MMA Fighter Services in the United States, or in the alternative, in North America, to be able to suppress Professional MMA Fighter compensation substantially below competitive levels.

96.     Professional MMA Fighters whose MMA Bouts are fought in or broadcast to the United States, or in the alternative, North America, do not view participation in MMA Bouts not fought in or broadcast to the United States (or, in the alternative, North America) as a reasonable substitute for bouts fought in or broadcast to the United States (or, in the alternative, North America). Exposure and access to U.S. audiences are critical to the careers of Professional MMA Fighters, and Professional MMA Fighters, as a result, do not view MMA Promoters who lack access to the U.S. MMA audience as a substitute for MMA Promoters with such access. Competing abroad imposes substantial costs on Professional MMA Fighters, including higher costs of training, travel, and lodging and reduced sponsorship income, and does not expose Professional MMA Fighters to U.S. (or, in the alternative, North American) audiences thereby thwarting Professional MMA Fighters' ability to build their notoriety and celebrity among such audience(s). Moreover, Professional United States MMA Fighters may have difficulty, or face significant costs associated with, obtaining necessary visas and approvals for themselves, family members, sparring partners, or trainers needed for fighting abroad. As a result, most U.S.-based MMA Fighters could not practically turn to a non-U.S.-based MMA Promotion company to earn a living or competitive compensation as a Professional MMA Fighter.

97.     Nearly all non-U.S.-based MMA Promotion companies focus on regional or local Fighters. Moreover, non-U.S.-based MMA Promoters frequently hold only a few events per year—very few of which are generally or widely open to non-locals. Further, non-U.S.-based MMA Promoters lack the dominance of the UFC and most MMA Fighters would not view non-U.S.-based Promoters as interchangeable with the UFC. In any case, the UFC deprives non-U.S.-based Promoters of access to top-flight and top-ranked Professional MMA Fighters. Accordingly, no significant number of United States Fighters can earn competitive compensation for appearing in live Professional MMA Events in foreign geographic markets.

98.     Successful foreign Fighters have immigrated to the United States to participate in Professional MMA Bouts. But, to the extent that a United States MMA Promoter such as the UFC is a net

32

importer of foreign labor, this fact would serve to enhance its monopsony power and bargaining power vis-à-vis United States MMA Fighters and MMA Fighters as a whole.

      **4.**     **The UFC has Monopsony Power with Respect to Professional MMA Fighter Services**

    99.    At all relevant times, the UFC had and continues to have monopsony power in the Relevant Input Market, *i.e.*, the market for Professional MMA Fighter services, whether that market includes only the United States, only North America, or, alternatively, the entire world.

    100.    The UFC has the vast majority of top-ranked and/or well-known Fighters across all major weight classes locked up under multi-bout exclusive agreements—which contracts, as discussed herein, are in practice effectively perpetual. Unlike other MMA Promoters, the UFC refuses to co-promote live Professional MMA Events in conjunction with other MMA Promoters, making UFC Fighters unavailable as opponents to any MMA Fighter selling his or her services in the Relevant Input Market unless the MMA Fighter signs a multi-bout exclusive contract with the UFC (which, once signed, perpetuates the Scheme further). In other words, the only way for Professional MMA Fighters to compete against other top-ranked MMA Fighters is therefore to sign a long-term exclusive agreement with the UFC. As a result of the UFC's Scheme, the UFC is the only purchaser of Professional MMA Fighter services that can offer Professional MMA Fighters (1) a wide array of actual and potential matchups against highly-ranked Professional MMA Fighters, (2) the opportunity to compete for the only titles in MMA that matter to MMA Fighters and fans, and therefore, (3) the opportunity to advance a Professional MMA Fighter's career and maximize such Professional MMA Fighter's earning potential in the bouts and events audiences want to see (and will pay top dollar for). In this way, the UFC's Scheme denies rival MMA Promoters the opportunity to build their reputations through the purchase of top Professional MMA Fighters' services and denies these other MMA Promoters' Fighters the opportunity to demonstrate their talent and rise in the ranks. These other MMA Promoters are thus stuck in the minor leagues because the UFC won't let them out. *See* Class Cert. Order at 32 ("[A]s Zuffa has acquired competitors and signed more and more fighters, competitors are cut off from increasingly large portions of the talent pool. The difficulty of accessing a talent pool capable of attracting enough commercial interest to turn a profit is

33

another artificial barrier to entry for competitors.").[24]

101.    The UFC controls the vast majority of the market for Professional MMA Fighter services (measured either in the UFC's share of the total amount paid to Professional MMA Fighters as a group or the total number of top-ranked, marketable MMA Fighters) whether the geographic market includes only the United States, only North America, or the entire world. The UFC possesses the ability to reduce the demand and compensation for Professional MMA Fighter services without losing so much revenue as to make its conduct unprofitable. Indeed, the UFC keeps more Professional MMA Fighters than it needs on its roster—an additional way in which the UFC denies other MMA Promoters access to the top-ranked Fighters necessary to build a successful MMA Promotion. UFC Fighters often sit idle for extended periods because the UFC refuses to schedule enough bouts to keep all of its Fighters busy—a practice known as "shelving." This practice makes little business sense except as an exercise of monopsony power and an exclusionary tactic. This tactic has the predictable spillover effect even at other MMA Promoters, which see their own top MMA Fighters sit idle for extended periods for lack of adequate available opponents.

102.    Indeed, in December 2023, plaintiffs' expert in the *Le* litigation, Dr. Hal J. Singer, extended his analyses of Zuffa's control over the Headliner Submarket to October 2023. *See* Fig. 1 below. Through that analysis, Dr. Singer demonstrated that the UFC's control over the most competitively significant MMA Fighters (as to both Relevant Markets), continues to the present. And that dominance remains true today.

---

[24] "As a single firm dominates more and more of the product market, especially by purchasing competitors, the labor that creates that product is necessarily more concentrated as well, allowing for opportunities for wage suppression." Class Cert Order at 26 & n.26 (citing T. Hyclak, G. Johnes & R. Thornton, Fundamentals of Labor Economics 211 (2d ed. 2012)).



FIGURE 1: ZUFFA MARKET SHARE OF RELEVANT INPUT MARKET OVER TIME
(THROUGH OCTOBER 2023)

103.    Due to the UFC's exclusive control of virtually all top Fighters, non-UFC Promoters in the Relevant Input Market cannot produce the marquee matchups that drive viewership, and their revenues—and ability to pay their Fighters competitively—suffer as a result. *See* Class Cert. Order at 57. ("As Zuffa's foreclosure share increases, its competitors' access to the critical input of fighters decreases and their concomitant ability to increase or maintain revenue also declines."). Moreover, Fighters for non-UFC Promoters in the Relevant Input Market find their careers stunted: Even the most promising Fighter is deprived access to the top-level matchups that would bring not only higher pay but also renown and career progress. The UFC, through its anticompetitive practices, thus artificially suppresses demand, compensation, and opportunity throughout the entire Relevant Input Market. Because the UFC denies alternative MMA Promoters access to the necessary input of top-ranked Fighters, other MMA Promoters cannot pay competitive compensation. And because there is little competition with the UFC for Fighters as a result of the Scheme, the UFC pays its own Fighters well below competitive levels as well. *See id.* at

32 ("[C]ompetitors' inability to effectively compete with Zuffa because of barriers to entry in the market significantly augments Zuffa's ability to suppress the compensation of its fighters.").

104.    The UFC's control of the Relevant Input Market affords it the ability to, *inter alia*, (i) impair and exclude MMA Promotion rivals, (ii) artificially suppress market-wide demand for Professional MMA Fighter services below competitive levels, leading to market-wide reduced compensation for Professional MMA Fighters, (iii) artificially restrict the career opportunities that would be available to Professional MMA Fighters in a competitive market, (iv) require UFC Fighters to enter into long-term exclusive contracts, and (v) impair or preclude UFC Fighters from negotiating competitive wages or working with would-be rival MMA Promoters.

