ERIC L. CRAMER (*pro hac vice*)
MICHAEL DELL'ANGELO (*pro hac vice*)
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
ecramer@bergermontague.com
mdellangelo@bergermontague.com

*Counsel for the Class and Attorneys for Individual
and Representative Plaintiff*

[Additional Counsel Listed on Signature Page]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| PHIL DAVIS, on behalf of himself and all others similarly situated,<br><br>　　　　　　　　Plaintiff,<br><br>　　v.<br><br>ZUFFA, LLC, TKO Operating Company, LLC f/k/a Zuffa Parent LLC (d/b/a Ultimate Fighting Championship and UFC), and ENDEAVOR GROUP HOLDINGS, INC.,<br><br>　　　　　　　　Defendants. | Case No.: 2:25-cv-00946-RFB-BNW<br><br>**PLAINTIFF PHIL DAVIS'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |

# TABLE OF CONTENTS

PAGE

I.  INTRODUCTION ...................................................................................................1

II.  BACKGROUND ....................................................................................................3

III.  ARGUMENT .........................................................................................................5

    A.  Mr. Davis Did Not Release His Claim.............................................................5

    B.  Mr. Davis Has Antitrust Standing ................................................................11

        1.  Ninth Circuit Law Establishes Mr. Davis's Standing to Seek Injunctive Relief.......................................................................................................11

        2.  The Relevant Factors Confirm Mr. Davis's Antitrust Standing.................15

    C.  Mr. Davis Has Article III Standing .............................................................21

III.  CONCLUSION ....................................................................................................24

# TABLE OF AUTHORITIES

PAGE(S)

**CASES**

*Acoustics, Inc. v. Am. Sur. Co. of N.Y.,*
    74 Nev. 6 (1958) ................................................................................................ 8

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.,*
    836 F.3d 1171 (9th Cir. 2016) ........................................................................ 24

*Allen v. Dairy Farmers of Am., Inc.,*
    2014 WL 2610613 (D. Vt. June 11, 2014)................................................ 20, 21

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.,*
    190 F.3d 1051 (9th Cir. 1999) .................................................................. 15, 16

*Amarel v. Connell,*
    102 F.3d 1494 (9th Cir. 1996) ........................................................................ 15

*Antoine L. Garabet, M.D., Inc. v. Autonomous Techs. Corp.,*
    116 F. Supp. 2d 1159 (C.D. Cal. 2000)..................................................... 20, 21

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
    472 U.S. 585 (1985) ........................................................................................ 24

*Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters,*
    459 U.S. 519 (1983) ........................................................................................ 15

*Bakay v. Apple Inc.,*
    2024 WL 3381034 (N.D. Cal. July 11, 2024) ............................................... 20

*Bayer v. Neiman Marcus Grp., Inc.,*
    861 F.3d 853 (9th Cir. 2017) .......................................................................... 23

*Bielar v. Washoe Health Sys., Inc.,*
    129 Nev. 459 (2013) ......................................................................................... 8

*Bird v. Dep't of Hum. Servs.,*
    935 F.3d 738 (9th Cir. 2019) ............................................................................ 8

*Cirkunovs v. Zuffa, LLC,*
    No. 2:25-cv-00914-RFB-BNW (D. Nev.) ....................................................... 5

*City of L.A. v. Lyons,*
    461 U.S. 95 (1983)........................................................................................... 22

*City of Oakland v. Oakland Raiders,*
    20 F.4th 441 (9th Cir. 2021)...................................................................... 20, 21

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ........................................................................................ 24

*Costco Wholesale Corp. v. AU Optronics Corp.*,
    2014 WL 4723880 (W.D. Wash. Sept. 23, 2014) ................................................................ 20

*Davidson v. Kimberly-Clark Corp.*,
    889 F.3d 956 (9th Cir. 2018) ........................................................................................... 22

*Dukes v. Walmart Stores*,
    564 U.S. 338 (2011) ......................................................................................................... 23

*Ford Motor Co. v. United States*,
    405 U.S. 562 (1972) ......................................................................................................... 24

*FTC v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020) ........................................................................................... 24

*Gross v. New Balance Athletic Shoe, Inc.*,
    955 F. Supp. 242 (S.D.N.Y. 1997) ................................................................................... 20

*Heard v. Sheahan*,
    253 F.3d 316 (7th Cir. 2001) ........................................................................................... 10

*Hesse v. Sprint Corp.*,
    598 F.3d 581 (9th Cir. 2010) ........................................................................................... 10

*Illinois Brick Co. v. Illinois*,
    431 U.S. 720 (1977) ......................................................................................................... 12

*In re Am. Express Anti-Steering Rules Antitrust Litig.*,
    19 F.4th 127 (2d Cir. 2021) ............................................................................................. 20

*In re Amazon.com, Inc. eBook Antitrust Litig.*,
    2022 WL 4581903 (S.D.N.Y. Aug. 3, 2022) ..................................................................... 20

*In re Amerco Derivative Litig.*,
    127 Nev. 196 (2011) ................................................................................................. 2, 6, 7, 8

*In re Coordinated Pretrial Proc. in Petroleum Prods. Antitrust Litig.*,
    497 F. Supp. 218 (C.D. Cal. 1980) .......................................................................3, 11, 14, 18

*In re Coordinated Pretrial Procs. in Petroleum Prods. Antitrust Litig.*,
    691 F.2d 1335 (9th Cir. 1982) ................................................................................... passim

*In re Google Play Store Antitrust Litig.*,
    147 F. 4th 917 (9th Cir. 2025) ......................................................................................... 24

*In re HIV Antitrust Litig.*,
    2022 WL 22609107 (N.D. Cal. Sept. 27, 2022) .................................................11, 15, 17, 22

*In re Modafinil Antitrust Litig.*,
    837 F.3d 238 (3d Cir. 2016),
    *as amended* (Sept. 29, 2016) .......................................................................................... 15, 17

*In re Online DVD Rental Antitrust Litig.*,
   2011 WL 1629663 (N.D. Cal. Apr. 29, 2011) ................................................................. 20, 21

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   2012 WL 6708866 (N.D. Cal. Dec. 26, 2012) ................................................................. 20, 21

*Johnson v. Zuffa, LLC*,
   No. 2:21-cv-01189-RFB-BNW (D. Nev.) ................................................................................ 5

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*,
   791 F.2d 1356 (9th Cir. 1986) ....................................................................... 15, 16, 19

*Lawlor v. Nat'l Screen Serv. Corp.*,
   349 U.S. 322 (1955) ................................................................................................... 10

*Le v. Zuffa, LLC*,
   No. 2:15-cv-01045-RFB-BNW (D. Nev.) ................................................................ passim

*Lucas Auto. Eng., Inc. v. Bridgestone/Firestone, Inc.*,
   140 F.3d 1228 (9th Cir. 1998) .................................................................................. passim

*M.S. v. Brown*,
   902 F.3d 1076 (9th Cir. 2018) ........................................................................................ 22, 23

*Matson v. Burlington N. Santa Fe R.R.*,
   240 F.3d 1233 (10th Cir. 2001) ...................................................................................... 10

*Mid-West Paper Products Co. v. Continental Group, Inc.*,
   596 F.2d 573 (3d Cir. 1979) ........................................................................................... 15

*Mirage Wine + Spirit's, Inc. v. Apple Inc.*,
   2025 WL 1896006 (S.D. Ill. July 9, 2025) ....................................................................... 20

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
   473 U.S. 614 (1985) ......................................................................................................... 10

*Oliver v. Am. Express Co.*,
   2020 WL 2079510 (E.D.N.Y. Apr. 30, 2020) ................................................................. 20

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
   555 U.S. 438 (2009) ......................................................................................................... 24

*Paulsen v. CNF Inc.*,
   559 F.3d 1061 (9th Cir. 2009) ........................................................................................ 23

*Phillips v. Mercer*,
   94 Nev. 279 (1978) ........................................................................................................... 8

*Redel's Inc. v. General Electric Co.*,
   498 F.2d 95 (5th Cir. 1974) ............................................................................................. 10

*Renee v. Duncan*,
   686 F.3d 1002 (9th Cir. 2012) ........................................................................................ 22

*Sabol v. PayPal Holdings, Inc.*,
    2024 WL 3924686 (N.D. Cal. Aug. 23, 2024) ............................................................ 20

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) .................................................................................................... 22

*United States v. Colgate & Co.*,
    250 U.S. 300 (1919) .................................................................................................... 24

*Utah v. Evans*,
    536 U.S. 452 (2002) .................................................................................................... 22

*Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) .................................................................................................... 24

*Williams v. Boeing Co.*,
    517 F.3d 1120 (9th Cir. 2008) .................................................................................... 10

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. III ............................................................................................................ 22

## I.     INTRODUCTION

Phil Davis, the named plaintiff here, was a member of the class in *Le v. Zuffa, LLC*, No. 2:15-cv-01045-RFB-BNW (D. Nev.) ("*Le*"). He is a mixed martial arts ("MMA") fighter who competed for the UFC, a promotion run by the defendants in this action ("Defendants"). ¶¶11, 45.[1] Now he is under contract with the Professional Fighters League ("PFL"), one of Defendants' potential rivals. ¶¶11, 45, 151–53.

