WILLIAM A. ISAACSON (*Pro hac vice*)
wisaacson@dirllp.com
JESSICA PHILLIPS (*Pro hac vice*)
jphillips@dirllp.com
AGBEKO PETTY (*Pro hac vice*)
apetty@dirllp.com
DUNN ISAACSON RHEE LLP
401 Ninth Street NW
Washington, DC 20004
Tel: (202) 240-2900

DONALD J. CAMPBELL (No. 1216)
djc@campbellandwilliams.com
J. COLBY WILLIAMS (No. 5549)
jcw@campbellandwilliams.com
CAMPBELL & WILLIAMS
710 South 7th Street
Las Vegas, NV 89101
Tel: (702) 382-5222

CHRISTOPHER S. YATES (*Pro hac vice*)
chris.yates@lw.com
AARON T. CHIU (*Pro hac vice*)
aaron.chiu@lw.com
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Tel: (415) 391-0600

[Additional counsel listed on signature page]

*Attorneys for Defendants Zuffa, LLC, TKO Group Holdings, Inc., and Endeavor Group Holdings, Inc.*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| Phil Davis, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>Zuffa LLC, TKO Group Holdings, Inc. (d/b/a Ultimate Fighting Championship and UFC), and Endeavor Group Holdings, Inc.,<br><br>Defendants. | Case No.: 2:25-cv-00946-RFB-BNW<br><br>**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS**<br><br>**HEARING REQUESTED** |

**TABLE OF CONTENTS**

**Page**

I.     DAVIS RELEASED HIS CLAIMS IN THE *LE* SETTLEMENT ......................... 1

    A.     Davis's Manufactured "Until Final Approval" Theory Cannot Be Reconciled With the Continuation Clause ............................................................ 2

    B.     The Continuing Violation Doctrine Cannot Undo a Settlement Release ................................................................................................................ 4

    C.     Public Policy Requires Enforcing the Release .................................................. 5

II.     DAVIS LACKS ARTICLE III STANDING ............................................................... 6

    A.     Davis Faces No Imminent Injury ....................................................................... 6

    B.     Davis's Alleged Injury Is Not Traceable to UFC .............................................. 7

    C.     An Injunction Would Not Redress Davis's Alleged Harm ................................ 8

III.     DAVIS LACKS ANTITRUST STANDING ............................................................... 9

    A.     Direct-Participant Cases Underscore Why Davis's Injury Is Too Remote ................................................................................................................ 9

    B.     Davis Cannot Deny that His "Foreclosure" Claim Is an Umbrella Theory ............................................................................................................... 11

    C.     *AGC* Confirms Davis is Not the Proper Plaintiff .............................................. 12

IV.     CONCLUSION ............................................................................................................ 12

# TABLE OF AUTHORITIES

Page(s)

### CASES

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
  459 U.S. 519 (1983)...........................................................................................................9

*Bakay v. Apple Inc.*,
  2024 WL 3381034 (N.D. Cal. July 11, 2024).................................................................8

*Bayer v. Neiman Marcus Grp., Inc.*,
  861 F.3d 853 (9th Cir. 2017) .......................................................................................6, 7

*Bird v. Dep't of Hum. Servs.*,
  935 F.3d 738 (9th Cir. 2019) ...........................................................................................4

*Briseño v. Henderson*,
  998 F.3d 1014 (9th Cir. 2021) .........................................................................................5

*City of L.A. v. Lyons*,
  461 U.S. 95 (1983)...........................................................................................................6

*City of Oakland v. Oakland Raiders*,
  20 F.4th 441 (9th Cir. 2021) .....................................................................................8, 12

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013).............................................................................................7, 8, 11

*Davidson v. Kimberly-Clark Corp.*,
  889 F.3d 956 (9th Cir. 2018) ...........................................................................................7

*Dukes v. Wal-Mart Stores, Inc.*,
  564 U.S. 338 (2011).........................................................................................................6

*FTC v. Qualcomm Inc.*,
  969 F.3d 974 (9th Cir. 2020) ...........................................................................................9

*Gross v. New Balance Athletic Shoe, Inc.*,
  955 F. Supp. 242 (S.D.N.Y. 1997) ...............................................................................11

*Hesse v. Sprint*,
  598 F.3d 581 (9th Cir. 2010) ...........................................................................................2

*In re Amerco Derivative Litig.*,
  127 Nev. 196 (2011) ........................................................................................................3

*In re HIV Antitrust Litig.*,
   2022 WL 22609107 (N.D. Cal. Sept. 27, 2022) .................................................................10