105.    Barriers to entry in the Relevant Input Market are high. To attract top Professional MMA Fighters, an MMA Promotion requires a critical mass of top-ranked, well-known, Professional MMA Fighters who can freely compete for independent titles, or who are not exclusively bound to compete for one promoter's title. Without such top Professional MMA Fighters, other top Professional MMA Fighters will not consider an MMA Promotion to be a viable purchaser of fighter services in the Relevant Input Market. Through the Scheme alleged herein, the UFC has locked up the vast majority of critical inputs to long-term exclusive contracts, thus raising these barriers to entry for purchasing Professional MMA Fighters. Further, to become a Professional MMA Fighter, one needs to be highly skilled and spend many years undergoing specialized training in multiple martial arts disciplines. Because MMA is a unique blend of various martial arts disciplines, including boxing, Muay Thai (kickboxing), judo, wrestling, BJJ, taekwondo and karate, a high level of proficiency in any one discipline alone is not sufficient to achieve elite-level status as a Professional MMA Fighter. For example, while a professional boxer may possess the mental and athletic skill to box and take blows in the form of punches, if he does not possess expert ability to grapple, wrestle or engage in other martial arts, he will not succeed as a Professional MMA Fighter. Professional MMA Fighters are rare multidisciplinary athletes who can perform at very high levels in more than one discipline. Moreover, training is costly and time consuming. To achieve top-level status, Professional MMA Fighters train daily, making alternative simultaneous full-time employment nearly impossible. Training also requires the services of professional trainers, sparring partners, and the relevant space and training equipment. To rise to the level of a Professional MMA Fighter, a Professional

MMA Fighter typically needs to work his or her way up the ranks in local and regional Promotions, often earning very little money in the process. Moreover, because the only way to rise in the ranks is to fight against other top-ranked Fighters, and the UFC has locked up the vast majority of such Fighters to long-term exclusive deals, non-UFC MMA Promotions cannot gain access to top-ranked Fighters sufficient to compete effectively in the market for MMA Fighter Services. The barriers to becoming a Professional MMA Fighter are, thus, high, and once achieved, due to the UFC's Scheme, there are no significant competitors for Professional MMA Fighters' services other than the UFC. As a result, non-UFC Promotions suffer financially, while their Fighters see both their pay and their prospects in their chosen career artificially suppressed.

C.     **Overview of the MMA Industry and the UFC's Dominance**

106.     The popularity of MMA as a combat sport began to take off during the 1990s. Professional MMA has since become one of the most popular and fastest growing spectator sports in the United States and North America.

107.     Professional MMA Fighters are among the most respected professional athletes in the world. Professional MMA Fighters include world-class and Olympic athletes utilizing all disciplines of martial arts, including wrestling, judo, jiu-jitsu, Muay Thai, taekwondo, karate and boxing, in one-on-one bouts.

108.     Professional MMA Fighters typically work their way up the rankings by contracting with MMA Promoters who can offer them matchups against other appropriately matched and ranked MMA Fighters.

109.     MMA Promotions are not organized into leagues or teams in the manner common to many organized sports.

110.     MMA Promoters host events that ordinarily contain seven to twelve bouts on a Card, organized by recognized weight classes. The Card at a typical event includes an Undercard—a set of preliminary bouts that generally feature up-and-coming and/or local Professional MMA Fighters—and the Main Card, which typically features Professional MMA Fighters who are further along in their careers and/or possess higher levels of public notoriety. The last bout on the Card, referred to as the Main Event, is typically between two well-known and highly ranked Professional MMA Fighters and

37

frequently a title fight. The Main Event usually gives the event its title and is the biggest draw on the Card. The Main Event is the primary driver of PPV buys, ticket sales, broadcast revenues, and advertising sales. For example, for "UFC 229: Nurmagomedov vs. McGregor," which took place on October 6, 2018, the main event was between two of the most well-known Fighters in the history of MMA: then-reigning UFC lightweight champion Khabib Nurmagomedov, widely considered to be one of the greatest MMA Fighters of all time, and former featherweight and lightweight champion Conor McGregor. The event sold 2.4 million PPV buys valued at $180 million.

111.    The strength of the Card, and in particular the attractiveness to audiences of the main event, draws ticket purchases for live events as well as viewers for broadcasts and purchases of PPV access (provided the MMA Promotion garners PPV distribution). During the Class Period, it has been and continues to be extremely rare for a bout that is not promoted by the UFC to have PPV distribution.

112.    Professional MMA Events are sanctioned in the United States by the same state athletic commissions as boxing. Nearly all athletic commissions in North America are members of the Association of Boxing Commissions ("ABC"). All member commissions of the ABC are encouraged to pass the Unified Rules of Mixed Martial Arts which govern Professional MMA Bouts and establish MMA weight classes, ring-fighting area requirements and equipment, length and number of rounds in a bout, the rest period between rounds, the nature of the protective gear worn by Fighters, judging requirements, fouls, and other bout rules and regulations.

**D.     The UFC's Complete Control of Its Sport Is Unique in the Context of Big-Time Professional Sports**

113.    As more fully set forth herein, due to the anticompetitive Scheme alleged herein, the UFC has monopsonized the Relevant Input Market and monopolized the Relevant Output Market, impairing actual and potential rival MMA Promoters, suppressing compensation to Professional MMA Fighters, and limiting Professional MMA Fighters' career opportunities.

114.    Athletes in other sports such as boxing and the "Big 4," *i.e.*, football, baseball, basketball, and hockey in the United States, have multiple competitively significant purchasers of their services, whether the teams in the National Football League, Major League Baseball, the National Basketball Association, or the National Hockey League, or the various major boxing promoters, and as a result such

athletes offer their services in more competitive markets and are paid more handsomely for it. The numerous purchasers of such athletes' services allow for greater athlete mobility between purchasers, something that is all but absent in the MMA Industry, in which the UFC has locked virtually every top Fighter into a long-term, effectively perpetual contract. By controlling a fighters rank and ability to ascend the rankings, the UFC dictates which fighters to garner public notoriety sufficient to create highly lucrative bouts and which fighters are allowed to compete for its title. As Lou Dibella observed, by enabling the promoter to control rank and title, the promoter ". . .would have total control. The entity paying the fighter would be the one determining who the champion is, determining who the challengers would be and basically, would put it into a, you know, a near total control over the Fighter." Or as Joe Silva wrote to Jon Fitch's manager, you know "I would make sure he is tied up" before giving Fitch a title shot. Due to the UFC's Scheme, both UFC and non-UFC Fighters lack the ability to pursue career opportunities in a competitive market. The direct and proximate result is that all Professional MMA Fighters make significantly less, and are presented with fewer career opportunities, than they would with greater competition absent the Scheme alleged herein.

## VII.   THE UFC's ANTICOMPETITIVE SCHEME AND ITS RESULTING ANTITRUST INJURIES TO PLAINTIFF AND MEMBERS OF THE CLASS

### A.   The UFC's Anticompetitive Scheme to Acquire, Maintain, and Enhance Monopsony Power

#### 1.   The UFC Has Leveraged Its Monopoly and Monopsony Power to Deny Necessary Inputs to Would-Be Rival MMA Promoters

115.   The UFC has illegally acquired, maintained, and exercised monopsony power in the market for Professional MMA Fighter services, *i.e.*, the Relevant Input Market, through an aggressive Scheme involving a series of exclusionary and anticompetitive acts. The anticompetitive effects associated with this ill-gotten monopsony power manifest themselves as artificially suppressed demand and compensation for Professional MMA Fighters in the Class and reduced output of Professional MMA Bouts.

116.   Unless an MMA Promoter can attract and have access to a critical mass of top-ranked Professional MMA Fighters, it cannot compete successfully in the Relevant Input or Output Markets. MMA Promoters cannot attract top-level Professional MMA Fighters unless they can demonstrate to such

athletes that they can promote profitable bouts that will result in meaningful opportunities to rise in the rankings (because the Promotion has a critical mass of top Fighters and thus is capable of creating multiple match-ups of top Fighters) and gain increased notoriety such that Fighters have the ability to earn significant compensation, success, and renown over an extended period of time. To succeed in the MMA Industry, Professional MMA Fighters must have the ability to compete against other top-ranked Fighters for championship belts that matter to fans and Fighters and register wins in widely viewed MMA Events that build public notoriety, reputation, and earnings potential. Without big-ticket MMA Cards with top-ranked Professional MMA Fighters, or the ability to offer championship belts that matter in the industry, rival MMA Promoters are unable to promote matchups that promise either sufficient revenues (and thus Bout purses) or career-advancement opportunities to attract top-tier Professional MMA Fighters. The UFC, knowing this, has engaged in a Scheme to deny actual or potential rival MMA Promoters (and any potential future rivals) the access to inputs necessary to promote successful MMA events or attract Professional MMA Fighters who are highly ranked or have the potential to become highly ranked (*e.g.*, a critical mass of top-level Professional MMA Fighters).

        a.    **The UFC Uses Restrictive, Exclusive Contracts with UFC Fighters to Impair Rival Promoters' Ability to Compete by Foreclosing Access to High-Quality, Top Ranked Fighters.**

117.    The UFC has illegally obtained and maintained monopoly power in the Relevant Output Market and monopsony power in the Relevant Input Market through an anticompetitive Scheme to exclude and impair actual and potential rival MMA Promoters by foreclosing access to a deep pool of elite Professional MMA Fighters necessary to sustain and grow a profitable rival MMA Promotion, and by restricting access to virtually all highly ranked professional MMA Fighters who are necessary to promote bouts that appeal to the general public. As a result of this and other aspects of the Scheme, the UFC has impaired the ability of rival or potential rival Professional MMA Promotions to reach efficient scale or to be sufficiently profitable to compensate their Fighters competitively. These rival Promotions' Fighters not only suffer suppressed pay but also—due to the UFC's control over top Fighters and refusal to co-promote—have no means of accessing the marquee matchups that would allow them to build their brands and careers.