In *Le*, this Court concluded the plaintiffs had presented sufficient evidence of the following to warrant class certification and survive summary judgment:[2]

• *Dominance*. The UFC dominates professional MMA. Class Cert. Order at 27–28, 30–33.

• *Unlawful Means*. The UFC did not achieve or maintain that dominance through lawful means. *Id.* at 33. Instead, it did so through an intentionally anticompetitive scheme (the "Scheme") aimed at undermining rivals. *Id.* at 33–42, 57.

• *Anticompetitive Scheme*. The Scheme foreclosed rivals from the market, first by acquiring and shuttering them, then by starving those that remained of the key input they need to compete—top-level fighter labor. *Id.* at 31–35, 39–41. Defendants[3] accomplished this by forcing UFC fighters into never-ending exclusive contracts that barred them from competing for non-UFC promoters or against non-UFC fighters. *Id*. at 34–39, 57.

• *Market Distortion*. The Scheme forced MMA fighters to operate in a distorted market, not in free competition. *Id.* at 31–33, 57–58. That decreased competition for fighters' labor, suppressed their compensation, and prevented non-UFC fighters from competing against UFC fighters. *Id*. at 31, 50, 57–58.

• *Harm to Non-UFC Fighters*. The Scheme harmed professional MMA fighters whether they fought for the UFC or for a would-be rival promoter. *See, e.g.*, *id*. at 73–74. All active MMA

---

[1] Unless otherwise noted, all "¶" references are to the *Davis* Complaint, ECF No. 1.
[2] *See Le*, ECF No. 839 (D. Nev. Aug. 9, 2023) ("Class Cert. Order"); ECF No. 959 (D. Nev. Jan. 18, 2024) ("MSJ Order").
[3] Defendant Zuffa, LLC, was the sole defendant in *Le*. It now is part of the same corporate family as Defendants TKO Operating Company, LLC f/k/a Zuffa Parent LLC (d/b/a Ultimate Fighting Championship and UFC), and Endeavor Group Holdings, Inc. Defendants do not rely on the change in the UFC's corporate structure to distinguish *Le* from this case or seek dismissal of Mr. Davis's Complaint. Accordingly, Mr. Davis refers to Defendants individually and collectively as "Defendants" throughout for ease of reference.

fighters "were subject to" Defendants' conduct. *Id.* at 74.

The *Le* Class settled. Its members, including Mr. Davis, released only their claims that had arisen by the time this Court granted final approval in March 2025. *See Le*, ECF No. 1064 (D. Nev. Mar. 3, 2025) ("Final Approval Order"). They did not release future claims.

As a result, Mr. Davis is free to bring this proposed class action seeking only injunctive relief, not damages, based on a claim that arose after final approval in *Le*. ¶¶11, 12, 23, 183. He asks this Court to stop Defendants' Scheme, which has harmed him and continues to harm him by suppressing his wages and preventing him from competing against UFC fighters. ¶¶23, 183.

Defendants make three arguments for dismissal. ECF No. 25 ("Motion" or "Mot."). Each one fails. First, they argue that Mr. Davis released his claim for injunctive relief in this case as part of the *Le* Settlement. Mot. at 7–9 (citing ECF No. 1063).[4] But the release in *Le* applied only to claims that arose before final approval of the *Le* Settlement on March 3, 2025. *See* Final Approval Order. The release did not extend to *future claims*. Nor did it restrict the factual or evidentiary basis for those *future claims*. Under Nevada law—which governs—Mr. Davis retained his future claims unless he released them expressly. *In re Amerco Derivative Litig.*, 127 Nev. 196, 211 (2011). He did not.

Defendants next argue that Mr. Davis lacks antitrust standing because, they argue, his relationship with Defendants is not sufficiently "direct." Mot. at 12–17. In doing so, they pretend Mr. Davis's relationship with them is more distant than it is. More fundamentally, Defendants ignore key legal distinctions—including that courts allow antitrust plaintiffs to bring federal antitrust claims for *injunctive relief* even when they would not allow them to bring claims for *damages*. Defendants fail to address *Lucas Automotive Engineering, Inc. v. Bridgestone/ Firestone, Inc.*, 140 F.3d 1228, 1235 (9th Cir. 1998), which held an antitrust plaintiff *may* bring a claim for injunctive relief under circumstances like Mr. Davis's. Defendants rely primarily on *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation*, 691 F.2d 1335, 1340–41 (9th Cir. 1982), which addressed only *damages*. Further, it did not disturb the lower

---

[4] Defendants cite "ECF No. 1063" as the final approval order in *Le* on page 7 of their Motion. That document has been removed from the docket. Mr. Davis cites ECF No. 1064, which this Court entered on March 3, 2025, as the "Final Approval Order."

court's holding that the plaintiffs there *could* seek injunctive relief. *See In re Coordinated Pretrial Proc. in Petroleum Prods. Antitrust Litig.*, 497 F. Supp. 218, 228–29 (C.D. Cal. 1980); *see also Lucas*, 140 F.3d at 1235 (citing *id.*). Both precedents support Mr. Davis here.

Finally, Defendants argue that Mr. Davis lacks Article III standing to seek injunctive relief because he is not currently under contract with the UFC. Mot. at 10–12. Zuffa made this argument in *Le*. This Court rejected it. Class Cert. Order at 73–74. Further, Defendants' latest version of their position fails because it does not address relevant *antitrust* cases. As noted above, Defendants ignore *Lucas*. There, the Ninth Circuit held that antitrust standing is "more demanding" than Article III standing. 140 F.3d at 1232. Mr. Davis's showing of antitrust standing thus necessarily establishes Article III standing. Defendants also err by relying on cases from other doctrinal areas, such as employment discrimination, where, unlike in antitrust, plaintiffs and defendants must have a direct relationship for Article III standing. And the antitrust cases Defendants cite do not address Article III standing, but rather the limits of defendant liability under specific antitrust doctrines that do not apply here. None of Defendants' cases support their position.

## II.    BACKGROUND

Plaintiff Phil Davis ("Plaintiff" or "Mr. Davis") is a professional MMA fighter. ¶¶11, 45. He currently fights for the PFL, an MMA promotion and would-be competitor of the UFC. ¶¶11, 45, 151–53. He previously fought for the UFC, achieving a top-5 ranking in the UFC's Light Heavyweight Division in 2014. ¶¶11, 45.

This case follows *Le v. Zuffa*. As noted above, this Court in *Le* found that the plaintiffs had put forward sufficient evidence about the UFC's Scheme and its impact for the Court to certify a class and to deny summary judgment. Class Cert. Order at 74–75; MSJ Order at 8. That evidence showed that the UFC dominates professional MMA fighting, controlling as much as 99% of the market for elite fighter services. Class Cert. Order at 27–28. It showed that Defendants had accomplished that dominance not through lawful competition, but by acquiring rivals to "remove potential competition," *id.* at 40, and "utiliz[ing] contracts containing exclusionary provisions that effectively negated a fighter's mobility to competitors," *id.* at 34.

The *Le* Plaintiffs showed that, as a result of the Scheme, Defendants have near-complete control over "the critical input" of top-ranked MMA fighters. *Id*. at 57. This "prevents any meaningful competition in the market," *id.*, because would-be competitors are unable to "access[] a talent pool capable of attracting enough commercial interest to turn a profit," *id*. at 32. *See also id.* at 31 ("These barriers to entry made it prohibitively expensive and difficult for new entrants in the input (and output) market to effectively compete with Zuffa.").

The *Le* Plaintiffs also presented extensive evidence that Defendants' "coercive contracts" harm "fighters by suppressing wages," *and* "damage the overall market environment by artificially restricting competitors' access to strong fighter talent which could be used to grow their business." *Id*. at 31. As a result, "non-Zuffa promoters were further precluded from offering competitive compensation and promising career paths to fighters." *Id*. at 40–41.

This effect on rivals was no accident: Defendants "understood their actions were having an anticompetitive effect on rivals *and engaged in this conduct for that very reason*." *Id.* at 57 (emphasis added); *see id.* at 40 ("The record establishes that undermining competitors was important to Zuffa leadership and an essential part of its strategy to establish market dominance."); *id.* ("Evidence also indicates" that Zuffa's purchase of rivals "was undertaken in an effort to swell the ranks of Zuffa's fighters and remove potential competition"). And this Court recognized that Defendants' Scheme affects professional MMA fighters' whether they fight for the UFC or a would-be rival promoter that Defendants have foreclosed from the market. *See, e.g.*, *id.* at 73–74.