*In re Petroleum Prods. Antitrust Litig.*,
   691 F.2d 1335 (9th Cir. 1982) ..........................................................................................11

*L.A. Mem'l Coliseum Comm'n v. NFL*,
   726 F.2d 1381 (9th Cir. 1984) ..........................................................................................11

*L.A. Mem'l Coliseum Comm'n v. NFL*,
   791 F.2d 1356 (9th Cir. 1986) ..........................................................................................10

*Lawlor v. Nat'l Screen Serv. Corp.*,
   349 U.S. 322 (1955) ............................................................................................................5

*Lucas Automotive Eng'g, Inc. v. Bridgestone/Firestone, Inc.*,
   140 F.3d 1228 (9th Cir. 1998) ..........................................................................................10

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) .......................................................................................................8, 9

*M.S. v. Brown*,
   902 F.3d 1076 (9th Cir. 2018) ........................................................................................7, 9

*Matter of 23 Partners Tr. I*,
   138 Nev. 836 (2022) ...........................................................................................................3

*Mitsubishi Motors v. Soler Chrysler-Plymouth, Inc.*,
   473 U.S. 614 (1985) ............................................................................................................5

*Paulsen v. CNF Inc.*,
   559 F.3d 1061 (9th Cir. 2009) ........................................................................................8, 9

*Price v. Second Jud. Dist. Ct. in & for Cnty. of Washoe*,
   567 P.3d 319 (Nev. 2025) ...................................................................................................4

*RB Prods., Inc. v. Encore DEC, LLC*,
   2022 WL 891292 (D. Nev. Mar. 25, 2022) ........................................................................1

*Renee v. Duncan*,
   686 F.3d 1002 (9th Cir. 2012) ........................................................................................7, 9

*Ringle v. Bruton*,
   120 Nev. 82 (2004) .............................................................................................................1

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) ............................................................................................................7

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ................................................................................................7

*Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) ................................................................................................9

*Whittum v. Acceptance Now*,
    2019 WL 4781846 (D. Nev. Sept. 30, 2019) ........................................................3

Plaintiff Phil Davis's Opposition confirms that his Complaint is incurably defective and must be dismissed with prejudice. A plain reading of the *Le* settlement release forecloses his claims. That settlement release covers claims "based upon, arising from, or relating to" the factual predicates of *Le* and "claims that arise after the Execution Date to the extent they involve a continuation" of that conduct. Davis's efforts to avoid this unequivocal language cannot be reconciled with the Complaint's repeated allegations that this case is a "continuation" of the operative facts in *Le*. Davis also cannot get around the fact that his claim is based on an attenuated and remote chain of causation that depends entirely on a third party (PFL), confirming that he lacks both Article III standing and antitrust standing. Moreover, Davis's alleged injury is entirely speculative: it depends on wages that third-party **PFL**—not UFC—independently set. The Ninth Circuit has squarely rejected this type of umbrella theory of liability. Davis offers no serious answer to these fundamental flaws. The Complaint should be dismissed with prejudice.

## I. DAVIS RELEASED HIS CLAIMS IN THE *LE* SETTLEMENT

Davis's Opposition reinforces that his claims are barred by the *Le* settlement release. Davis concedes the facts requiring dismissal: he was a *Le* class member, did not opt out, and is bound by the Court-approved settlement in that action, Opp. 1–2; and his case challenges the "continuing" anticompetitive scheme alleged in *Le*. *Id*. Those concessions, standing alone, end the matter: Davis agreed to release all claims, including continuation claims arising from the UFC contracts, markets, and theory of harm at issue here. His attempt to manufacture an exception cannot undo the bargain struck by class counsel—and would render class action settlements meaningless.

"[W]hen contract language is clear and unambiguous, it will be enforced as written" and "the court may not admit any other evidence of the parties' intent because the contract expresses their intent." *RB Prods., Inc. v. Encore DEC, LLC*, 2022 WL 891292, at *3 (D. Nev. Mar. 25, 2022) (Boulware, J.) (citing *Ringle v. Bruton*, 120 Nev. 82, 93 (2004)). The *Le* settlement release is unambiguous. It releases "any and all known and unknown claims . . . for equitable or injunctive relief of any nature . . . ***based upon, arising from, or relating to***" the factual predicates of *Le* "from the beginning of time until final approval," and further clarifies: "Released Claims include, but are

not limited to, ***claims that arise after the Execution Date to the extent they involve a continuation*** " of that conduct. *Le*, Dkt. No. 1045-4 ¶ 10(a).[1] The Settlement further provides that courts must "interpret and enforce" the release "broadly and to the fullest extent permitted by law." *Id.* at ¶ 1(s).