118.    The UFC has sustained its monopsony power, in substantial part, through its Scheme involving the use of exclusive agreements with UFC Fighters that lock in Professional MMA Fighter services perpetually and exclusively for the UFC. The UFC's long-term exclusive contracts foreclose would-be rival Promoters from vital inputs—namely, access to a deep pool of top-ranked Professional MMA Fighters with the fame and ability needed to sustain a successful live Professional MMA Promotion. Discussing the UFC's exclusive contracts, White has conceded that, across the MMA Industry, "everybody knows how crazy we are about protecting our contracts."

119.    Through the anticompetitive Scheme alleged herein, including by successfully eliminating and impairing actual or potential rivals in the Relevant Input and Output Markets, the UFC has garnered and maintained unrivaled bargaining power vis-à-vis Professional MMA Fighters. The UFC uses its monopsony power to extract exclusionary and restrictive concessions from all UFC Fighters.

120.    The UFC classifies its Fighters as independent contractors, who are compensated based on the number of fights in which they participate. But the UFC uses standard-form agreements with all or nearly all its Fighters that require exclusivity during the term of the agreements and extending after the term technically expires, often long after it expires. Given that, through the Scheme alleged herein, the UFC dominates the Relevant Markets, Professional MMA Fighters have little choice but to accept the UFC's exclusionary terms if they want to try to earn a living and rise in the ranks as Professional MMA Fighters. As Zuffa repeatedly admitted—at least until Francis Ngannou, discussed below—"no athlete has left the UFC that the Company wanted to retain."

121.    At all times relevant to this litigation, the UFC's standard agreements with Fighters have contained at least the following restrictive provisions:

        a.    The "Exclusivity Clause," which binds UFC Fighters into a restricted relationship with the UFC and prohibits them from appearing in bouts televised or organized by actual or potential rival Promotions unless approved by the UFC, thus preventing athletes from receiving competitive purses from co-promoted or competitor MMA events. This clause blocks actual or potential rival Promotions from having access to Professional MMA Fighters under contract with the UFC for protracted periods of time. Regardless of the term of the agreement, the provision includes various termination and extension clauses that can be triggered at the UFC's sole discretion, thereby effectively extending the exclusivity

1   provisions indefinitely.

2           b.      The "Champion's Clause," which allows the UFC, at its discretion alone, to extend

3   a UFC Fighter's contract for one year or three bouts for a Fighter who is a "champion" in his or her

4   weight class, preventing the Fighter from financially benefiting from his or her "championship" status by

5   soliciting competing bids from other MMA Promotions even after the end of his or her original UFC

6   contract term. This clause specifically blocks actual or potential rival Promotions from having access to

7   successful Professional MMA Fighters, which are needed for a would-be rival event to be commercially

8   successful. This clause (combined with other aspects of the UFC's Fighter contracts) denies UFC Fighters

9   free agency—despite their being independent contractors—thereby retaining the Fighter's services for

10  the UFC effectively indefinitely.

11          c.      The "Exclusive Negotiation Period" and "Right to Match" Clauses, which give the

12  UFC at least 30 days of exclusive negotiation rights after the term of the Fighter's contract has officially

13  expired and then another four months to match the financial terms and conditions of any offer made to a

14  UFC Fighter from a rival Promotion. Because the UFC Fighter would need to refrain from earning

15  money in his or her chosen profession for nearly half a year in order to fight for another Promotion

16  against the UFC's will, these clauses, in the context of the other portions of the UFC Fighter contracts,

17  make it nearly impossible for a Fighter to leave the UFC if the UFC wants to keep that Fighter. As the *Le*

18  Court found, the "devastating economic effect" of forgoing any income for "a significant portion of a

19  Fighter's career . . . effectively and practically force[s] Fighters to re-sign with Defendant if they wanted

20  to continue to be competitive MMA Fighters." Class Cert. Order at 36.

21          d.      The "Promotion Clause," which requires UFC Fighters to attend, cooperate, and

22  assist in the promotion of bouts in which they fight and, as required by the UFC, any other bouts, events,

23  broadcasts, press conferences and sale of merchandise, for no additional compensation. By contrast, no

24  affirmative obligation exists for the UFC to promote the UFC Fighter. In fact, the UFC regularly punishes

25  athletes who do not bow to its whims. As just one example, UFC light-heavyweight champion Jon Jones

26  refused to take a short-notice replacement of one of his opponents, as MMA Fighters typically train for

27  bouts with a specific opponent. After his refusal, the UFC issued a press release stating, "Lorenzo Fertitta

28  (UFC chairman and CEO) and I [Dana White] are disgusted with Jon Jones and Greg Jackson [Jones

trainer]." White continued by stating, "UFC 151 will be remembered as the event Jon Jones and Greg Jackson murdered." By denigrating the UFC Fighter in public, the UFC reduces a Fighter's earnings ability as the consuming audience will support events featuring the UFC Fighter in lower numbers, leading to reduced payments for bouts and endorsements.

e.    The "Retirement Clause," which gives the UFC the power "to retain the rights to a retired Fighter" for four years when a Fighter retires before competing in the specified number of bouts in his or her UFC contract.

f.    Tolling provisions, which extend the term of the UFC Fighter's contract during periods when he or she is injured, retired, or otherwise declines to compete, thus virtually prohibiting even disgruntled athletes from sitting out the term and signing with a would-be rival Promoter.

g.    The "Sponsorship and Endorsement Clause," which grants the UFC sole discretion over all sponsorship and endorsement approvals. In effect, the Sponsorship and Endorsement Clause requires the approval of the UFC before an entity can contract with a UFC Fighter to sponsor or endorse the entity's product or service during any UFC events. This gives the UFC control over sponsors and Fighters and allows the UFC to block opportunities for sponsors where: (i) the UFC has decided to boycott the sponsor in retaliation for the sponsor having endorsed non-UFC Fighters or otherwise worked with actual or potential rival MMA Promoters; (ii) the sponsors have refused to pay the UFC's "sponsorship tax," which is a fee paid to the UFC for the right to sponsor a UFC Fighter; or (iii) the sponsors are engaged in ancillary business endeavors that compete with the UFC in any segment of the MMA Industry that the UFC intends to dominate, such as, *e.g.*, MMA publications, MMA video games, gyms, online MMA stores, energy drinks, online gaming sites, fan festivals and apparel providers. This clause gives substantial power to the UFC to block sponsors from working with actual or potential rival Promoters and to deprive them of key revenue opportunities for themselves and their Fighters, making actual or potential rivals less profitable and a less attractive option for top-ranked Professional MMA Fighters.

122.    As the UFC gained and then maintained market and monopsony power through this anticompetitive Scheme, including by impairing actual or potential rivals, it added provisions—such as additional restrictions on sponsorship rights—that further enhanced the UFC's control over its Fighters.