In denying summary judgment in *Le*, this Court held, after it had "carefully considered the parties arguments [], intervening developments," and "the record and law previously relied upon in the Class Certification Order," that "Plaintiff has furnished sufficient evidence to sustain a reasonable jury finding that Zuffa violated 15 U.S.C. § 2." MSJ Order at 8–9.

The *Le* Class reached a settlement with Defendants that this Court approved on March 3, 2025. Final Approval Order. In the settlement, the *Le* Class agreed to release a broad range of their actual and potential claims that arose up to Final Approval. Settlement Agreement, Sec. 10(a), *Le*, ECF No. 1045-4 (D. Nev. Oct. 7, 2024) ("*Le* Settlement"). As a *Le* Class member, Mr.

Davis released his claims that existed as of March 3, 2025.

But Defendants' Scheme did not end at Final Approval. Neither did its impact on Mr. Davis and fighters like him, who continue to operate in the distorted market it created. On May 1, 2025, Mr. Davis fought in a PFL-promoted bout and was paid less than he would have been without the Scheme. ¶¶11, 45; *see also* ¶23. When he filed the *Davis* Complaint, he was scheduled to fight again in June 2025. ¶45. As a current professional MMA fighter, the Scheme deprives him of competitive compensation and the opportunity to fight UFC athletes. ¶23, 100, 103, 116–17. In short, he continues to be "subject to" Defendants' Scheme. *See* Class Cert. Order at 74.

Mr. Davis brings a single claim against Defendants for violating Section 2 of the Sherman Act on behalf of himself and a class of MMA fighters who competed in Professional MMA bouts for non-UFC Promoters since May 2021 (the "*Davis* Class").[5] ¶¶23, 46, 176–183. He seeks injunctive relief to stop Defendants' unlawful Scheme. ¶¶23, 183.

## III.  ARGUMENT

### A.  Mr. Davis Did Not Release His Claim

Defendants claim that Mr. Davis released his claim here as part of the *Le* Settlement. Mot. at 7–9. They argue extensively about the broad range of potential claims they say the *Le* Settlement release encompasses, including claims Mr. Davis may not have known about or that the plaintiffs may not have raised in *Le*. Mot. at 7–9.

But Defendants barely address the relevant point—that the release included only those claims that had arisen as of the date the Court granted Final Approval. Mr. Davis's claim arose *after* Final Approval. He did not release it. Indeed, the release does not address post-Final Approval claims at all, so Mr. Davis is not restricted in the events or evidence on which he can rely in pursuing his claim.

Under governing Nevada law, a party may release future claims only if it does so

---

[5] The *Davis* Class excludes fighters currently under contract with the UFC and members of the proposed classes in *Johnson v. Zuffa, LLC*, No. 2:21-cv-01189-RFB-BNW (D. Nev.), and *Cirkunovs v. Zuffa, LLC*, No. 2:25-cv-00914-RFB-BNW (D. Nev.).

*expressly*. *Amerco*, 127 Nev. at 211.[6] "When a settlement agreement does *not* contain language exhibiting a clear intent to release future claims, the release clause is limited to the claims that existed at the time the settlement agreement was reached." *Id.* at 206 (emphasis added).

The Settlement Agreement here does not contain language "exhibiting a clear intent to release future claims." *See id*. On the contrary, the release, by its own terms, applied only "until final approval of this Settlement Agreement." *Le* Settlement, Sec. 10(a).

Mr. Davis's claim here did not arise until Defendants took actions in furtherance of their ongoing Scheme *after* Final Approval, and until Mr. Davis suffered injuries—and suffered the risk of future injuries—from those actions. *See, e.g.*, ¶¶4 ("requiring all UFC fighters, the top-talent in the sport, to sign its highly restrictive, effectively perpetual contracts"), 11–12 (Mr. Davis's May 2025 PFL fight); 45 ("Davis is scheduled to compete for the PFL's Light Heavyweight World tournament champion on June 27, 2025."). This claim did not exist at the time of Final Approval; it was a "future claim."

Further, the *Le* Settlement expressly released claims only "until final approval." *Le* Settlement, Sec. 10(a). It *did* release claims reaching back "to the beginning of time," but it did *not*, for example, release claims extending forward "to the end of time." *Id*. So the express language of the release confirms that it does not apply to claims arising after Final Approval.

Under *Amerco*, this express timeframe limits the scope of the *Le* release. There, the Nevada Supreme Court interpreted the express waiver of *existing* claims as inconsistent with a release of *future* claims. 127 Nev. at 212 ("Not only does the agreement lack language that indicates any intent to release future claims, but the express language refers to claims that existed at the time of the settlement agreement."). Like the release in *Amerco*, the release here expressly applies to claims "from the beginning of time until final approval of this Settlement Agreement." *Le* Settlement, Sec. 10(a). The release has a fixed ending—Final Approval—as the release in *Amerco* had a fixed ending—the execution of the settlement agreement. *See id.*; *Amerco*, 127 Nev. at 212.

---

[6] *See Le*, ECF No. 1045-4, ¶11(a) ("This Settlement shall be governed by and interpreted according to the substantive laws of the state of Nevada.").

To be sure, the *Amerco* release ended on the date that the settlement was agreed to, and the release here extends until Final Approval. *Amerco*, 127 Nev. at 212 ("the express language refers to claims that existed at the time of the settlement agreement"); *Le* Settlement, Sec. 10(a). To emphasize that subtlety, the *Le* Settlement *clarifies* that its release extends beyond the execution date of the settlement agreement. It states: "For clarity, Released Claims include, but are not limited to, claims that arise after the Execution Date." *Le* Settlement, Sec. 10(a). That term—which expressly clarifies the release—ensured that the release covers claims that arose after the execution date—September 26, 2024—and before the final approval on March 3, 2025.

The only portion of Defendants' brief that addresses this relevant issue is a fragment of a sentence. Mot. at 9. Defendants say that the *Le* release is "intentionally forward-looking, extending to any 'claims that arise after the Execution Date to the extent they involve a continuation of some' of the conduct forming the factual predicates of *Le*." *Id*. (quoting *Le* Settlement, Sec. 10(a)). This sentence fragment mischaracterizes the release.

What Defendants ignore—and what they redact from their quotation of the release in this section of their brief, Motion at 8—is that the "forward-looking" language was "[f]or clarity;" it *clarified*, rather than *modified* the definition of the released claims. *Le* Settlement, Sec. 10(a). The settlement agreement defined the release at one point as extending only "until final approval of this Settlement Agreement," *Le* Settlement, Sec. 10(a)(i), and in another it did not specify a timeframe. *Id.* at 10(a)(ii). Under *Amerco*, that means the release does not apply to claims beyond Final Approval. In this context, the clarifying language that the release applies to "claims that arise after the Execution Date" is accurate and *undermines* Defendants' position. As noted above, Final Approval was after the Execution Date. It is true the release applies to claims arising after the execution of the *Le* Settlement, but that does *not* mean it extends to claims arising after Final Approval.

As noted above, rather than focusing on the relevant issue, Defendants argue at length that the release here—like the one in *Amerco*—applies to claims that *arose from* a broad range of conduct. Mot. at 7–9. In both *Amerco* and here, the release included "any and all" claims, whether "known" or "unknown," "suspected or unsuspected," "contingent or non-contingent,"

and "whether or not concealed or hidden." 127 Nev. at 211–12; *Le* Settlement, Sec. 10(a). But the issue is not how broad a range of claims Mr. Davis released *that arose before final approval*, but when his *current* claim arose. It arose after Final Approval. So it was not released.

Doctrines for contract interpretation confirm this reading. First, the rule against surplusage holds that "A court should not interpret a contract so as to make meaningless its provisions." *Phillips v. Mercer*, 94 Nev. 279, 282 (1978). "[E]very word must be given effect if at all possible." *Bielar v. Washoe Health Sys., Inc.*, 129 Nev. 459, 465 (2013) (citation omitted). Defendants' reading—that any future antitrust claims relating to MMA fighting are released, Mot. at 4—would render the words "until final approval of this Settlement Agreement" meaningless. *See Le* Settlement, Sec. 10(a). That language would serve no purpose if the Settlement released future claims arising *after* Final Approval. On the other hand, if Defendants had wanted to release future claims, "it would have been an extremely simple matter to make this intention plain" by writing the release for all claims from the beginning of time until the end of time. *Acoustics, Inc. v. Am. Sur. Co. of N.Y.*, 74 Nev. 6, 10 (1958).

The continuing violation doctrine determines when Mr. Davis's claims arose. *Bird v. Dep't of Hum. Servs.*, 935 F.3d 738, 746 (9th Cir. 2019). Under that doctrine, his new claim came into existence when Defendants took new unlawful acts, and he suffered new injuries. The "essence" of the continuing violation doctrine is that an action can challenge an ongoing antitrust violation if "the last act evidencing the continuing practice falls within the limitations period." *Id*. at 746 (citation omitted). The doctrine can apply both (1) to a series of related acts before and during the limitations period or (2) to the maintenance of unlawful conduct before and during the limitations period. *Id.* (citation omitted).