Against that text, the Ninth Circuit's decision in *Hesse v. Sprint* provides the governing rule: a class settlement release bars later suits when the subsequent new claim is "based on the identical factual predicate as that underlying the claims in the settled class action." 598 F.3d 581, 590 (9th Cir. 2010). Davis cites *Hesse*, Opp. 10, to suggest his claims fall outside the rule. But the opposite is true. In both his Complaint and Opposition, Davis repeatedly characterizes his claims as a continuation of the factual predicates litigated in *Le*. Compl. ¶¶ 1, 23, 46, 171, 179, 181 (alleging "ongoing" and "continuing" *Le* factual predicates); Opp. 1, 6–9 (same). Under *Hesse*, Davis's claims are "identical" for purposes of the release: they arise from the identical factual predicates litigated in *Le*, which the Settlement covers as claims ***"based upon, arising from, or relating to"*** those predicates. *Le*, Dkt. No. 1045-4 ¶ 10(a). Labeling Davis's requested relief as "injunctive only" does not change the result. The *Le* release unequivocally covers "equitable or injunctive relief of any nature." *Id.*

### A. Davis's Manufactured "Until Final Approval" Theory Cannot Be Reconciled With the Continuation Clause

Davis argues his claims survive because the release "applied only 'until final approval'" and lacks "a clear intent to release future claims." Opp. 6. The reference to "until final approval" is in Paragraph 10(a)(i) and does not apply to the independent release of "(ii) any issue raised in the Action by pleading or motion." *Le*, Dkt. No. 1045-4 ¶ 10(a). And "Released Claims include, but are not limited to, claims that arise after the Execution Date ***to the extent they involve a continuation of some or all of the conduct or issues set forth in 10(a)(i) and (ii) herein***." *Id.*

Plaintiff nonetheless contends the "for clarity" language—which releases claims "that arise

---

[1] Unless noted, all quoted material has been cleaned up by removing brackets, ellipses, footnote call numbers, internal quotation marks, and internal citations, and all emphases are added.

1   *after the Execution Date* to the extent they involve a continuation" of *Le* conduct, without any time
2   limit—only applies to claims arising between execution of the settlement agreement on September
3   26, 2024, and final approval of the Settlement on March 3, 2025. Opp. 7. But the text
4   unambiguously says the opposite. The "for clarity" sentence is the forward-looking provision; it
5   confirms that claims arising after execution—and absent any end date—are released if they
6   "involve a continuation" of the *Le* conduct. Reducing that plain language to a five-month gap is
7   not interpretation; it is invention. Davis's narrow reading would also disregard and contradict the
8   very next section, which directs that the release be enforced "***broadly and to the fullest extent***
9   ***permitted by law***." *Le*, Dkt. No. 1045-4 ¶ 10(b); *see Whittum v. Acceptance Now*, 2019 WL
10  4781846, at *4 (D. Nev. Sept. 30, 2019) (Boulware, J.) (a "fundamental principle" of "language
11  itself" is "that the meaning of a word cannot be determined in isolation, but must be drawn from
12  the context in which it is used"). Davis's reading would make meaningless the Nevada Supreme
13  Court's guidance that a "contract must be read as a whole without negating any provision." *See*
14  *Matter of 23 Partners Tr. I*, 138 Nev. 836, 842 (2022) ("A court should not interpret a contract so
15  as to make meaningless its provisions.").

16     Davis next argues that treating the continuation clause as forward-looking would render
17  the phrase "until final approval of this Settlement Agreement" meaningless. Opp. 8. Again, the
18  opposite is true. "Until final approval" defines the period of the factual predicates being released
19  in 10(a)(i); the continuation clause makes clear that later-arising claims based on continuation of
20  those released predicates are also barred for both claims arising under 10(a)(i) and (ii). Confining
21  the continuation clause to the five months between execution and approval would leave it with no
22  independent role. It is Davis's interpretation—not Defendants'—that strips the continuation clause
23  of purpose, in direct violation of Nevada law.

24     Davis then relies on *In re Amerco Derivative Litig.*, 127 Nev. 196 (2011), to argue the *Le*
25  release "does not apply to claims beyond Final Approval." Opp. 6–7. That misstates *Amerco*, in
26  which the Nevada Supreme Court held that, absent "clear intent," a release is confined to existing
27  claims. *Amerco*, 127 Nev. at 206. Unlike the release in this case, the release in *Amerco* contained
28

no provision addressing future conduct and covered only "known or unknown claims" "that have been or could have been asserted in the litigation." *Id*. at 211–12. Nevada law under *Amerco* requires clarity; the *Le* release provides it.