1

**b.    The UFC Uses Threats, Intimidation, and Retaliation to Prevent MMA Fighters from Working for Would-Be Rivals.**

2

123.    As part of its exclusionary Scheme, the UFC has threatened, intimidated, and/or retaliated

3

against: (i) UFC Fighters who work or threaten to work with other Promoters, (ii) MMA Fighters

4

working with other Promoters who might someday wish to compete in the UFC, and (iii) other Promoters

5

who attempt to work with UFC Fighters. As a result, UFC Fighters have refused offers to fight for

6

potential rival Promoters, or declined to even inquire into alternative employment possibilities, out of

7

fear that the UFC would retaliate against both the Promoter and the Fighter. And in the rare event that a

8

UFC Fighter does escape the UFC's control, it is only at peril of the great financial and reputational harm

9

inflicted by the UFC's coercive and retaliatory conduct. As a result, Professional MMA Fighters are

10

deterred from even testing the waters of free agency: Professional MMA Fighters recognize that being

11

blackballed from future opportunities to fight for the UFC will substantially diminish their abilities to

12

earn income as Professional MMA Fighters, and that attempting to seek alternative opportunities to

13

compete risks an aggressive, targeted retaliatory campaign. Moreover, the UFC has control over key

14

sponsors, sponsors the UFC threatens never to work with if they contract with a Professional MMA

15

Fighter against the UFC's wishes.

16

124.    The UFC uses its market dominance, restrictive contract provisions, and the looming

17

threat of retaliation to render its multi-bout exclusive contracts effectively perpetual. As UFC officials

18

admit, the UFC's practice is to require each Fighter to re-sign a new exclusive deal *before* the last fight in

19

the Fighter's current contract. In the words of longtime UFC matchmaker Joe Silva: "I always

20

renegotiate before the last fight." And as former UFC executive Michael Mersch explained, "if a Fighter

21

is successful under a 4-fight deal, we typically negotiate a new agreement after the 3rd fight s*o he never*

22

*will see the end of his contract* and, assuming the Fighter is successful, or at least competitive, that is the

23

process that will continue thereafter."

24

125.    This practice opened another avenue for what the *Le* Court described as the UFC's "brutal

25

coercive tactics." Class Cert. Order at 38. If a UFC Fighter refused to resign before his final bout, the

26

UFC would match the Fighter against a suboptimal opponent for that bout, including by forcing the

27

Fighter to face a more skilled opponent who was likely to hurt or seriously injure the Fighter. As Silva

28

44

stated, if a UFC Fighter refused to sign a new contract, he would "put him in a prelim [a low-viewership event] against a really tough guy for his last fight," ensuring that the Fighter—even if not seriously injured—would face diminished career prospects after the contract ended. Silva was known to tell Fighters that "if you don't like the first fight I offer you, you're sure as shit not going to like the second one." In the words of the *Le* Court, the "variety of coercion tactics available to Defendant, in conjunction with the restrictive contractual provisions, ensured that Defendant could maintain almost perpetual control over Fighters." *Id.* at 39. In one highly publicized example, UFC veteran Gray Maynard detailed a conversation with then head UFC matchmaker Joe Silva about facing Roger Huerta. Maynard stated that because Roger Huerta had fallen out of favor with the UFC, "Joe told me he wanted me to go out and break his arm."

126.    The many instances in which the UFC has used these coercive tactics to maintain perpetual control over top MMA Fighters and stifle competition are well-established. In recent years, moreover, the UFC has become only more aggressive in exerting its vise grip over top Fighters' careers. The most illustrative instance involves Francis Ngannou, a champion Cameroonian-French heavyweight MMA Fighter who currently fights for PFL, the same Promotion as Plaintiff Davis.

127.    Ngannou began fighting for the UFC in 2015 and won his first UFC heavyweight title in 2021. Ngannou then turned down multiple extension offers from the UFC, leading to the "exceptionally rare" situation in which Ngannou "fought out" his contract—refusing to sign a new contract before his present contract expired—the last fight of which was his successful heavyweight title defense against Ciryl Gane in January 2022.

128.    Ngannou rebuffed the UFC's efforts to re-sign him to the UFC's standard contract. As Ngannou stated about the standard-form UFC contract: "In that contract, I'm not free. In that contract, I'm not an independent contractor. In that contract, I have no rights, I have no power. I hand over all the power to you guys, and I've seen in the past how you can utilize that power."

129.    For the UFC, Ngannou's request to alter its standard-form provisions that help render its exclusive contracts perpetual was a nonstarter. So UFC executives responded to Ngannou's requests with their familiar coercive playbook. Because Ngannou was a titleholder at the end of this deal, the UFC could invoke his Champion's Clause, which allows the UFC to unilaterally extend a "champion's"

contract by three fights or one year. Of course, for a champion who does not want to fight for the UFC, the Champion's Clause—combined with the contract's tolling provisions—renders any contract perpetual until the Fighter acquiesces. Ngannou thus sat idle, at the prime of his career, for the rest of 2022, unable to escape his perpetual contract and unwilling to submit the UFC's control.

130.     Ngannou was able to escape his contract at the end of 2022 thanks only to a little-known, short-lived loophole in post-2017 UFC contracts known as the "Sunset Clause." This clause provided that Ngannou's contract—signed at the end of 2017—could not be unilaterally extended more than 5 years beyond its effective date. The Sunset Clause overrode the Champion's Clause's perpetual extension rights, allowing Ngannou to access free agency at the end of 2022. Ngannou then signed with PFL— becoming, by far, the biggest star MMA Fighter to leave the UFC for another Promotion—in exchange for freedom to pursue a boxing career, as well as equity and leadership positions in PFL, including a position as chairman of PFL Africa. In response, the UFC quickly and decisively altered its contractual language to prevent any future Fighter from using the Sunset Clause to access free agency—including by allowing the UFC to toll the Sunset Clause's five-year clock if a Fighter turns down a fight, among other reasons. Due to the Sunset Clause that Ngannou had in his contract, Ngannou was able to negotiate with MMA Promoters as a complete free agent, something unheard of for UFC champions, and as a result was able to sign a contract described as "unprecedented" in the sport. A contract that not only paid more than typical in the industry but that allowed him to accept lucrative boxing matches while also having a termination date after a few years with no extensions for a champions clause.

131.     Having lost Ngannou to a since-eliminated loophole, the UFC turned to its usual tactics of intimidation and retaliation to ensure no future Fighter would make a similar attempt. Dana White repeatedly attacked Ngannou personally, describing Ngannou's decision to leave as "a bunch of bullshit" that reflected his desire to "fight lesser opponents." The UFC stripped Ngannou of his heavyweight title, before publicly blackballing him from any future relationship with the UFC. In White's words: "It's over . . . . He'll never be in the UFC again."

132.     Although Ngannou was able to escape his UFC contract due to a since-closed and short-lived loophole to sign with PFL, a single contract with one high-level MMA Fighter is far from sufficient to allow PFL to compete with the UFC's dominance. Indeed, since signing with PFL, Ngannou has

appeared in only one bout for PFL, in October 2024 against the then-10[th] ranked heavyweight fighter (now 12th ranked heavyweight), with the UFC controlling 8 of the top 10-ranked heavyweights in October 2024 and 7 of the top 10-ranked heavyweights today.

133.    Moreover, Ngannou's saga—in which one of the most popular MMA Fighters in the world had to sit inactive for a full year, exploit a one-time contractual loophole, and suffer a public smear campaign just to test free agency—demonstrates the extreme chilling effect of the UFC's coercive conduct on any UFC Fighter who would think to compete for potential rival Promotions. PFL founder Donn Davis acknowledged the difficulty in finding an opponent that would allow them to use Ngannou properly: "I think the opponents in pure MMA are not that interesting right now."

### 2.    The UFC Impaired and then Acquired Its Largest Would-Be Rivals, Giving It Dominant Shares of the Relevant Input and Output Markets

134.    The UFC's Scheme successfully blocked actual or potential rival Promoters from accessing inputs necessary to put on successful MMA events and to operate, sustain, and grow successful MMA Promotions that could eventually compete directly with the UFC. This Scheme put several actual or potential rival MMA Promoters out of business. Those companies that were not forced to exit the MMA Promotion business were weakened to such a degree that selling out to the UFC or becoming a "feeder" or "developmental" Promotion for the UFC became the only realistic options. As a result, and as part of the Scheme, from December 2006 to March 2011, the UFC engaged in a series of strategic acquisitions of competing MMA Promoters, culminating with its acquisition of its top rival MMA Promotion, Strikeforce. The UFC's acquisitions, along with other aspects of the exclusionary Scheme, resulted in the UFC becoming, by its own admission, the only meaningful Promoter of live Professional MMA Events in the United States and North America, enhancing the UFC's monopoly power in the Relevant Output Market and monopsony power in the Relevant Input Market.