This Court has repeatedly recognized that Defendants have engaged in a continuing Scheme. In *Le*, this Court analyzed Defendants' pre-Class Period conduct in ruling on the motions to dismiss and for class certification. *See, e.g., Le* Motion to Dismiss Order at 17–18; Class Cert. Order at 39–41.[7] This Court similarly ruled that the *Le* Plaintiffs could argue at the

---

[7] The Class Period here is from May 13, 2021, until Defendants' ongoing illicit Scheme alleged herein ceases. ¶29 The class period in *Le* was from December 16, 2010 to June 30, 2017. Class Cert. Order at 2.

then-imminent trial that "particular alleged conduct started before the class period and it continued into the class period" because "*the continuing violations doctrine certainly allows that*." Transcript of Pretrial Conf. at 41–42, Le, ECF No. 1010 (D. Nev. Mar. 4, 2024) (emphasis added); Minutes of Proceedings re Motions in Limine, Le, ECF No. 1011 (D. Nev Feb. 13, 2024). Mr. Davis should be permitted to do the same here.

Mr. Davis alleges that Defendants engaged in a continuing Scheme. *Davis* Complaint at 1 ("Through the *continuing* anticompetitive Scheme, . . . the UFC *maintains*" monopoly and monopsony power, "suppresses the wages" of fighters, in the output market for Promotion of live Professional MMA Bouts, and monopsony power in the input market for Professional MMA Fighter services.") (emphases added); *id.* at ¶¶4, 10, 23 ("ongoing anticompetitive actions"), 99, 102 ("that dominance remains true today"), 132 ("UFC controlling 8 of the top 10-ranked heavyweights in October 2024 and 7 of the top 10-ranked heavyweights today"), 171, 179, 181.

The latest anticompetitive acts by Defendants alleged in the *Davis* Complaint occurred after final approval of the *Le* Settlement and endure to this day. For instance, Defendants entered new long-term, exclusive contracts and engaged in other ongoing behavior as part of the Scheme, and they continue to do so. ¶¶4 ("requiring all UFC fighters, the top-talent in the sport, to sign its highly restrictive, effectively perpetual contracts"), 11–12 (UFC's practices "prevent rival non-UFC MMA promotions from attracting a critical mass of top-level fighters").[8]

The harms to Mr. Davis giving rise to this litigation also post-date final approval in *Le*. Nearly two months after final approval, Mr. Davis competed in a Live Professional MMA Event

---

[8] *See also* ¶¶21–23 ("the [UFC's] current purported rivals are doing no better than their failed predecessors"), 42 ("Endeavor and TKO are (or as of March 24, 2025, were) operated and managed by many of the same senior executives and directors: they share a CEO (Emanuel), a President and COO (Shapiro), a Chief Administrative Officer and Senior Counsel to both companies' boards (Seth Krauss), and three directors"); 105 ("the UFC has locked up the vast majority of such Fighters"), 116, 154–58 ("The UFC's ongoing anticompetitive Scheme has enhanced and maintained the UFC's monopoly power in the Relevant Output Market monopsony power in the Relevant Input Market by substantially foreclosing competition in both Relevant Markets. . . . [T]he UFC suppresses all Professional MMA Fighters' pay") (compensation "continue[s] to be artificially suppressed"), 168–71 ("UFC has consistently been able to keep Fighters bound by the exclusionary provisions in its contracts and thus unavailable. . . . The conduct comprising the UFC's anticompetitive Scheme is continuing and so are the damages suffered"), 177–79 (UFC is "coercing, intimidating, and retaliating against MMA Fighters who consider attempting to compete for an alternative MMA Promotion").

on May 1, 2025. *See* ¶11 ("Davis fought … for PFL in May 2025."). He alleges that he received suppressed compensation because of Defendants' continuing unlawful conduct. ¶23 ("UFC's anticompetitive Scheme has stunted Plaintiff's career and robbed him of the opportunity to compete for a competitive wage"). Defendants' ongoing Scheme also deprived Mr. Davis of opportunities to compete against top fighters. *Id*. In this action for injunctive relief only, Mr. Davis alleges that he is going to continue to suffer harm from Defendants' ongoing anticompetitive conduct. *Id*.

As a result, under the continuing violation doctrine, the *Le* release does not cover the claim here. Under the continuing violation doctrine, "the cause of action accrues at . . . the date of the last injury." *Heard v. Sheahan*, 253 F.3d 316, 319 (7th Cir. 2001) (quoting *Matson v. Burlington N. Santa Fe R.R.*, 240 F.3d 1233, 1237 (10th Cir. 2001)). Mr. Davis's claims arose after Final Approval when he received sub-competitive pay for his May 1, 2025 bout.

Public policy also supports a literal reading of the *Le* release that preserves Mr. Davis's antitrust claim here. Courts are resistant to agreements that waive future antitrust claims: if confronted by a "prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985) (citing *Redel's Inc. v. General Electric Co.*, 498 F.2d 95, 98–99 (5th Cir. 1974)); *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 329 (1955).

More generally, the Ninth Circuit has held that a settlement agreement can preclude a future related claim "only where the released claim is 'based on the identical factual predicate as that underlying the claims in the settled class action.'" *Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010) (quoting *Williams v. Boeing Co.*, 517 F.3d 1120, 1133 (9th Cir. 2008). Defendants seek the type of blanket immunity that is improper. The conduct at issue here does not have the "identical factual predicate" as the *Le* case. As detailed above, Defendants have engaged in new anticompetitive conduct after final approval and caused new injuries to Mr. Davis and the others in the proposed *Davis* Class.

In sum, the *Le* Settlement did not release claims arising *after* final settlement approval.

That is when Mr. Davis's claim here arose. He should be free to pursue it through this litigation. Defendants are entitled to the benefit of the bargain they made in *L*e, but no more.

### B. Mr. Davis Has Antitrust Standing

#### 1. Ninth Circuit Law Establishes Mr. Davis's Standing to Seek Injunctive Relief.

Defendants argue that Mr. Davis does not have antitrust standing because his relationship with them is not sufficiently direct. Mot. at 12–17. That argument fails. Courts have consistently held plaintiffs have antitrust standing in Mr. Davis's circumstances because: (1) he seeks injunctive relief, not damages; (2) he sold to a foreclosed competitor, not a competitor that benefited from Defendant's Scheme; and (3) as a result, he suffered the kind of loss that the antitrust laws were designed to prevent, including suppressed compensation. *See Lucas*, 140 F.3d at 1235, 1237; *In re HIV Antitrust Litig.*, 2022 WL 22609107, at *46 (N.D. Cal. Sept. 27, 2022).

Defendants' argument to the contrary suffers from two crucial errors. First, Defendants rely on case after case in which courts analyzed whether plaintiffs who do not have a direct relationship with antitrust defendants may bring claims for *damages*, not injunctive relief. Mot. at 12–16. Courts have repeatedly recognized that such plaintiffs may seek injunctive relief under federal antitrust law and that the test for antitrust standing is less exacting when they do. *Lucas*, 140 F.3d at 1235, 1237; *Petroleum Prods*, 497 F. Supp. at 228–29. Defendants ignore these decisions and instead rely on inapposite caselaw addressing damages claims. Defendants also ignore Mr. Davis's allegations that they injured him *directly* by depriving him of the opportunity to fight top-level fighters that they have locked into long-term, exclusive contracts. *E.g.*, ¶¶23, 100, 103, 113.

Defendants' second crucial error is their claim that Mr. Davis relies on an "umbrella theory" for antitrust standing. Mot. at 13–15. He does not. Umbrella pricing occurs when defendants fix prices and their non-defendant competitors take advantage of that "umbrella" from competition to engage in non-competitive pricing. *Petroleum Prods.*, 691 F.3d at 1338. The non-defendant competitors thereby *benefit* from the conspiracy. Here, in contrast, Defendants substantially foreclosed the PFL and other promoters from the market, depriving them of access to professional MMA fighters. *See* ¶¶16, 76, 78, 89, 100, 103, 113; Class Cert. Order at 31–32;

1   *id.* at 57 (noting "[a]s Zuffa's foreclosure share increases, its competitors' access to the critical

2   input of fighters decreases and their concomitant ability to increase or maintain revenue also

3   declines"). That *harms* the PFL and limits the quality of the matches it can promote and, as a

4   result, the compensation it pays its fighters. ¶¶100, 103, 114, 117.