Finally, Davis suggests that because the parties knew how to write carve-outs, the continuation clause was insufficiently express. Opp. 8. But the Settlement Agreement ***did*** exclude (i) ordinary-course disputes, (ii) claims in the *Johnson* Action, and (iii) actions to enforce the settlement. Dkt. No. 1045-4 ¶10(a). Those express carve-outs confirm the Parties understood and unequivocally exempted specific claims from the release. *Price v. Second Jud. Dist. Ct. in & for Cnty. of Washoe*, 567 P.3d 319, 324 (Nev. 2025) (Herndon, J., concurring) ("[T]he expression of 'one thing is the exclusion of another' has been repeatedly confirmed in this State"). No such carve-out exists for continuation claims, which are included in the release. Davis's theory requires the Court to invent a "silent carve-out" that the parties could have drafted but chose not to.

### B. The Continuing Violation Doctrine Cannot Undo a Settlement Release

Davis next invokes the continuing violation doctrine, arguing it controls "when [his] claims arose" and his "new claim came into existence when Defendants took new unlawful acts." Opp. 8 (citing *Bird v. Dep't of Hum. Servs.*, 935 F.3d 738 (9th Cir. 2019)). But that misstates the law. *Bird* applied the doctrine only as a statute-of-limitations accrual rule, explaining that a claim is timely when "the last act evidencing the continuing practice falls within the limitations period." 935 F.3d at 746; *id.* at 948 (emphasizing that "continuing impact from past violations is not actionable."). Nothing in *Bird* suggests the doctrine can override a bargained-for settlement release. Davis cites no case—and Defendants have found none—applying the continuing violation doctrine to override a settlement release.

Class settlements are bargains. Davis accepted the monetary benefits of *Le* and agreed to release any and all continuation claims. *Le*, Dkt. No. 1045-4 ¶ 10(a). He cannot now rely on a limitations doctrine to rewrite that deal. If his theory were accepted, every class member could re-file the day after final approval claiming a continuing violation, gutting the finality of settlements. Allowing statute of limitations accrual doctrines to override express releases would severely

impair the incentive to settle class actions.[2]

### C. Public Policy Requires Enforcing the Release

Davis next appeals to "public policy" as a reason to disregard the *Le* release, relying on *Mitsubishi Motors* and *Lawlor*. Opp. 10. Neither case supports him.

*Mitsubishi Motors v. Soler Chrysler-Plymouth, Inc.* warned, in dicta, that courts should hesitate before enforcing arbitration clauses that "operated in tandem as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations." 473 U.S. 614, 637 n.19 (1985). That warning was confined to contracts of adhesion requiring parties to waive ***unknown future claims before a dispute arose***. *Id.* at 628–29. Unlike *Mitsubishi Motors*, the *Le* release was the result of a court-supervised settlement, negotiated by sophisticated counsel after years of litigation, and designed to release continuation claims arising from the *identical* scheme alleged in *Le*. See Order Granting Final Approval of *Le* Settlement, Dkt. No. 1064 (settlement was the "result of vigorous arm's-length negotiations" by "counsel with significant experience" and involving a "highly regarded mediator."). The *Le* release is not a prospective waiver of unknowable rights.

*Lawlor v. Nat'l Screen Serv. Corp.* did not interpret a settlement release. 349 U.S. 322 (1955). "[T]he only question presented" in *Lawlor* was whether res judicata "barred" a second antitrust lawsuit after an earlier lawsuit was resolved by a settlement agreement. *Id.* at 323. The Court allowed a second suit because defendants engaged in "new antitrust violations," including the settlement agreement itself, that were "not present in the former action," and undertook "a substantial change in the scope" of their monopoly. *Id.* at 328. Unlike *Lawlor*, Davis alleges no such new acts (and certainly not that the *Le* settlement was itself an antitrust violation). Regardless, *Lawlor* addressed res judicata, not the scope of a bargained-for release.

Davis's public policy arguments cut against him. Enforcing the *Le* release vindicates the strong federal policy favoring both settlements of and finality in complex class actions. *Briseño v.*

---

[2] Davis's reliance on the discussion of the continuing violation doctrine in *Le* (Opp. 8–9) is misplaced. The doctrine was analyzed to decide whether pre-class-period conduct could be considered in evaluating the scheme's legality—even if outside the statute of limitations—***not*** in the context of interpreting a settlement release. *Le*, Dkt. No. 1010 (Pretrial Conf. Tr.) at 41–43.