135.    Beginning at least as early as December 2006, the UFC embarked on a campaign to monopolize and monopsonize the Relevant Markets. As part of a deliberate plan to consolidate the MMA Industry and more broadly solidify its control over the Relevant Markets, the UFC began acquiring its competitors one by one. In December 2006, the UFC announced the acquisition of assets of actual or potential rival Promoters World Extreme Cagefighting ("WEC") and World Fighting Alliance ("WFA").

Initially, the UFC operated WEC, based in California, as a separate MMA Promotion company, broadcast on a separate cable network to block would-be rivals from being televised on the network. But in October 2010, the UFC announced that it was merging the WEC and all of its Fighters with the UFC. The UFC's acquisition of WEC enabled the UFC to eliminate a would-be rival for Professional MMA Fighters in heavier weight classes, while also acquiring the major Promotion entity for Fighters in lighter weight classes. The UFC also acquired Pride and several other would-be rival Promoters in 2007.

136.    Between 2008 and 2011, and continuing into the present, the UFC accelerated its aggressive anticompetitive campaign. As part of the Scheme alleged herein, the UFC's efforts to prevent any successful competitive activity by new entrants directly contributed to the impairment and ultimate failure of the following MMA Promoters, among others:

a.    Affliction Entertainment/Golden Boy Promotions. Golden Boy Promotions is the promotional arm of legendary boxer Oscar de la Hoya. Golden Boy partnered with Affliction Entertainment and entered the market for promotion of live Professional MMA Events for less than one year before being forced to pull out in 2009 after just two events. As part of its Scheme, the UFC forced Affliction, a niche apparel provider, to exit the MMA Promotion business by raising its costs and blocking Affliction from continuing to sponsor any UFC Fighters. When asked why Golden Boy did not pursue further events, De La Hoya was clear: "[I]t's just because I received too much heat from Dana White. That's literally the bottom line. . . . I decided I'm going to stay in my own lane."

b.    HDNet Fights. HDNet Fights was founded in 2007 by billionaire owner of the Dallas Mavericks and HDNet founder, Mark Cuban. HDNet Fights briefly promoted its own live Professional MMA Bouts. By 2009, the UFC had forced Cuban to shut down and, instead, become a bondholder in Zuffa. The combination of the UFC's Exclusive Promotional Agreements, its persistent refusal to co-promote, and its blocking of the ability of Professional MMA Fighters to self-promote, even after the terms of their contracts had expired, prevented Cuban's Promotion company from promoting potentially lucrative fights, including a proposed mega fight between Randy Couture and Russian superstar Fedor Emelianenko.

137.    By 2011, the only potentially robust competitor to the UFC was Strikeforce, an MMA Promotion company that had been threatening to become a major force in the MMA Industry. Strikeforce

had a strong roster of top-ranked Professional MMA Fighters, and at the time was the only major MMA outfit promoting women's MMA. It also had signed lucrative broadcast deals with Showtime and CBS. Strikeforce publicly announced its desire to co-promote high-level MMA events with international Promoters, and had a number of co-promotional arrangements, including co-promotional arrangements with Russian Promoter M-1 and the Japanese Promotion Dream. Co-promotional arrangements, common in boxing, mean athletes promoted by competing Promoters fight against each other in co-promoted events with a split of profits generated.

138.    As part of the exclusionary Scheme, in the years before 2011, the UFC had actively sought to use its market dominance to put Strikeforce out of business. For instance, as part of this Scheme—even when it was not economically rational but for the potential for exclusion—the UFC regularly "counterprogrammed" against Strikeforce events, *i.e.*, purposely staged UFC events on the same nights as Strikeforce events to prevent Strikeforce from gaining adequate ticket sales, television viewers or public notoriety for its events. The UFC counter-programmed against Strikeforce not because it was profitable in the short-run, but rather because it was a means of using the UFC's dominance in the Relevant Markets to prevent Strikeforce from successfully promoting MMA events and thereby gaining adequate economies of scale or scope. Moreover, the UFC used its market power to pressure sponsors of Strikeforce's MMA Fighters to withdraw their sponsorships by threatening to ban them from sponsoring UFC Fighters or otherwise appearing in UFC broadcasts.

139.    In March 2011, as part of the Scheme alleged herein, after the UFC had made it difficult for Strikeforce to compete profitably, Strikeforce was forced to sell to Defendant Zuffa. Following the purchase, the UFC signed many of Strikeforce's top stars and champions, including Cung Le, Jason Miller, Nick Diaz, Dan Henderson, and Alistair Overeem. Under Zuffa's ownership, Strikeforce closed the Promotion's men's weight classes below "lightweight." After an extension was reached to continue Strikeforce as a separate entity under the UFC's umbrella through 2012, the Promotion's heavyweight division was merged into the UFC, and the UFC ended the Promotion's "Challengers" series. The final show under the Strikeforce brand was "Strikeforce: Marquardt vs. Saffiedine" on January 1, 2013, after which the UFC dissolved the Promotion and all Fighter contracts were either ended (where the UFC did not find them valuable) or absorbed into the UFC.

140.    After the UFC's acquisition of Strikeforce, the UFC controlled virtually all top-ranked Professional MMA Fighters in every weight class—which, in the words of Joe Silva, meant that the UFC "own[ed] MMA." The Strikeforce acquisition was part of a series of UFC acquisitions of actual or potential rival Promotions that, together, enabled the UFC to consolidate and maintain its control over the revenue-generating core of the MMA Industry. While they proclaimed to promote the best in every weight class prior to the Strikeforce acquisition, following the Strikeforce purchase, the UFC could accurately state that it now controlled virtually all top-ranked Professional MMA Fighters in every weight class. Going forward, this insured that, to succeed in Professional MMA and achieve corresponding public notoriety, a Professional MMA Fighter must sign with the UFC and compete against UFC Fighters for UFC championship belts.

141.    These acquisitions served one purpose: eliminate competition and consolidate the UFC's iron grip over the careers and contracts of virtually all top Professional MMA Fighters. As the *Le* Court concluded, the UFC can point to no "meaningful evidence that these acquisitions were procompetitive or contributed to the development of the industry." Class Cert. Order at 40. Instead, the Court found, "[t]hese acquisitions consciously eliminated would-be rivals to which Fighters might otherwise have switched. This conduct substantially foreclosed competition and had market-wide anticompetitive effects without any recognizable procompetitive benefits." *Id.* This result, moreover, was deliberate: "The record establishes that undermining competitors was important to Zuffa leadership and an essential part of its strategy to establish market dominance." *Id.*

### 3.    The UFC Relegated all Remaining MMA Promoters to "Minor League" Status

142.    Beginning no later than March 2011, those few fringe MMA Promoters that the UFC had not yet acquired or put out of business, such as Bellator, Legacy, Titan, and Invicta, effectively functioned and continue to function as "minor leagues" or feeder Promotions for the UFC. *See* Class Cert. Order at 10. These MMA Promotion outfits provide no real access to top media rankings, public notoriety, lucrative bout purses, endorsements, or sponsorships. Thus, through its anticompetitive Scheme, the UFC has come to dominate, and maintain dominance in, the Relevant Input and Output Markets.

143.    Professional MMA Fighters generally view non-UFC Promotion companies that still exist as the "minor leagues," *i.e.*, as training grounds for future UFC Fighters. While skilled Professional MMA Fighters may emerge outside of the UFC or break off from the UFC, those Fighters cannot demonstrate their skill, garner attention, or otherwise maintain sustainable careers outside of the UFC. The measure of success of a Professional MMA Fighter is dependent upon the level of competition he or she faces and his or her success or failure when doing so. The success of a Professional MMA Fighter requires that he or she register wins over Fighters seen by the viewing audience and media as top-ranked or otherwise well-known Professional MMA Fighters in widely viewed MMA Events to build public notoriety, reputation, sponsor interest, and earnings potential. Professional MMA Fighters who compete at the highest level of the sport cannot "opt out" of the UFC because the UFC's anticompetitive conduct has made it impossible to maintain a successful MMA fighting career outside of the UFC. Likewise, because UFC Fighters are bound by non-compete agreements, and because the UFC will not co-promote, would-be rival MMA Promotion companies cannot stage bouts between their own non-UFC Fighters and UFC Fighters.