5       The most relevant Ninth Circuit decision is *Lucas Automotive*. Defendants do not even

6   cite it. There, a manufacturer and a distributor entered an exclusive dealing agreement for vintage

7   tires. 140 F.3d at 1230–31. Plaintiff alleged that the agreement substantially foreclosed

8   competition, artificially inflating vintage tire prices. *Id*. at 1231. The plaintiff did not buy vintage

9   tires directly from the defendants but rather made purchases through an intermediary that in turn

10  purchased from the defendants. *Id*. at 1233. The Ninth Circuit held that the plaintiff could not

11  seek damages because it was not the first party in the distribution chain to purchase from

12  defendants; it was an "indirect purchaser." *Id*. at 1233–34 (citing *Illinois Brick Co. v. Illinois*, 431

13  U.S. 720, 728–29 (1977)).

14      But *Lucas* also held that the plaintiff had both antitrust standing and Article III standing,

15  *id*. at 1232, to seek injunctive relief. *Id*. at 1237. It confirmed that plaintiffs without a direct

16  relationship with an antitrust defendant may seek injunctive relief under federal antitrust law. *Id*.

17  at 1235. Accordingly, Defendants' argument that Mr. Davis lacks antitrust standing because he

18  "has no present direct relationship with the UFC" fails. Mot. at 13.

19      *Lucas* also held that "an antitrust plaintiff seeking injunctive relief need only show a

20  *threatened* injury, not an actual one." *Lucas*, 140 F.3d at 1235 (emphasis in original) (citation

21  omitted). Mr. Davis has alleged actual injuries *as well as* threatened injuries from: (1) suppressed

22  compensation, ¶¶23, 103, 113, 114, 117, 144 169; and (2) the lost opportunity to compete against

23  UFC fighters. ¶¶23, 100, 103, 117 143, 144, 169, 170. This Court recognized these harms in its

24  order certifying the *Le* Class. Class Cert. Order at 31–32, 57.

25      The Ninth Circuit further held that such a plaintiff satisfies antitrust standing if it alleges

26  that its "injury flows" from the underlying antitrust violation because the plaintiff was "*forced to

27  operate in a market controlled by a monopolist rather than by market forces*." *Lucas*, 140 F.3d at

28  1235–36 (emphasis in original). And it recognized that an antitrust defendant can qualify as a

monopolist with a market share as low as 44%. *Id.* at 1236. Mr. Davis's injury here flows from the underlying antitrust violation because Defendants' anticompetitive conduct gives it monopsony power, forcing Mr. Davis to operate in a market that is not controlled by market forces. *E.g.*, ¶¶103, 113–14, 116–17, 134–44. Indeed, in its Class Certification Order in *Le*, this Court recognized that Defendant's "coercive contracts *damage the overall market environment* by artificially restricting competitors' access to strong fighter talent which could be used to grow their business." Class Cert. Order at 31 (emphasis added). This Court also found that Defendants controlled over 90% of the relevant input market, *id.* at 27–28, far larger than the market share in *Lucas*. *See also id.* at 29 (noting that "Zuffa's level of market share and dominance in the input (and output) market is more than double the percentage recognized by scholars and the Ninth Circuit as establishing monopsony market power") (citation omitted). The result, again, is to decrease Mr. Davis's compensation below competitive levels and to deprive him of the opportunity to compete against top fighters in lucrative bouts. ¶¶23, 100, 103, 113–14, 116–17, 143–44. In other words, Mr. Davis's injury "flows from" Defendants' antitrust violation.

Accordingly, under *Lucas*, Mr. Davis has antitrust standing to pursue his claim for injunctive relief. But, as noted, Defendants do not discuss *Lucas*. Instead, the primary precedent on which they rely is *Petroleum Products*, 691 F.2d 1335 (9th Cir. 1982). Mot. at 13–14.

The *Petroleum Products* decision Defendants cite involved only *damages*, *not* injunctive relief, unlike this case. Also, unlike this case, it *did* involve umbrella damages. *Petroleum Products* involved an alleged conspiracy to artificially inflate prices for petroleum products. 691 F.2d at 1338–39. The pertinent issue was whether the plaintiffs could bring claims for damages under federal antitrust law using "an 'umbrella' theory of liability." *Id.* at 1338. That theory arises if a conspiracy to inflate prices "created a 'price umbrella'" that enabled *non*-conspirators to raise their prices above competitive levels. *Id.* Further, the plaintiffs and defendants there were separated by independent refiners *and* independent marketers, so between them were at least *two*

1    *intermediaries*. *Id*.[9]

2        Under these circumstances, the Ninth Circuit held that the plaintiffs could not seek

3    *damages*. *Id*. at 1340–41. It based its analysis on the Supreme Court's reasons in *Illinois Brick*

4    for holding that indirect purchasers cannot bring federal antitrust claims *for damages*. *Id*. That

5    reasoning does not apply to injunctive relief, as the Ninth Circuit held in *Lucas*.

6        Indeed, the trial court in *Petroleum Products* held that the plaintiffs there *could* pursue

7    injunctive relief under federal antitrust law, *In re Coordinated Pretrial Proceedings in Petroleum*

8    *Products Antitrust Litigation*, 497 F. Supp. 218, 228–29 (C.D. Cal. 1980). The trial court rejected

9    the defendants' argument that the indirect-purchaser rule in *Illinois Brick* applies to claims for

10   injunctive relief and held that "plaintiffs are entitled to seek injunctive relief for antitrust

11   violations directed against the refined product market *regardless of whether the plaintiffs*

12   *purchased directly or indirectly from the defendants*." *Id*. at 229 (emphasis added). The Ninth

13   Circuit cited that ruling with approval in *Lucas* when it held the same thing. *Lucas*, 140 F.3d at

14   1235 (citing *id.* at 228–29). So *Petroleum Products* does not support Defendants' position and, in

15   fact, undermines it.

16       As a result, Defendants interpret Ninth Circuit law backwards. In circumstances like the

17   ones at issue in *Petroleum Products*, plaintiffs *have* antitrust standing to seek injunctive relief,

18   which is the only relief Mr. Davis seeks here. Moreover, the plaintiffs in *Petroleum Products*

19   were separated from the defendants by at least two intermediaries. 691 F.2d at 1340. In contrast,

20   Mr. Davis's injury stems from his direct relationship with the PFL and directly from the

21   Defendants. ¶¶11, 45.

22       Further, in *Petroleum Products,* the defendants' conduct did not harm competitors; it

23   benefited them by allowing them to artificially raise their prices. 691 F.2d at 1338. That is a

24   defining feature of umbrella damages. *Id*. Here, in contrast, Defendants substantially foreclosed

25   the PFL from the market, harming it and, in turn, Mr. Davis. *See, e.g.*, ¶23; 154–58; *see also*

26   

27   ---

     [9] Some of the damages the plaintiffs sought originated from purchases of petroleum products
     manufactured by *non*-conspirators, sold to independent marketers, and then sold to plaintiffs. *Id*.
28   at 1340. Other purchases were based on petroleum products manufactured by the conspirators,
     brokered by independent refiners, sold to independent marketers, and then sold to plaintiffs. *Id*.

Class Cert. Order at 31–32, 57. Courts distinguish "umbrella claims" from claims based on market foreclosure to find antitrust standing in circumstances like Mr. Davis's. *See, e.g.*, *In re HIV*, 2022 WL 22609107, at *46; *see also In re Modafinil Antitrust Litig.*, 837 F.3d 238, 265 (3d Cir. 2016), *as amended* (Sept. 29, 2016) (distinguishing a price-fixing "umbrella" case from a market exclusion case for purposes of antitrust standing).[10]

### 2. The Relevant Factors Confirm Mr. Davis's Antitrust Standing.

Mr. Davis has antitrust standing under the relevant factors. The Ninth Circuit in *American Ad Management* summarized five of them and other cases include a sixth:

1. *Antitrust Injury*: "the nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to forestall;

2. *Directness*: "the directness of the injury;"

3. *Speculative Measure of Harm*: "the speculative measure of the harm;"

4. *Duplicative Recovery*: "the risk of duplicative recovery;"

5. *Apportioning Damages*: "the complexity in apportioning damages;"[11] and

6. *Improper Motive*: "the motive of the defendant—whether it specifically intended to cause plaintiff's harm."[12]

A plaintiff need not make a favorable showing on each factor to establish antitrust standing. *L.A. Mem'l Coliseum*, 791 F.2d at 1363. The Ninth Circuit has explained, "Most cases will find some factors tending in favor of standing (to a greater or lesser degree), and some against (also in varying degrees), and a court may find standing if the balance of factors so instructs." *Id.*

Here, Defendants do not challenge four of the six factors: (1) antitrust injury; (4)

---

[10] Indeed, Defendants are even wrong that *Petroleum Products* precludes Mr. Davis from seeking *damages* under federal antitrust law. The source of Defendants' error is their mischaracterization of Mr. Davis's claim as involving a "multi-tier" causation theory. Mot. at 14. It does not. Mr. Davis sold his services directly to the PFL, a UFC competitor. ¶¶11, 45. *Petroleum Products* explicitly declined to decide whether a plaintiff so situated may seek damages. 691 F.2d at 1339–41. In fact, it suggested reasons such a plaintiff *should* be able to do so. *Id.* (listing criticisms of *Mid-West Paper Products Co. v. Continental Group, Inc*., 596 F.2d 573 (3d Cir. 1979), holding otherwise). But that issue was not before the Court because, again, the plaintiffs there were separated from the defendants by two intermediaries. That is not true here. So it remains an open question whether Mr. Davis would have antitrust standing to pursue damages under federal antitrust law. What is clear is that he has standing to seek injunctive relief.