*Henderson*, 998 F.3d 1014, 1030 (9th Cir. 2021) (the Ninth Circuit has "repeatedly noted that there is a strong judicial policy that favors settlements, particularly where complex class action litigation is concerned"). If Davis's position were accepted, antitrust settlements would become unworkable under res judicata and statute of limitations case law: class members could accept settlement benefits and then immediately re-litigate the same claims seeking additional damages under a new label, undermining finality, burdening courts, and destabilizing settlements. Public policy requires enforcing the *Le* release, not voiding it.

## II. DAVIS LACKS ARTICLE III STANDING

Even if the release did not bar this action (which it does) Davis's Complaint must still be dismissed because he lacks Article III standing. Davis's Opposition confirms he cannot establish injury in fact, traceability, or redressability. Davis left UFC in 2015, admits he is under contract with a UFC competitor (PFL), and does not allege any imminent plan to return. Compl. ¶¶ 11, 45. His only theory is that changes to UFC's contracts might mean more competition among MMA promoters, which in turn might cause PFL to pay him more. That speculation does not satisfy Article III.

### A. Davis Faces No Imminent Injury

Davis concedes he left UFC a decade ago and fights exclusively for PFL, yet tries to claim that he faces imminent harm from UFC contracts. He does not allege UFC has offered him a contract, that he intends to seek one, or that any UFC opportunity is imminent. Compl. ¶¶ 11, 45. Those admissions foreclose standing. Article III requires a plaintiff seeking injunctive relief to show a concrete threat that he himself will again be subject to the challenged conduct, not mere past exposure. *See City of L.A. v. Lyons*, 461 U.S. 95, 111 (1983).

Davis attempts to distinguish *Dukes v. Wal-Mart Stores, Inc.*, 564 U.S. 338 (2011) and *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853 (9th Cir. 2017) as mere "employment" cases. Opp. 23. That is a distinction without a difference. In both cases, former employees lacked standing to enjoin practices that no longer apply to them. *Dukes*, 564 U.S. at 364–65; *Bayer*, 861 F.3d at 865. Article III's imminence requirement applies regardless of the area of law: whether in

employment, antitrust, or any other context, a former participant does not have standing to enjoin conduct he does not face and will not face again. *Bayer*, 861 F.3d at 865.

Davis relies on *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, (9th Cir. 2018), *Summers v. Earth Island Inst.*, 555 U.S. 488 (2009), *Renee v. Duncan*, 686 F.3d 1002 (9th Cir. 2012), and *M.S. v. Brown*, 902 F.3d 1076 (9th Cir. 2018). Opp. 22–23. But each case cuts against him. *Davidson* involved a consumer who still intended to buy the allegedly mislabeled product, so the injury was ongoing. 889 F.3d at 962. *Renee* upheld standing because the challenged regulation directly governed the plaintiffs' rights, so an injunction would predictably alter them. 686 F.3d at 1013. By contrast, *Summers* denied standing where the alleged risk of harm was speculative and generalized. 555 U.S. at 495–96. And *Brown* rejected standing where relief depended on discretionary third-party choices not compelled by court order. 902 F.3d at 1083, 1085. Davis's case is like *Summers* and *Brown*, not *Davidson* or *Renee*: any benefit to Davis depends on the independent choices of a third-party (PFL) and not any imminent UFC conduct.

The Supreme Court's standard underscores the point: for injunctive relief, "a threatened injury must be certainly impending to constitute injury in fact, and [] allegations of possible future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Davis's theory—that if UFC's contracts were enjoined, PFL *might* earn more, and PFL *might* then pay him more—is the kind of speculation *Clapper* forbids.

**B.    Davis's Alleged Injury Is Not Traceable to UFC**

Davis argues that UFC's contracts allegedly limit competition, which might reduce PFL's revenues, which might cause PFL to pay him less. Opp. 21–24. Davis's multi-link chain fails Article III as a matter of law. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

Davis's admissions doom his traceability theory. He concedes PFL, not UFC, sets his pay. Compl. ¶¶ 11, 45. UFC does not negotiate his contracts, determine his fights, or schedule his bouts: those are PFL's independent judgments, influenced by its own revenues, fan demand, costs, and strategy. Davis's theory requires at least five speculative steps: allegedly, UFC's contracts reduce competition; rivals cannot attract fighters; PFL's revenues decline; PFL links pay to that decline;

and PFL chooses to suppress Davis's pay. Opp. 18–19; Mot. 15–16. Each step impermissibly depends on non-party discretion. *Clapper*, 568 U.S. at 414, n.5 (no standing where injury depends on "unfettered choices made by independent actors not before the court"); *Bakay v. Apple Inc.*, 2024 WL 3381034, at *6 (N.D. Cal. July 11, 2024) (no standing for injunctive relief because Plaintiffs' theory of harm depended on speculative third-party action ).