144.    As a result, each day a Fighter competes for a rival Promotion, he suffers not only suppressed pay for his Bouts, but also irreparable career harm. As the *Le* Court noted, the UFC's Scheme was "particularly effective because of the short duration of an average MMA Fighter's career"—roughly 31-41 months, or 5-6 bouts. Class Cert. Order at 39. Particularly for a young Fighter at the start of his career, each Bout spent competing against an artificially inhibited talent pool increases the likelihood that he will never reach his full potential; the UFC's iron grip over the Relevant Input Market of top Fighters and the Relevant Output Market of widely viewed events ensures that, unless and until he signs with the UFC, he will toil in obscurity in the "minor leagues."

145.    Accepting and publicly acknowledging their "minor league" status, rather than competing with the UFC, potential rival Promotions in the MMA Promotion Industry seek instead to work as developmental and feeder promotions for the UFC and to obtain the UFC's approval. Rather than invest in and develop Professional MMA Fighters to their full potential, the UFC's potential rival Promoters acknowledge that they can afford only small purses. Thus, "rival" Promoters survive and attract Professional MMA Fighters by serving as a "minor league" training ground for the UFC and

guaranteeing their Fighters' release to the UFC—and only the UFC—should the Professional MMA Fighter achieve enough success and earn enough notoriety to potentially obtain an offer from the UFC. *See* Class Cert. Order at 10 (describing the purpose of "minor league" Promoters as to "essentially develop fighters to eventually farm out to the UFC"). Alternatively, non-UFC MMA Promotions attract MMA Fighters on the downsides of their careers that the UFC no longer wishes to retain. Either way, potential rival Promotions cannot put on events that compete with the UFC and cannot offer potential top-level MMA Fighters opportunities to advance their careers.

146.    Legacy Fighting Alliance and Titan Fighting Championship are two such UFC "minor leagues." According to Legacy CEO Ed Soares, his "vision" was "to build a developmental league for guys who want to move up into the UFC." Soares further acknowledged that all Resurrection MMA Fighters who received offers from the UFC would be released from their Resurrection promotional agreements pursuant to those agreements' "Zuffa-out" clauses. In 2016, after Legacy merged with Resurrection Fighting Alliance, Soares reiterated his vision, emphasizing that Legacy was the "NCAA of MMA," that there was no "competition" with UFC, and that Legacy Fighters were "fighting for an opportunity to get seen and to get noticed and to go up to the upper organization [UFC] to make money." Titan, a regional Promotion formed in 2006 and promoted by Jeffrey Aronson, similarly provides its Fighters with Zuffa-out clauses. In the words of Aronson, Titan is "is not looking to compete with the UFC" but rather to give MMA Fighters "a forum to get back" into the UFC. Titan is broadcast exclusively on the UFC's internet broadcast subscription service, "Fight Pass."

147.    Invicta Fighting Championship ("Invicta"), which also broadcasts exclusively on Fight Pass, was formed in 2012 and promotes only women's MMA events. Shannon Knapp, the founder and owner of Invicta, likewise insists that Invicta does not aim to compete directly with the UFC but rather functions as a platform from which female Professional MMA Fighters can "graduate" or "advance" to the UFC.

148.    Responding to questions regarding whether Invicta (and all other MMA Promoters) were being established as "feeder" Promotions to the UFC, White stated: "As bad as people don't want to believe it, they don't want to hear it, meaning the other owners of the other mixed martial arts organizations, that's what they all are: They're all the Triple-A [*i.e.*, the minor leagues] to the UFC."

White continued by boasting that all Promotions that resist minor league status "end up $30 million in the hole. All the people that don't embrace it, embrace losing shitloads of money."

149. ONE Championship is a pan-Asian Promoter that the *Le* Court found "[l]ogically . . . do[es] not meaningfully compete" with American Promoters like the UFC in the Relevant Geographic Market. Class Cert. Order at 26. Though ONE has long teased a foray into the American market, it has to date promoted only two MMA Events in the United States—a 2023 event in Broomfield, Colorado, and a 2024 event in Denver—with no other planned events on the horizon.

150. Now-defunct Bellator MMA, as noted above, was viewed within the MMA Industry—and by the UFC itself—as a "minor league," a training ground for future UFC Fighters, or as a place for former UFC Fighters to compete after they have been released by the UFC. As White said in 2013 of Professional MMA Fighters under contract with Bellator: "I feel sorry for the kids that fight there. I do. I truly feel sorry for the kids that have to be stuck in that shithole." After years of struggling to stay afloat, Bellator was finally purchased and shuttered by PFL.

151. PFL, which was founded in 2018, is due to the Scheme alleged herein itself a minor league Promoter that has failed to meaningfully compete with the UFC. Its Fighters lack significant public followings. Its bout purses, gate revenues, attendance figures, merchandise sales, television licensing fees and ad rates are minimal compared to those obtained by the UFC. As Dana White stated about PFL's acquisition of Bellator: "One shitty organization that sells no tickets and nobody watches buys another shitty organization that sells no tickets and nobody watches. Sounds like a fucking winner to me." And as TKO President and COO Shapiro stated about PFL: "[M]ake no doubt about it: they are the B-squad."

152. PFL itself has made clear that its core business model is to compete for viewers abroad, outside the Relevant Geographic Market. PFL has announced its plan to launch six international regional leagues by 2026, including PFL Europe and PFL Africa, in an effort to "tap into the underserved markets, grow our great sport, and provide opportunities to find the best Fighters across the globe by creating a system for Fighters to go from amateur to pro that doesn't exist in the world today."

153. Moreover, to the extent PFL does attempt to compete directly with the UFC in the Relevant Markets, it is merely the latest in a long line of deep-pocketed, would-be competitors—

including Mark Cuban, Donald Trump, Paramount Global, and more—who have tried and failed to challenge the UFC's monopoly and monopsony power. As Dana White stated about the PFL's large-scale expenditures, "you can only waste unbelievable amounts of money for so long, no matter how much money somebody has." He continued: "There's been plenty of people that have opened the checkbook to be a competitor. . . . Most of these other guys are all running charities. Not businesses. Like I said, you can only do that for so long before it runs out." Even after acquiring Bellator for a sum reported as being less than $100 million dollars—a purchase White described as "one of the fucking biggest" business blunders he had ever seen—PFL founder Donn Davis reported revenues of well under one-tenth the UFC's in 2024.

**B.    The UFC's Exclusionary Scheme Substantially Foreclosed Competition in the Relevant Input and Output Markets**

154.    The UFC's ongoing anticompetitive Scheme has enhanced and maintained the UFC's monopoly power in the Relevant Output Market and monopsony power in the Relevant Input Market by substantially foreclosing competition in both Relevant Markets.

155.    The UFC has used its exclusive contracts and dominant market power to prevent its Fighters from competing for other MMA Promoters, foreclosing other Promoters' access to a sufficient stable of top Fighters to be successful. By locking up the vast majority of top MMA Fighters—including by enforcing provisions that give the UFC the power to extend contracts unilaterally, ensuring that contract end dates are staggered, prioritizing locking up the most valuable MMA Fighters for the longest terms, and coercing any top Fighter who considers attempting to leave—the UFC's Scheme has blocked potential competitors from entering or expanding. Without access to the top MMA Fighters the UFC locked up with its contracts, other MMA Promoters have given up on competing with the UFC for talent, and have accepted their role as "feeder" leagues to the UFC.

156.    The UFC's effectively perpetual control over the vast majority of top Fighters allows it to substantially foreclose competition in both the Input and Output Market. The *Le* Court found that the UFC controlled between 71 and 91 percent of the Professional MMA Fighter services sold in the Relevant Input Market—and as much as 99 percent of the top-15-ranked Professional MMA Fighter services sold in the critical Headliner Submarket, the services that drive viewership and revenues—under

54

exclusive contracts. Class Cert. Order at 27-28. As the Court noted, this foreclosure share far exceeds the "20 to 30% market dominance" that may be "sufficient to infer anticompetitive effects." *Id.* at 27 n.27.

157.    By foreclosing rival MMA Promotions' access to the critical mass of top Fighters needed to compete for viewers in the Output Market and talent in the Input Market, the UFC suppresses *all* Professional MMA Fighters' pay. The *Le* Court recognized precisely this market-wide effect, finding: "As Zuffa's foreclosure share increases, its competitors' access to the critical input of Fighters decreases and their concomitant ability to increase or maintain revenue also declines." Class Cert. Order at 57. Without access to the top Fighters necessary to attract a wide audience, rival Promoters' revenues and profits are artificially impaired, directly suppressing the pay of their Fighters below competitive levels. Indeed, this market-wide pay suppression is an essential element of the UFC's Scheme; only once would-be rivals' profitability—and thus their ability to pay Fighters a competitive wage—is sufficiently impaired can the UFC itself dramatically cut its Fighter pay without fear that any Fighters would attempt to defect. This is why Lorenzo Fertitta urged the UFC to "keep taking these fuckers['] oxygen till they tap out": Suppressing rivals' ability to compete was a key goal of the Scheme.