[11] *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1054–55 (9th Cir. 1999). (citing *Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519, 530–36 (1983); *Amarel v. Connell*, 102 F.3d 1494, 1507 (9th Cir. 1996); *Lucas*, 140 F.3d at 1232).

[12] *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1363 (9th Cir. 1986).

duplicative recovery; (5) apportioning damages; and (6) improper motive. *See* Mot. at 13 n.7, 15. These four factors provide powerful reasons for this Court to find antitrust standing. Mr. Davis suffered—and will suffer—just the kind of injury the antitrust laws are designed to prevent—the suppression of compensation because Defendants disrupted the ordinary competitive market. *E.g.*, ¶¶11, 12, 103, 117, 157–58, 168–71; *see* Class Cert. Order at 31. There is no risk of duplicative recovery or complexity in apportioning damages because Mr. Davis seeks only injunctive relief. ¶¶12, 23, 183. And Mr. Davis makes copious allegations establishing that Defendants' intent was anticompetitive. *E.g.*, ¶¶16, 76, 79, 116, 177; Class Cert. Order at 31, 40, 57. Defendants make no argument that the four factors that it concedes support antitrust standing are outweighed by the two it (incorrectly) claims Mr. Davis does not satisfy. That alone provides a sufficient basis to rule against it.

In any case, Defendants are wrong about the remaining two factors. They too support a finding of antitrust standing here. Defendants indicate that their arguments address the second and third factors. Mot. at 15.[13] The Ninth Circuit calls the second factor "the directness of the injury," *Am. Ad Mgmt.*, 190 F.3d at 1054, or "the directness of the causal connection between the violation and the injury." *L.A. Mem'l Coliseum*, 791 F.2d at 1363. It calls the third factor "the speculative measure of the harm," *Am. Ad Mgmt.*, 190 F.3d at 1054, or "the extent to which abstract speculation underlies the allegations of injury and of their causation by defendant's antitrust violations." *Id*.

Defendants do not distinguish between these factors or indicate when they are discussing one as opposed to the other. Instead, they vaguely suggest for various reasons that the relationship between Zuffa's alleged antitrust violation and Mr. Davis's past and future injuries is too attenuated and speculative. Mot. at 15–17. They are wrong.

*Defendants' Misinterpretation and Misapplication of Umbrella Damages Doctrine*. As explained above, Defendants' main argument on this point rests on legal error. They claim that

---

[13] Defendants order and describe the *AGC* factors differently, Motion at 13, than the Ninth Circuit does. Mr. Davis follows the Ninth Circuit's order and descriptions. Defendants also refer to their "factor (2)"—improper motive—on page 15, line 3 when they appear to be discussing its factor (1)—causal connection. But that is not entirely clear.

Mr. Davis is pursuing an "umbrella theory" and that such a theory cannot support a claim for injunctive relief under federal antitrust law. Mot. at 13–15. Neither is true. As also explained above, Mr. Davis is not pursuing an umbrella theory but rather a claim based on foreclosure of competition, and courts have found antitrust standing to pursue injunctive relief under these circumstances. *See Lucas*, 140 F.3d at 1235–37; *In re HIV*, 2022 WL 22609107, at *46.

Defendants cite only one case that addresses foreclosure of competition, *In re HIV*, 2022 WL 22609107, at *44. Mot. at 14. But that decision *supports* Mr. Davis. There, the plaintiffs sued brand pharmaceutical companies for conspiring to keep generic versions of their drugs off the market. *Id.* at *1–2. The plaintiffs sought damages in part because the conspiracy allegedly inflated prices that they paid defendants' *non-conspiring rivals* for the generic versions of the drugs by delaying competition between generic manufacturers. *Id.* at *43–44. The defendants argued that the plaintiffs did not have antitrust standing to pursue claims for these damages, which the defendants said were based on the "umbrella theory" the Ninth Circuit purportedly rejected in *Petroleum Products*. *Id.* at *44.

The court disagreed. It held that plaintiffs who purchased generic drugs directly from defendants' foreclosed rivals had antitrust standing to pursue *damages* for those purchases. *Id.* at *46. The court distinguished foreclosure of competition from umbrella pricing. *Id.* at *46. In cases involving foreclosed competitors, "the whole point" of the conduct is to limit competition; "the anticompetitive effect on the marketplace [i]s foreseeable, indeed intended." *Id.* at *46. Because such conduct "prevents a competitive market from forming at all," "*all market customers* should have antitrust standing to sue those engaged in the allegedly anticompetitive conduct because all suffer equally from the foreclosure of choice." *Id.* at *45 (quoting *Modafinil*, 837 F. 3d at 238) (emphasis in *In re HIV*). The court also noted that calculating damages based on prices paid directly to defendants' foreclosed rivals "does not involve the problems of a 'multi-tiered distribution system'" like the one in *Petroleum Products*. *Id.* at *46 (citing *Petroleum Prods.*, 691 F.2d at 1341).

As in *In re HIV*, Defendants' conduct here is intended to exclude competition from rivals like the PFL. *E.g.*, ¶¶79, 115–19, 132–41, 154–59. The anticompetitive effect of that conduct on

the market for fighter labor "was foreseeable," and "intended." *Id.*; Class Cert. Order at 40, 57. Defendants' Scheme did not injure only excluded competitors like the PFL. It also harmed market participants like Mr. Davis who sold their labor directly to those excluded competitors. *E.g.*, ¶¶157-58, 167-71. Accordingly, *In re HIV* supports Mr. Davis's standing.[14]

 *Defendants' Invented Causal Chain*. Defendants make a second argument along somewhat similar lines. They fabricate what they pretend is an extended causal chain and then claims it is too long and uncertain to weigh in favor of antitrust standing. Mot. at 15–16. According to Defendants, that chain includes that (1) top fighters sign exclusive agreements with the UFC; (2) those contracts bar appearances for rival promoters; (3) fighters comply with the restrictions; (4) rival promotions earn less because they cannot stage bouts featuring UFC-contracted fighters; and (5) as a result, rival promotions pay their fighters less than they would if they could co-promote. *Id.* This causal chain is both exaggerated and inaccurate.

 As to exaggeration, the first three links are not meaningfully distinct. The exclusive contracts at issue by their terms bar appearances at rival promoters. ¶¶117–22; Class Cert. Order at 34–35. Further, the fighters Defendants coerce into exclusive contracts are of course overwhelmingly going to abide by them for fear of reprisal, including for breach of contract. *Id.*; *see also* ¶¶123–25; Class Cert. Order at 36–39. The three points are best summarized as one: Defendants require their fighters to enter exclusive contracts that prevent them from competing for rival promoters.[15] *See* Class Cert. Order at 36. These contracts have the effect of foreclosing Defendants' rivals from a substantial portion of the market, harming competition and Mr. Davis. These "links" are not speculative. They find support in this Court's rulings. *Id.*

 Defendants also distort Mr. Davis's allegations. He claims that Defendants' Scheme not only prevents bouts between UFC and non-UFC fighters but also stops the PFL and other promoters from attracting top fighters by competing on compensation. *See, e.g.*, ¶¶23, 116–18,

---

[14] In any event, as noted above, Defendants are wrong that an "umbrella theory" cannot support a claim for injunctive relief, *see Petroleum Products*, 497 F. Supp. at 228–29; *Lucas*, 140 F.3d at 1235 (citing *id.*). It may even support a claim for damages in Mr. Davis's circumstances. *Petroleum Products*, 691 F.2d at 1339–41.

[15] This sort of sophistry is reminiscent of Zeno's paradox: that motion is impossible because we can divide any trip into an infinite number of smaller steps, and no one can take an infinite number of steps. It is a fallacy, and so is Zuffa's argument.

154–58. If the PFL and other promoters could attract top fighters through financial incentives, that would increase the value of their events and the compensation they would pay their athletes, including Mr. Davis. *Id*. Allowing UFC fighters to compete for other promotions is one route to higher athlete compensation. *Id*. Co-promotion is a second. *Id*. Competition to attract fighters is a third. *Id*. None is attenuated or speculative. *See* Class Cert. Order at 31–32, 57.

Mr. Davis also alleges that the Scheme impacts him directly by blocking the routes for him to raise his rank and profile, such as competing against top-level fighters in his weight class. ¶¶23, 100, 103, 113, 114, 116, 117. That effect is not an accident. Defendants know the direct link between opportunities to fight in top-level matches and how "valuable" a fighter is, *i.e.*, how much a fighter gets paid. *See* ¶116. Blocking those opportunities has the purpose and effect of harming not just rival promotions like the PFL, but of keeping down fighter pay by depriving them of negotiation leverage. This is yet another way that Defendants' exclusive contracts distort the market and directly harm Mr. Davis. Class Cert. Order at 31.