The attenuated theory here is even weaker than the one rejected in *Clapper*, where plaintiffs alleged their communications might be intercepted under a surveillance program. 568 U.S. at 410–14. There, the Supreme Court held those allegations too speculative because they required assuming the government would target plaintiffs' contacts, choose to use the challenged program, and successfully intercept communications. *Id*. Davis's chain has even more contingencies.

Davis's fallback—pointing to *Le* rulings recognizing harms to non-UFC fighters—fails. Opp. 21–24. Those rulings addressed damages and certification for current UFC fighters, where causation was direct: UFC set their pay and allegedly depressed it. *Id*. Article III standing is plaintiff- and relief-specific, and it must be proven at every stage. *City of Oakland v. Oakland Raiders*, 20 F.4th 441, 452 (9th Cir. 2021). Davis's alleged injury is *admittedly* caused directly by PFL's wage-setting, not UFC's contracts. That defeats traceability.

### C.    An Injunction Would Not Redress Davis's Alleged Harm

Davis's argument that an injunction against UFC's contracts would redress his harm, Opp. 22, cannot be squared with the fact that any downstream benefit to him would depend on another party—PFL. For Davis's injury to be redressable, it must be likely—not speculatively—remedied by the relief sought. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). If relief depends on non-party discretion, redressability fails. *Paulsen v. CNF Inc.*, 559 F.3d 1061, 1073 (9th Cir. 2009).

Davis's requested relief illustrates the problem: he seeks only an injunction against UFC's contracts. Compl. ¶ 183. Any resulting benefit to Davis would therefore depend entirely on *PFL's* independent choices and whether increases reach Davis. Even if UFC's contracts were enjoined, nothing would compel PFL to increase his compensation. That decision belongs to PFL alone. Defendants do not argue redressability must be guaranteed, as Davis claims. Opp. 22. But Article

III requires likelihood of redressability, and here the required likelihood is lacking because of the dependency on actions by a third party. *Lujan*, 504 U.S. at 561.

Davis relies on *Renee* and *Brown* but misreads them. Opp. 22. In *Renee*, the government directly controlled the regulation limiting plaintiffs' services, so enjoining it would immediately and directly alter the plaintiffs' rights. 686 F.3d at 1013. *Renee* also confirms that redressability requires a likely practical consequence—not speculation about third-party behavior. *Brown* is even worse for Davis: there, the Ninth Circuit held redressability lacking because relief depended on discretionary choices of state officials not compelled by the court order. 902 F.3d at 1083. That is exactly Davis's posture, and relief contingent on those discretionary choices cannot support standing. *Paulsen*, 559 F.3d at 1073.

Davis's co-promotion theory is no better. UFC has no duty to assist rivals. *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408, 411 (2004); *FTC v. Qualcomm Inc.*, 969 F.3d 974, 994–95 (9th Cir. 2020). Even if UFC's contracts were enjoined, nothing would require UFC to co-promote with PFL, share fighters, or match talent with Davis.

## III.  DAVIS LACKS ANTITRUST STANDING

Even if Davis could overcome the *Le* release and Article III defects, his claim still fails because he lacks antitrust standing. Davis's Opposition confirms that the alleged harm is derivative of alleged harm to his own promoter—PFL—and again depends on PFL's independent wage-setting. That is the kind of remote, umbrella theory that fails the requirements of *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*").

### A.  Direct-Participant Cases Underscore Why Davis's Injury Is Too Remote

Antitrust standing requires more than Article III injury. Courts apply the *AGC* factors, which ask whether there is: (1) a causal connection between the violation and the harm; (2) directness of the injury; (3) speculative nature of the injury; (4) risk of duplicative recovery; and (5) whether the plaintiff is a proper party to enforce the antitrust laws. *AGC*, 459 U.S. at 537–44. Davis fails on the core inquiries of causation, directness, and speculation. For the same reasons, he is not the proper party to enforce the antitrust laws.