158.    As a result of the UFC's Scheme, compensation and opportunities associated with fighting in MMA bouts in the Relevant Input Market to members of the Class have been and continue to be artificially suppressed. In addition, the anticompetitive effects of the UFC's exclusionary Scheme in the Relevant Markets include, *inter alia*:

      a.   reduced competitiveness of live Professional MMA Events;

      b.   artificially suppressed output in the Relevant Output Market, including fewer live Professional MMA Bouts than would exist in the absence of the challenged anticompetitive Scheme;

      c.   artificially inflated prices for access to live and rebroadcast Professional MMA Bouts, including tickets to live events, PPV access, and the UFC's streaming service;

      d.   artificially inflated prices for broadcast rights for Professional MMA Bouts;

      e.   artificially suppressed demand in the Relevant Input Market; and,

      f.   artificially suppressed Fighter compensation in the Relevant Input Market.

159.    There are no legitimate procompetitive justifications for the anticompetitive Scheme alleged in this Complaint, or for any aspect of the anticompetitive conduct standing alone. Even if, *arguendo*, such justifications existed, there are less restrictive means of achieving those purported procompetitive effects. To the extent the anticompetitive Scheme or any aspect of the anticompetitive Scheme has any cognizable procompetitive effects, they are substantially outweighed by the anticompetitive effects.

## C.    Endeavor's Participation in the Scheme and Its Effect on Fighter Pay

160.    Since acquiring a controlling interest in the UFC for $4 billion in 2016, Endeavor has played a substantial role in the UFC's operations—and in the anticompetitive Scheme alleged in this Complaint.

161.    Endeavor was responsible for overseeing many aspects of the UFC's operations, including:

- Live Event Production Services;
- Content Production Services;
- Ticketing and Hospitality Services;
- Sale/Licensing of Content Rights Services;
- Marketing/Events Services;
- Consumer Product Licensing Services; and
- Sponsorship Services.

162.    Endeavor has publicly touted its "flywheel," which is the mechanism through which it leverages Endeavor's premium sports and entertainment properties (including the UFC) to drive network effects and create value across its business and derives value from it for itself and the UFC.[25]

163.    On March 8, 2023, at the Morgan Stanley Technology, Media & Telecom Conference,

---

[25] The term "flywheel" is used as Endeavor used that term in its 2023 Form 10-K: "the integration of [Endeavor's] broad range of capabilities, along with [its] owned and managed premium sports and entertainment properties, drives network effects across the Endeavor flywheel, which is the way we connect and utilize multiple divisions of Endeavor to maximize the power of our platform, creating value for our business." *See* Part I, Item I, Business, https://www.sec.gov/ix?doc=/Archives/edgar/data/0001766363/000095017023005121/edr-20221231.htm.

Emanuel, then Chief Executive Officer, director and Executive Chair of TKO and Chief Executive

Officer and a director of Endeavor, explained how Endeavor's "flywheel" operates with respect to the

UFC:

> And so what do we do for the UFC? Endeavor streaming does their
> streaming services. Their sponsorship business, we do their sponsorship
> business. On Location does the high-end experience business. IMG does the
> international sales. Our government relations team does the location fees that
> we get when we go across the globe. And our licensing business does the
> licensing.

164.    In investor presentations, Endeavor explained how it "Leverag[ed] Endeavor's Flywheel

to Drive Value Creation" which reveals Endeavor's widespread involvement in and responsibility for the

UFC: entering new international markets, investing in local stars, and undertaking content promotion;

developing relationships to maximize value from U.S. media rights; increasing sponsorship revenue due

to Endeavor's "deep relationships with major brands;" and millions of dollars in "Operating Synergies"

due to the UFC's "integration within Endeavor global infrastructure."[26]

165.    On February 7, 2025, Emanuel appeared on the Pat McAfee Show during Super Bowl

LIX and confirmed that Endeavor made sponsorship deals for the UFC:

> McAfee: "is there a collaboration between those two companies [WWE &
> UFC] with you [Endeavor] . . . business wise[?]"

> Emanuel: "[W]hen we go out and you know we make . . . sponsorship
> deals or site fees in different countries and different states all that stuff
> yes[.]"

166.    In short, Endeavor "sold the show": Endeavor produced live events—providing

everything from ticketing and marketing services to overseeing sponsorships for the UFC and Fighters

and even carrying the promoter licenses necessary to hold events. It then negotiated broadcast rights for

viewing the events and other UFC content on PPV, linear TV, and the UFC's streaming service. Along the

way, and due to the Scheme alleged herein, Endeavor charged artificially inflated prices: for tickets for

live events and for viewing events on TV or the UFC's streaming service. This conduct exploited—and

confirms—the UFC's monopoly power in the Relevant Output Market. Also due to the Scheme alleged

---

[26] *See* Endeavor Investor Presentation (April 2023) https://s29.q4cdn.com/745718849/files/
doc_presentations/Endeavor-Investor-Deck_FINAL.pdf (last visited May 28, 2025).

herein, Endeavor charged artificially inflated prices for broadcasting rights for UFC Events; the five-year exclusive contract Endeavor negotiated with ESPN in 2018 cost $1.5 billion. As a result of Endeavor's conduct as alleged herein as part of the alleged anticompetitive Scheme, fewer Professional MMA Bouts were produced and sold, reducing output below competitive levels in the Relevant Output Market.

167.    This enhanced monopoly power also strengthened the UFC's monopsony power in the Relevant Input Market. With fewer Professional MMA Bouts, the demand for fighter services decreased below competitive levels, and so did fighter pay. When fighters vie for fewer spots, the UFC's leverage increases and allows it to further suppress compensation.

### D.    Plaintiff and Members of the Class Suffered Antitrust Injury

168.    As a direct and proximate result of the Defendants' anticompetitive conduct, as alleged herein, Plaintiff and all members of the Class suffered substantial losses to their business or property in that their compensation associated with competing in one or more live Professional MMA Bouts for a non-UFC MMA Promoter in the Relevant Input Market was artificially suppressed during the Class Period.

169.    Furthermore, as a direct and proximate result of the Defendants' anticompetitive conduct, Plaintiff and all members of the Class suffer ongoing harm in the form of diminished opportunities to pursue their chosen professions and continued artificially suppressed pay. Due to MMA's taxing and dangerous nature, Professional MMA Fighters have short careers—spanning, on average, only 5-6 Bouts. Fighters, moreover, are generally in precarious economic positions, as they fund their own training and get paid only when they fight. Each Bout is thus crucial to a Fighter's career and future. But as long as the UFC's Scheme remains in effect, Class members must pursue these career-defining Bouts in a highly anticompetitive market that artificially stifles their advancement, thus preventing all Class members from achieving their potential in a competitive environment.

170.    As part of its effort to foreclose potential rival MMA Promoters from accessing a critical mass of top-ranked Professional MMA Fighters, the UFC has used its Scheme involving acquisitions, effectively perpetual contracts, and coercive tactics to prevent any top Fighters from reaching free agency and attempting to compete for an alternative Promoter. The UFC has consistently been able to keep Fighters bound by the exclusionary provisions in its contracts and thus unavailable to other MMA

Promoters. The UFC furthers this anticompetitive Scheme by knowingly signing more Fighters than it could schedule for Bouts in a given year—and then letting these Fighters sit idle under exclusive contract—and refusing to co-promote Bouts with other MMA Promoters—even when such co-promoted Bouts would be profitable. By denying other MMA Promoters access to the top Professional MMA Fighters, this conduct bolster's the UFC's Scheme to enhance its monopoly and monopsony power in the Relevant Markets.

171.    The conduct comprising the UFC's anticompetitive Scheme is continuing and so are the damages suffered by the members of the Class.

## VIII.   INTERSTATE COMMERCE

172.    The UFC engages in interstate commerce and in activities substantially affecting interstate commerce including (1) promotion of MMA Events in nearly all of the states comprising the United States, (2) PPV, television, and Internet subscription-based broadcasts which occur throughout the United States, (3) sale, distribution or licensing of merchandise throughout the United States, and (4) production of television and Internet subscription-based programming which occurs throughout the United States.