*Defendants' Misreading of Precedents*. Defendants' argument also relies on inapposite precedents and ignores controlling ones (in addition to *Lucas*). Directly relevant is *Los Angeles Memorial Coliseum Commission v. National Football League*, 791 F.2d 1356 (9th Cir. 1986). There, a stadium pursued antitrust claims based on the NFL's refusal to allow the Oakland Raiders to move locations. The agreement harmed the Raiders, and it also prevented the stadium from attempting to contract with the Raiders in a free market. *Id*. at 1365. The Ninth Circuit found antitrust standing. *Id.*

Mr. Davis is similarly situated here. Defendants' conduct injures the PFL and other promoters. *E.g.*, ¶¶116–17, 154–58; Class Cert. Order at 31–32. It also harms the fighters who sign with the PFL. *E.g.*, ¶¶113–18. The PFL is unable to offer them co-promotion with UFC athletes or to attract UFC athletes through pay. *E.g.*, ¶¶11, 12, 15, 100, 103, 154–58. That diminishes the PFL's revenues and the amount it pays its fighters. *Id.*; Class Cert. Order at 57. Fighters are the key input for an MMA promotion. *E.g.*, ¶¶115–122, 154–57; Class Cert. Order at 57. As a result, harm to a fighter through an MMA promoter is just like harm to a stadium through an NFL team.

Defendants do not distinguish or even cite *Lucas* or *Los Angeles Coliseum*. Instead, they rely on inapposite cases where the plaintiffs are not like Mr. Davis because they seek damages— not injunctive relief; they pursue an umbrella theory, unlike Mr. Davis; they did not adequately allege an antitrust violation; or some combination of these reasons.

Nearly all the cases Defendants cite, Motion at 13–16, address antitrust standing for *damages*.[16] As noted above, the requirements are different for damages than injunctive relief. *See Lucas*, 140 F.3d at 1235. Mr. Davis does not seek damages here.

Further, in many of these and the other cases Defendants cite, Motion at 13–15, the plaintiffs *do* bring umbrella claims. They seek to recover for transactions with defendants' competitors that priced under the defendants' "umbrella"—which *benefited* the competitors.[17] Those cases do not apply to cases involving foreclosed competitors, like the PFL.

*Mirage Wine + Spirit's, Inc. v. Apple Inc.*, and *Bakay v. Apple Inc.*, Motion at 16, are likewise inapposite because the plaintiffs there did not adequately allege an antitrust violation. *Mirage Wine + Spirit's, Inc. v. Apple Inc.*, 2025 WL 1896006, at *1 (S.D. Ill. July 9, 2025); *Bakay v. Apple Inc.*, 2024 WL 3381034, at *4 (N.D. Cal. July 11, 2024). Mr. Davis plausibly alleges an antitrust violation here, which Defendants do not contest. Mot. at 1 n.1; *see* Class Cert. Order at 42; MSJ Order at 8–9.

*City of Oakland v. Oakland Raiders* is also inapposite. First, it addresses damages, not injunctive relief. 20 F. 4th at 455. In addition, the facts there do not resemble the facts here. Oakland sought damages based on an NFL agreement to restrict the number of teams, which

---

[16] *Petroleum Products*, 691 F.2d at 1340–41; *Allen v. Dairy Farmers of Am., Inc.*, 2014 WL 2610613, at *28 (D. Vt. June 11, 2014); *Sabol v. PayPal Holdings, Inc.*, 2024 WL 3924686, at *3 (N.D. Cal. Aug. 23, 2024); *In re Online DVD Rental Antitrust Litig.*, 2011 WL 1629663, at *1 (N.D. Cal. Apr. 29, 2011); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2012 WL 6708866, at *1 (N.D. Cal. Dec. 26, 2012); *Antoine L. Garabet, M.D., Inc. v. Autonomous Techs. Corp.*, 116 F. Supp. 2d 1159, 1170 (C.D. Cal. 2000); *Gross v. New Balance Athletic Shoe, Inc.*, 955 F. Supp. 242, 246 (S.D.N.Y. 1997); *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 19 F.4th 127, 134 (2d Cir. 2021); *Costco Wholesale Corp. v. AU Optronics Corp.*, 2014 WL 4723880 (W.D. Wash. Sept. 23, 2014); *City of Oakland v. Oakland Raiders*, 20 F.4th 441 (9th Cir. 2021).

[17] *See Allen*, 2014 WL 2610613, at *28; *Sabol*, 2024 WL 3924686, at *3; *In re Online DVD*, 2011 WL 1629663, at *1; *In re TFT-LCD*, 2012 WL 6708866, at *1; *Garabet*, 116 F. Supp. 2d at 1170; *Gross*, 955 F. Supp. at 246; *In re AmEx*, 19 F.4th at 134; *Oliver v. Am. Express Co.*, 2020 WL 2079510, at *9 (E.D.N.Y. Apr. 30, 2020); *In re Amazon.com, Inc. eBook Antitrust Litig.*, 2022 WL 4581903, at *8 (S.D.N.Y. Aug. 3, 2022); *Costco*, 2014 WL 4723880.

allegedly drove up the prices cities paid for those teams. *Id.* at 456. But Oakland did not allege that it paid *any* overcharge for a team because *it did not purchase one*; it was "priced out." *Id.* at 458 (citation omitted). The Ninth Circuit found as a "*nonpurchaser*" Oakland's injuries were too speculative. *Id.* at 449, 459. It noted the dearth of allegations that "but for the limited number of teams, Oakland would still have an NFL team." *Id.* at 459–60.

In contrast, Mr. Davis *does currently* participate in the market for MMA fighter labor. ¶¶11, 45. He is not a *nonfighter* sitting on the sidelines alleging that but for the UFC's conduct he would enter the ring. Nor does he seek damages based on the amount he would be paid for that hypothetical fight. Also, unlike Oakland, Mr. Davis makes many nonconclusory allegations that but for Defendants' coercive contracts and other anticompetitive conduct, he and other fighters would be paid more. *E.g.*, ¶¶23, 100, 103, 105, 114–18, 154–58. *City of Oakland* is inapposite.

Finally, many of the cases Defendants cite address antitrust standing at class certification or summary judgment,[18] so Defendants' arguments are not only wrong but also premature.

## C.    Mr. Davis Has Article III Standing

Defendants claim that Mr. Davis lacks Article III standing because he is not currently under contract with the UFC. Mot. at 10–12. But this Court has already held that fighters for UFC's rival promoters have Article III standing to seek injunctive relief. Class Cert. Order at 73–74. Defendants ignore that ruling.

Defendants also ignore *Lucas*. There, the Ninth Circuit held that the inquiry into antitrust standing is "more demanding" than the inquiry into Article III standing. 140 F.3d at 1232 (citation omitted). Courts must also dismiss a case *sua sponte* if a plaintiff lacks Article III, even if no party raises it. Mr. Davis's antitrust standing establishes his Article III standing.

Instead of addressing the relevant legal authorities, Defendants rely on two irrelevant lines of cases. The first do not involve antitrust doctrine. The second do not address Article III standing. Neither supports dismissal.

Article III authorizes the judiciary to adjudicate only "cases" and "controversies." U.S.

---

[18] *See, e.g.*, *Allen*, 2014 WL 2610613, at *28; *In re Online DVD*, 2011 WL 1629663, at *1; *TFT-LCD*, 2012 WL 6708866, at *1; *Garabet*, 116 F. Supp. 2d at 1170.

Const. art. III. To satisfy Article III, a plaintiff must show "injury-in-fact, causation, and redressability." *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 967 (9th Cir. 2018). When the injury alleged is a future injury, the plaintiff must show that it is "actual and imminent, not conjectural or hypothetical." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). Past harms are "evidence bearing on whether there is a real and immediate threat of repeated injury," but if plaintiffs' theory of standing is alleged entirely on the threat of repeated injury, they must show "a sufficient likelihood that he will again be wronged in a similar way." *City of L.A. v. Lyons*, 461 U.S. 95, 102 (1983). In addressing standing, courts should "be careful not to employ too narrow or technical an approach," "examine the questions realistically," and consider "the context of the inquiry." *Davidson*, 889 F.3d at 967 (cleaned up).

To show redressability, Mr. Davis "need not demonstrate that there is a 'guarantee' that [his] injuries will be redressed by a favorable decision." *M.S. v. Brown*, 902 F.3d 1076, 1083 (9th Cir. 2018) (quoting *Renee v. Duncan*, 686 F.3d 1002, 1013 (9th Cir. 2012)). *See also In re HIV*, 2022 WL 22609107 at *31. Rather, he "need only show that there would be a 'change in a legal status,' and that a 'practical consequence of that change would amount to a significant increase in the likelihood that [he] would obtain relief that directly redresses the injury suffered.'" *Renee*, 686 F.3d at 1013 (quoting *Utah v. Evans*, 536 U.S. 452, 464 (2002)). He has made that showing.