Davis relies on *Lucas Automotive Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228 (9th Cir. 1998), *L.A. Mem'l Coliseum Comm'n v. NFL*, 791 F.2d 1356 (9th Cir. 1986) ("*Coliseum II*"), and *In re HIV Antitrust Litig.*, 2022 WL 22609107 (N.D. Cal. Sept. 27, 2022), but each involved plaintiffs who were direct market participants whose injuries flowed immediately from the alleged restraint. Opp. 11–18. Davis is not in that position.

In *Lucas*, the plaintiff was a downstream buyer in the vintage tire market who challenged a competitor's acquisition of exclusive distribution rights. 140 F.3d at 1232. The Ninth Circuit held the plaintiff lacked standing for damages but allowed standing for equitable relief, based on the plaintiff's ongoing participation as a purchaser in a market allegedly monopolized through Defendant's exclusive distribution arrangement. *Id.* at 1236–37 (Tashima, J., concurring). *Lucas* thus involved a plaintiff transacting in the market controlled by the defendant's alleged monopoly. *Id.* Davis, by contrast, is not a customer of UFC, not a purchaser from UFC, and concedes his compensation is set by a non-party, PFL. Compl. ¶¶ 117–18, 121. Davis alleges only derivative harm filtered through an independent promoter's wage-setting. *Id.*

In *In re HIV,* consumers purchased HIV medications directly from specialty pharmacies that were foreclosed by defendants' conduct and paid higher prices to the entities suffering foreclosures. 2022 WL 22609107 at *1–2. The court found plaintiffs' injuries were immediate and direct because they transacted with the very entities excluded by the restraint, and the foreclosure increased the prices they themselves paid. *Id*. at *50–51. Davis is in the opposite posture: he is not a customer of UFC or even of a foreclosed entity. Compl. ¶¶ 11, 45. Instead, he alleges only that he is paid less by PFL, a non-defendant, because UFC supposedly indirectly weakened PFL's revenues. *Id.* That flips the causal chain: in *In re HIV*, the plaintiffs paid more because their suppliers were foreclosed, whereas here, Davis claims he is paid less because his buyer allegedly lost revenue. *Id.* That distinction introduces another layer of causation that makes his alleged injury speculative and indirect.

Davis also invokes *Coliseum II*, Opp. 16, but that case further underscores the weakness of his argument. There, plaintiff Coliseum had a negotiated lease with the Raiders in hand, and the

NFL's relocation rule directly vetoed that specific transaction. *L.A. Mem'l Coliseum Comm'n v. NFL,* 726 F.2d 1381, 1384 (9th Cir. 1984) ("*Coliseum I*"). Davis alleges nothing comparable. Instead, he alleges only generalized market effects that might someday influence how PFL chooses to pay him.

### B. Davis Cannot Deny that His "Foreclosure" Claim Is an Umbrella Theory

Unable to identify a direct injury, Davis insists he is not asserting an "umbrella theory" but a "foreclosure" claim. Opp. 17. That is wordplay. However he describes it, Davis's allegations fit the umbrella mold for a monopsony case: an indirect, derivative injury caused not by UFC's conduct with respect to its fighters but through an alleged effect on the wage-setting of another market participant. The Ninth Circuit has described umbrella liability as a "consequential damages" theory that seeks to hold defendants liable for injuries flowing from non-defendants' independent pricing decisions. *In re Petroleum Prods. Antitrust Litig.*, 691 F.2d 1335, 1339–41 (9th Cir. 1982). That is exactly what Davis alleges.

Davis's own causal chain proves the point. UFC contracts allegedly foreclose rivals; rivals earn less revenue; PFL responds by lowering pay; Davis receives "suppressed wages." Opp. 1–2. That is the definition of an umbrella theory because his harm materializes only as a consequence of the choices of a non-defendant. Courts consistently reject such claims where the injury depends on "unfettered choices made by independent actors not before the courts." *Clapper*, 568 U.S. at 414, n.5; *see also Petroleum Prods.*, 691 F.2d at 1340–41, nn.6–9; *Gross v. New Balance Athletic Shoe, Inc.*, 955 F. Supp. 242, 246–47 (S.D.N.Y. 1997). Davis's effort to distinguish his case on the ground that his promoter is "harmed" rather than benefitted underscores the flaw in his argument. Opp. 11–12. The defect is the same: Davis's harm depends on the effects on a promoter other than UFC.