## IX.   CLAIM FOR RELIEF FOR MONOPSONIZATION UNDER SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2

173.    Plaintiff incorporates by reference all of the preceding and ensuing paragraphs as if fully alleged herein.

174.    The relevant geographic market is the United States, or in the alternative, North America.

175.    The Relevant Markets include the markets for (a) promoting Professional MMA Bouts in the United States (the "Relevant Output Market"), and (b) the market for Professional MMA Fighter services (the "Relevant Input Market").

176.    The UFC possesses monopoly power in the Relevant Output Market and monopsony power in the Relevant Input Market, whether the geographic market includes the United States only, North America only, or the entire world. The UFC has obtained, enhanced, and maintained dominance in both Relevant Markets through the exclusionary Scheme alleged herein. The UFC has abused and continues to abuse that power to maintain and enhance its market dominance in the market for Professional MMA Fighter services through a continuing exclusionary Scheme to impair and

59

1  substantially foreclose competition by depriving actual and potential competitors in the Relevant Markets

2  of necessary inputs (including, *e.g.*, top-ranked Professional MMA Fighters) and pursuing an aggressive

3  strategy of merging with or purchasing the would-be rivals that its Scheme had first competitively

4  impaired.

5       177.    The UFC's exclusionary Scheme includes, but is not limited to, the following conduct: (a)

6  causing or directly and intentionally contributing to the failure of competing MMA Promotions and

7  acquiring actual or potential rival Promotions to eliminate competing promotions and titles from the

8  marketplace and to obtain the contracts of Professional MMA Fighters; (b) leveraging its monopsony and

9  monopoly power in the Relevant Markets through the use of long-term Exclusive Agreements with

10  Professional MMA Fighters, which allows the UFC to lock up the vast majority of top MMA Fighters for

11  their entire productive careers; (c) coercing, intimidating, and retaliating against MMA Fighters who

12  consider attempting to compete for an alternative MMA Promotion.

13      178.    By locking up the vast majority of top-ranked MMA Fighters across all major weight

14  classes to multi-bout exclusive contracts that are effectively perpetual, the UFC's exclusionary Scheme

15  has substantially foreclosed competition in the Relevant Markets by ensuring that no rival MMA

16  Promoter can obtain a critical mass of top Fighters. This conduct has thereby impaired the ability of any

17  MMA Promoters to compete effectively with the UFC in either Relevant Market, and has impaired the

18  ability of non-UFC Fighters to advance their careers. As a result, the UFC has artificially suppressed the

19  pay below competitive levels of both its own Fighters and MMA Fighters competing for other MMA

20  Promotions in the Relevant Input Market, all of whom are deprived of the increased demand and wages

21  that active competition for Professional MMA Fighter services would provide.

22      179.    As a direct and proximate result of this continuing violation of Section 2 of the Sherman

23  Act, Plaintiff and members of the Class have suffered, and continue to suffer, injury and damages in the

24  form of artificially suppressed bout compensation and lost career opportunities.

25      180.    Plaintiff's and Class members' injuries are of the type the antitrust laws were designed to

26  prevent, and flow directly from the Defendants' unlawful conduct.

27      181.    The violations set forth above, and the effects thereof, are continuing, apply generally to

28  the class, and will continue unless injunctive relief appropriate for the class as a whole is granted.

182.    Legal remedies such as damages are inadequate to fully redress Plaintiff's and Class members' injuries arising from Defendants' unlawful conduct.

183.    Therefore, Plaintiff, on behalf of himself and other members of the Class, seeks injunctive relief barring Defendants from engaging in the anticompetitive Scheme alleged herein. Specifically, Plaintiff, on behalf of himself and other members of the Class, seeks injunctive relief in the form of changes to Defendants' business practices, including the elimination of restrictive and/or exclusionary clauses from Defendants' agreements with Professional MMA Fighters; the elimination of arbitration clauses and class action waivers from Defendants' agreements with Professional MMA Fighters; and the required insertion of a provision in all existing and future contracts between the UFC and any of its fighters relating to bouts of a "sunset provision," that would allow the fighter the option to terminate the contract with no penalty within one year after its execution

## X.    **DEMAND FOR JUDGMENT**

WHEREFORE, Plaintiff, on behalf of himself and the proposed Class, respectfully asks the Court for a judgment that:

a.    Certifies the case as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2), and appoints Plaintiff and his attorneys as class representative and class counsel, respectively;

b.    Awards Plaintiff and the Class the reasonable costs of this action including attorneys' fees;

c.    Orders such equitable relief as is necessary to correct for the anticompetitive market effects caused by the unlawful conduct of Defendants;

d.    Enters judgment against each Defendant, holding each Defendant jointly and severally liable for the antitrust violations alleged; and

e.    Directs such further relief as it may deem just and proper.

1  Dated this 29th day of May, 2025.

2                                        Respectfully Submitted,

3                                        CLAGGETT & SYKES

4                                   By:  */s/ Michael J. Gayan*

5                                        Michael J. Gayan
                                         4101 Meadows Lane, Ste. 100
6                                        Las Vegas, NV 89107
                                         Telephone: (702) 333-7777
7                                        Fax: (702) 655-3763
                                         mike@claggettlaw.com
8

9                                        *Liaison Counsel for Plaintiff Phil Davis and the*
                                         *Proposed Class*
10

11                                       Eric L. Cramer (*pro hac vice* forthcoming)
                                         Michael Dell'Angelo (*pro hac vice* forthcoming)
12                                       Patrick F. Madden (*pro hac vice* forthcoming)
                                         BERGER MONTAGUE PC
13                                       1818 Market Street, Suite 3600
                                         Philadelphia, PA 19103
14                                       Telephone: (215) 875-3000
                                         Facsimile:  (215) 875-4604
15                                       ecramer@bm.net
                                         mdellangelo@bm.net
16                                       pmadden@bm.net

17                                       Joshua P. Davis (*pro hac vice* forthcoming)
18                                       Kyla Gibboney (*pro hac vice* forthcoming)
                                         Robert C. Maysey (*pro hac vice* forthcoming)
19                                       BERGER MONTAGUE PC
                                         505 Montgomery Street, Suite 625
20                                       San Francisco, CA 94111
                                         Telephone: (415) 906-0684
21                                       Facsimile: (215) 875-4604
                                         jdavis@bm.net
22                                       kgibboney@bm.net
23                                       rmaysey@bm.net

24                                       *Counsel for Plaintiff Phil Davis and the Proposed Class*

25

26

27

28

                                         62

Joseph R. Saveri (*pro hac vice* forthcoming)
Kevin E. Rayhill (*pro hac vice* forthcoming)
Chris Young (*pro hac vice* forthcoming)
Itak Moradi (*pro hac vice* forthcoming)
JOSEPH SAVERI LAW FIRM
601 California Street, Suite 1000
San Francisco, California 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
jsaveri@saverilawfirm.com
krayhill@saverilawfirm.com
cyoung@saverilawfirm.com
imoradi@saverilawfirm.com

Benjamin D. Brown (*pro hac vice* forthcoming)
Richard A. Koffman (*pro hac vice* forthcoming)
Daniel H. Silverman (*pro hac vice* forthcoming)
Daniel Gifford (*pro hac vice* forthcoming)
COHEN MILSTEIN SELLERS
  & TOLL, PLLC
1100 New York Ave., N.W., Suite 500, East
Tower Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408 4699
bbrown@cohenmilstein.com
rkoffman@cohenmilstein.com
dsilverman@cohenmilstein.com
dgifford@cohenmilstein.com

W. Joseph Bruckner (*pro hac vice* forthcoming)
Brian D. Clark (*pro hac vice* forthcoming)
Consuela M. Abotsi-Kowu (*pro hac vice* forthcoming)
LOCKRIDGE GRINDAL NAUEN PLLP
100 Washington Ave S, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 596-4001
Facsimile: (612) 339-0981
wjbruckner@locklaw.com
bdclark@locklaw.com
cmabotsi-kowu@locklaw.com

Kyle Pozan (*pro hac vice* forthcoming)
LOCKRIDGE GRINDAL NAUEN PLLP
1165 N. Clark Street, Ste. 700
Chicago, IL 60610
Telephone: (612) 339-6900
kjpozan@rlocklaw.com

*Additional Counsel for Plaintiff Phil Davis and the Proposed Class*