Along with other relief, Mr. Davis seeks changes in UFC's contracts with its fighters. ¶183. If the Court were to enjoin Zuffa from enforcing those provisions, that would be a change in legal status. *In re HIV*, 2022 WL 22609107 at *31 (barring enforcement of contractual terms is a "change in legal status" for purposes of Article III redressability). Mr. Davis makes nonconclusory allegations that, as a practical matter, without those provisions, he would be significantly more likely to earn more from his bouts and compete against superior fighters. ¶¶4, 11. He similarly makes nonconclusory allegations that he would fight UFC fighters through co-promotion because UFC would have to compete on a level playing field and such co-promotion "would be profitable." ¶¶170, 100, 137, 11. In other words, but for those contractual terms, there is a "sufficient likelihood" that Mr. Davis would fight top-level UFC fighters and make more money in the process. *Lyons*, 461 U.S. at 111. He has satisfied the requirements of Article III—

injury in fact, traceability, and redressability.

In arguing otherwise, Defendants invoke *Dukes v. Walmart Stores, Inc.*, Motion at 10, for the proposition that Mr. Davis's claims fail because he is not employed by UFC. 564 U.S. 338, 364–65 (2011). But that—along with the other employment discrimination case Defendants cite—does not fit Mr. Davis's claims. Mot. at 10 (citing *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 865 (9th Cir. 2017)). In an employment discrimination case, plaintiffs lack standing to enjoin unlawful conduct if they are no longer employed at the company and there is no strong threat of their being harmed by future discrimination at that company. *Dukes*, 564 U.S. at 364. Not so in the antitrust context. Mr. Davis is a professional fighter in a tight-knit industry where Defendants' Scheme has systematically suppressed competition, output, and wages. Class Cert. Order at 31, 40–41. The allegations in the *Davis* Complaint detail how the Scheme harms him and how his fighting prospects and compensation would be greater without it. *E.g.*, ¶¶23, 100, 103–105, 114–18, 154–58. In an antitrust context, Mr. Davis need not show that Defendants are *required* to directly redress his injuries as long as he can "show that the defendant or a third party are nonetheless *likely* to provide redress as a result of the decision." *M.S.*, 902 F.3d at 1083 (emphasis added). That is what Mr. Davis has done by explaining how he would benefit from injunctive relief.

Defendants are also wrong that Mr. Davis's claims are speculative. Mot. at 10–11. They argue that Mr. Davis's injuries are not redressable by reforming UFC's contracts because "changes to UFC's contracts will not (and cannot) require his league to pay him more." Mot. at 11 (citing *Paulsen v. CNF Inc.*, 559 F.3d 1061, 1073 (9th Cir. 2009)). But that too misunderstands antitrust law. In *Paulsen*, the ERISA case Defendants cite, there was no reason to believe the relief sought would benefit plaintiffs and good reasons to believe it would not. *Id.* ("any possible recovery . . . must go to" a governmental body, "the Employees have no stake in the recovery," and the court had no basis to "predict" that the governmental body would compensate plaintiffs). That is not true here. As explained above in the section on antitrust standing, this Court's rulings, the evidence in *Le*, and Mr. Davis's allegations all strongly support his claim that injunctive relief would benefit him.

The national security surveillance case Defendants cite, *Clapper*, fares no better. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411 (2013). Mot. at 11. There, the Court held that plaintiffs' purported injuries were predicated on an implausible chain of improbable events. For plaintiffs to be injured, the government would have to surveil certain specific foreign individuals, use a particular surveillance method, obtain court approval, successfully intercept communications, and incidentally capture the plaintiffs' own messages to those individuals. *Id.* at 411–14. Plaintiffs' allegations here, by contrast, require only straightforward application of antitrust economic principles to this Court's past rulings, the evidence in *Le*, and Mr. Davis's allegations.

Nor do Defendants find support in refusal-to-deal doctrine. The cases they cite discuss when an antitrust defendant can—and cannot—be held liable for refusing to do business with another market actor. *See, e.g.*, *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009); *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985); *FTC v. Qualcomm Inc.*, 969 F.3d 974, 994 (9th Cir. 2020); *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016); *see also United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919). Those decisions do not address Article III standing. Further, Mr. Davis's claim is not based on a refusal to deal, but rather on Defendant's Scheme. That Scheme suppressed his compensation and deprived him of opportunities to compete against UFC fighters. Those allegations about the *effects* of Defendants' Scheme do not implicate refusal-to-deal doctrine.

"The Supreme Court has repeatedly endorsed the principle that district courts are clothed with large discretion to fit the decree to the special needs of the individual case—not just to unfetter a market from anticompetitive conduct, but also to pry open to competition a market that has been closed by defendants' illegal restraints." *In re Google Play Store Antitrust Litig.*, 147 F. 4th 917, 946 (9th Cir. 2025) (citing *Ford Motor Co. v. United States*, 405 U.S. 562, 573 (1972) (internal citations omitted). Mr. Davis has standing to ask the Court to do that here.

## III.    CONCLUSION

The Court should deny Defendants' motion to dismiss.

Respectfully submitted,

Dated: September 18, 2025

By:    /s/ Eric L. Cramer
       Eric L. Cramer (*pro hac vice*)
       Michael Dell'Angelo (*pro hac vice*)
       Patrick F. Madden (*pro hac vice*)
       BERGER MONTAGUE PC
       1818 Market St., Suite 3600
       Philadelphia, PA 19103
       Telephone: +1 (215) 875-3000
       Email: ecramer@bergermontague.com
       Email: mdellangelo@bergermontague.com
       Email: pmadden@bergermontague.com

       Joshua P. Davis (*pro hac vice*)
       Robert C. Maysey (*pro hac vice*)
       Kyla J. Gibboney (*pro hac vice*)
       BERGER MONTAGUE PC
       505 Montgomery Street, Suite 625
       San Francisco, CA 94111
       Telephone: +1 (415) 906-0684
       Email: jdavis@bergermontague.com
       Email: rmaysey@bergermontague.com
       Email: kgibboney@bergermontague.com

       *Counsel for Plaintiff Phil Davis and the
       Proposed Class*

       Joseph R. Saveri (*pro hac vice*)
       Kevin E. Rayhill (*pro hac vice*)
       Christopher K. L. Young (pro hac vice)
       Itak Moradi (pro hac vice)
       JOSEPH SAVERI LAW FIRM
       601 California St., Suite 1000
       San Francisco, CA 94108
       Telephone: +1 (415) 500-6800
       Facsimile: +1 (415) 395-9940
       Email: jsaveri@saverilawfirm.com
       Email: krayhill@saverilawfirm.com
       Email: cyoung@saverilawfirm.com
       Email: imoradi@saverilawfirm.com

       Richard A. Koffman (*pro hac vice*)
       Benjamin Brown (*pro hac vice*)
       Daniel H. Silverman (*pro hac vice*)
       COHEN MILSTEIN SELLERS & TOLL,
          PLLC
       1100 New York Ave., N.W., Suite 500 East
          Tower
       Washington, DC 20005
       Telephone: +1 (202) 408-4600
       Facsimile: +1 (202) 408-4699
       Email: rkoffman@cohenmilstein.com
       Email: bbrown@cohenmilstein.com
       Email: dsilverman@cohenmilstein.com

Daniel Gifford (*pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL,
    PLLC
88 Pine St., Suite 14th Fl.
New York, NY 10005
Telephone : +1 (617) 877-0508
Email : dgifford@cohenmilstein.com

W. Joseph Bruckner (*pro hac vice*)
Brian D. Clark (*pro hac vice*)
Consuela M. Abotsi-Kowu (*pro hac vice*)
LOCKRIDGE GRINDAL NAUEN PLLP
100 Washington Ave. S, Suite 2200
Minneapolis, MN 55401
Telephone: +1 (612) 596-4001
Facsimile : +1 (612) 339-0981
Email : wjbruckner@locklaw.com
Email : bdclark@locklaw.com
Email : cmabotsi-kowu@locklaw.com

Kyle Pozan (*pro hac vice*)
LOCKRIDGE GRINDAL NAUEN PLLP
1165 N. Clark St., Ste. 700
Chicago, IL 60610
Telephone : +1 (612) 339-6900
Email : kjpozan@locklaw.com

*Additional Counsel for Plaintiff Phil Davis
    and the Proposed Class*

Michael J. Gayan
CLAGGETT & SYKES LAW FIRM
4101 Meadows Lane
Ste #100
Las Vegas, NV 89107
702-655-2346
Fax: 702-655-3763
Email: mike@claggettlaw.com

*Liaison Counsel for Plaintiff Phil Davis and
    the Proposed Class*