Davis wrongly argues *Petroleum Prods.* is "only a damages case." Opp. 20. The Ninth Circuit's reasoning—that antitrust standing cannot rest on indirect injuries caused by non-defendants—applies equally to injunctive relief claims. 691 F.2d at 1340–41. Davis also fails to confront the extensive case law rejecting umbrella theories of antitrust liability. Mot. 12–15.

Davis also improperly dismisses *City of Oakland* as inapposite. Opp. 20–21. There, the Ninth Circuit held that a claim depending on "too many speculative links in the chain of causation" was "too speculative" and "indirect" to confer antitrust standing. 20 F.4th at 459–61. Oakland's theory required multiple assumptions about how the NFL and third parties would behave in a counterfactual market. *Id*. Davis's theory is even weaker. Oakland at least alleged it sought to contract with a team, *id.* at 449–50; Davis identifies no prospective transaction with UFC.

### C.   *AGC* Confirms Davis is Not the Proper Plaintiff

Davis further fails under *AGC* because he is not the proper plaintiff to enforce the antitrust laws. Davis argues he may vindicate the "competitive process" on behalf of the market. Opp. 11. But *AGC* makes clear the question is not whether someone was harmed, but whether this plaintiff is the proper party to enforce the antitrust laws. 459 U.S. at 537–44. There, the Supreme Court held that a union's alleged injury was too indirect, and derivative of harms suffered by contractors, to support standing. *Id.* at 540–46.

The same is true here. The only possible direct victims of the conduct alleged in the Complaint would be UFC's rival promoters, such as PFL, who allegedly cannot compete effectively for their own fighters. They, not Davis, have both the incentive and ability to challenge UFC's contracts. Allowing Davis to sue as an employee of a rival promoter illustrates why *AGC* imposes this limitation. If his theory were accepted, every fighter employed by any competitor could sue alleging "suppressed wages," spawning duplicative, derivative litigation untethered from the entities directly restrained. The antitrust laws do not authorize such claims because antitrust enforcement is entrusted to those directly restrained by the challenged conduct, not to employees whose alleged harm arises only through a non-defendant's discretionary wage-setting. *City of Oakland*, 20 F.4th at 459, 461.

### IV.   CONCLUSION

For the foregoing reasons, the Court should dismiss Davis's Complaint with prejudice.

Dated: October 9, 2025                            Respectfully Submitted,


                                                  /s/ Christopher S. Yates
WILLIAM A. ISAACSON (*Pro hac vice*)              CHRISTOPHER S. YATES (*Pro hac vice*)
wisaacson@dirllp.com                              chris.yates@lw.com
JESSICA PHILLIPS (*Pro hac vice*)                 AARON T. CHIU (*Pro hac vice*)
jphillips@dirllp.com                              aaron.chiu@lw.com
AGBEKO PETTY (*Pro hac vice*)                     LATHAM & WATKINS LLP
apetty@dirllp.com                                 505 Montgomery Street, Suite 2000
DUNN ISAACSON RHEE LLP                            San Francisco, CA 94111
401 Ninth Street NW                               Tel: (415) 395-8095
Washington, DC 20004
Tel: (202) 240-2900                               SEAN M. BERKOWITZ (*Pro hac vice*)
                                                  sean.berkowitz@lw.com
DONALD J. CAMPBELL (No. 1216)                     LATHAM & WATKINS LLP
djc@campbellandwilliams.com                       330 North Wabash Ave, Suite 2800
J. COLBY WILLIAMS (No. 5549)                      Chicago, IL 60611
jcw@campbellandwilliams.com                       Tel: (312) 777-7016
CAMPBELL & WILLIAMS
710 South 7th Street                              LAURA WASHINGTON (*Pro hac vice*)
Las Vegas, Nevada 89101                           laura.washington@lw.com
Tel: (702) 382-5222                               LATHAM & WATKINS LLP
                                                  10250 Constellation Blvd, Suite 1100
                                                  Los Angeles, CA 90067
                                                  Tel : (424) 653-5578

                                                  DAVID L. JOHNSON (*Pro hac vice*)
                                                  david.johnson@lw.com
                                                  LATHAM & WATKINS LLP
                                                  555 Eleventh Street NW, Suite 1000
                                                  Washington, D.C. 20004
                                                  Tel: (202) 637-1061


*Attorneys for Defendants Zuffa, LLC, TKO Group Holdings, Inc., and Endeavor Group Holdings, Inc.*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing Defendants' Reply in Support of Motion to Dismiss was served on October 9, 2025 via the Court's CM/ECF electronic filing system addressed to all parties on the e-service list.

/s/ Christopher S. Yates
Christopher S. Yates of
LATHAM & WATKINS LLP