WILLIAM A. ISAACSON (*Pro hac vice*)
wisaacson@dirllp.com
JESSICA PHILLIPS (*Pro hac vice*)
jphillips@dirllp.com
AGBEKO PETTY (*Pro hac vice*)
apetty@dirllp.com
DUNN ISAACSON RHEE LLP
401 Ninth Street NW
Washington, DC 20004
Tel: (202) 240-2900

SAMUEL R. MIRKOVICH (No. 11662)
srm@cwlawlv.com
CAMPBELL & WILLIAMS
710 South 7th Street, Ste. A
Las Vegas, NV 89101
Tel: (702) 382-5222

CHRISTOPHER S. YATES (*Pro hac vice*)
chris.yates@lw.com
AARON T. CHIU (*Pro hac vice*)
aaron.chiu@lw.com
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Tel: (415) 391-0600

*Attorneys for Defendants Zuffa, LLC and TKO Group Holdings, Inc.*

[Additional counsel listed on signature page]

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEVADA**

| | |
|---|---|
| PHIL DAVIS, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ZUFFA, LLC, TKO Group Holdings, Inc. (d/b/a Ultimate Fighting Championship and UFC), and Endeavor Group Holdings, Inc.,<br><br>Defendants. | Case No.: 2:25-cv-00946-RFB-BNW<br><br>**ZUFFA, LLC, AND TKO GROUP HOLDINGS, INC.'S COUNTERPROPOSAL TO PLAINTIFF'S PROPOSED PROTOCOL FOR PRODUCTION OF 23 MOBILE DEVICE EXTRACTIONS FROM DEFENDANTS' CUSTODIANS** |

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ..... 1

I. BACKGROUND ..... 3

A. Plaintiffs Concede The *Johnson* Action Has "Little Value" ..... 3

B. Plaintiffs Claim Certain Discovery Is Necessary To Respond To Defendants' Motion To Compel Arbitration In *Cirkunovs* ..... 4

C. Given Their Massive Liability Hurdles, Plaintiffs Focus On Escalating Allegations of Spoliation While Never Identifying What Is Supposedly Missing. 5

D. Plaintiffs Instigate A Rule 706 Process And Recommend Eric Wedin To Court; Mr. Wedin Erases The Central Evidence In Spoliation Proceedings ..... 6

II. LEGAL STANDARD ..... 9

III. PLAINTIFF'S PROPOSAL IS DISPROPORTIONATE AND UNDULY BURDENSOME UNDER RULE 26(B)(1) ..... 10

A. Plaintiff's Proposal Cannot Be Completed On Any Reasonable Timeline ..... 12

B. Plaintiff's Proposal Seeks Access To Defendants' Legally Protected And Sensitive Information ..... 16

IV. PLAINTIFF'S PROPOSAL IS TECHNICALLY UNWORKABLE ..... 19

V. DEFENDANTS SHOULD NOT BEAR THE CONSEQUENCES OF THE COURT-APPOINTED EXPERT'S FAILURES AND LACK OF CANDOR ..... 20

VI. ZUFFA AND TKO'S COUNTERPROPOSAL ..... 21

CONCLUSION ..... 22

## INTRODUCTION

It should have been an inflection point when the Court fired its appointed expert after he finally admitted, after filing three reports and testifying on multiple occasions, to erasing Dana White's iPhone 11 Pro—the central piece of evidence in these spoliation proceedings. Unfortunately it was not. Plaintiffs now seek almost unfettered access to twenty-three devices belonging to six custodians—the same level of access that the Court afforded its now-terminated Rule 706 expert. Providing this sort of nearly unrestricted access to a civil litigation adversary would be unprecedented and trample the privacy and other rights of the six custodians—and the lawyers, spouses, medical professionals, family and others they communicated with about matters that have no bearing on this litigation.

The failure of the 706 process has already caused irreparable harm to TKO and Zuffa ("Defendants") in several ways. *First*, the wiping of Dana White's iPhone 11 Pro permanently deprives Defendants of evidence and permanently impairs their ability to defend against Plaintiffs' unfounded spoliation allegations. *Second*, Defendants are without recourse to recoup the more than $500,000 spent on forensic experts to address Mr. Eric Wedin's wiping of the iPhone, let alone the attorneys' fees, time and resources that were necessary to respond to and defend against Mr. Wedin's claims and accusations, many of which turned out to be wrong. And *third*, rather than progress to merits discovery, the dismissal of the Court's expert is now being bootstrapped by Plaintiffs to attempt to gain improper access to nearly all of Defendants' ESI, to the prejudice of the custodians and others, as well as Defendants.

Plaintiff's Proposal is technically impossible and legally indefensible. The process contemplated by Plaintiff's Proposal does not meet even a basic Rule 702/*Daubert* analysis and would require altering original evidence using a method that has never been published, tested, peer-reviewed, or ordered by any court—at a cost, delay, and burden far out of proportion to the amount at issue in this case or anything Plaintiffs may seek to achieve. Most troubling, Plaintiff's Proposal will almost certainly lead to the inadvertent disclosure of attorney-client privileged information and ensure Plaintiffs have access to Defendants' sensitive personal communications, protected spousal communications, competitively sensitive business information about issues that

are not relevant to this litigation, and protected medical information, among other things. None of this information should be provided to Plaintiffs—and a Protective Order is not sufficient to protect the privacy and other interests of Defendants, the custodians, and the non-parties with whom they were communicating. *See, e.g.*, *In re Williams-Sonoma, Inc.*, 947 F.3d 535, 540 (9th Cir. 2020) (granting mandamus relief to prevent compelled disclosure of sensitive customer information because "before a direct appeal could be taken and heard, the disclosure and damage to [privacy] interests would be complete"); *Lim v. Expel, Inc.*, 2025 WL 3458981, at *5 (S.D. Cal. Dec. 1, 2025) (rejecting argument that labeling information confidential under protective order was sufficient "to offset the harm to privacy caused by allowing an adverse third party to comb through more than a decade of personal information that is of remote relevance"). The burden of implementing Plaintiff's Proposal, an estimated 12–24 months at a cost of more than $4 million in forensic expert fees, to produce an altered copy of data that no expert could rely upon consistent with Rule 702, is completely unconstrained by what is appropriate and proportional.

In response to the Court's request that Defendants propose a means for providing Plaintiffs access to information they would never otherwise be entitled to, or risk the Court ordering Plaintiff's Proposal, Defendants outline their counterproposal ("Defendants' Counterproposal") in Section VI, below.[1] As explained, Defendants' Counterproposal will ensure that each of Plaintiffs' requests for information are specifically tethered to the facts, proportional, and permit Defendants the necessary opportunity to protect and redact privileged, protected, and sensitive irrelevant information. Specifically, Defendants' Counterproposal calls for Plaintiffs to identify the specific data believed to be necessary to perform a particular analysis. These requests would be addressed one at a time and device by device, to permit Defendants to identify how to effectuate the request

---

[1] Defendants continue to maintain that neither Plaintiff's Proposal nor any counterproposal should be necessary. As Defendants explained in their July 24, 2026 Response to Plaintiffs' Statement of Materials Missing from Defendants' Productions (Dkt. No. 313), the documents Plaintiffs claim are missing are, in fact, already in Defendants' productions, and Plaintiffs' ever-changing spoliation theories are untethered from the actual discovery record. *See* Dkt. No. 313 at 2–4. The most efficient and appropriate path forward remains for the parties to conclude this collateral inquiry and return to fact discovery so the case can proceed to the merits. *See id.* at 4. Defendants submit their counterproposal below consistent with the Court's instruction, but without waiving this position.

according to the device's particular specifications. With twenty-three devices, including various makes, models, operating systems and versions, different installed applications, application versions, and extraction methods, no single procedure can serve the entire data set. And for each request, Defendants' experts would locate the requested information, after which Defendants' counsel would review the specific information for attorney-client privilege and other sensitive information.

## I. BACKGROUND

### A. Plaintiffs Concede The *Johnson* Action Has "Little Value"

When seeking approval for a global settlement, Plaintiffs freely detailed the merit and value of the *Johnson* action. As Plaintiffs explained, the arbitration clauses across the *Johnson* class would likely involve a "***doomed trip to the Ninth Circuit and the Supreme Court relating to trying to overturn arbitration clauses that the Supreme Court has said time and again should be enforced***." *Le* Dkt. No. 1036 (July 12, 2024 Hr'g Tr.) at 87:7–10. Plaintiffs argued that no other lawyers "would have brought the *Johnson* case if *Le* didn't exist," *id.* at 16:20–22, and that "no firm" (*id.* at 19:1–4) would take such an "uphill battle," *id.* at 41:20–42:7. It was for these reasons, Plaintiffs reasoned, the *Johnson* claims were of "***little value***." *Id.* at 86:17; *see also, e.g.*, *id.* at 89:14–15 (Plaintiffs' counsel describing "the likelihood that the [*Johnson*] claim is worth more than $3,000 is very low."); *Le* Dkt. No. 1024-7, at ¶¶ 10–15, 20–23; *Le* Dkt. No. 1029-1 at 9–11. Nevertheless, the Court denied the parties' proposed global settlement which would have resolved all claims in *Le* and *Johnson*. *Le* Dkt. No. 1038. Shortly thereafter, the parties reached a settlement agreement in *Le* only. *Le* Dkt. No. 1045.

Consistent with Plaintiffs' description of *Johnson*'s merit and the serious challenges presented by the large percentage of the putative class with arbitration clauses and class action waivers, Defendants filed a motion to deny class certification or strike the class allegations. *Johnson* Dkt. No. 179. Defendants argued the named Plaintiffs, who do *not* have arbitration clauses in their fighter contracts, cannot represent a class of fighters who *do* have arbitration clauses in their fighter contracts. *Id.* Acknowledging the merits of Defendants' motion, Plaintiffs chose not to file an opposition and instead sought a joint stipulation to amend the

*Johnson* complaint to eliminate any fighter whose contract contained an arbitration agreement. *See Johnson* Dkt. No. 191, 194. Without written order, the Court denied the parties' joint stipulation. *Johnson* Dkt. No. 195.

Afterwards, Plaintiffs filed *Cirkunovs v. Zuffa, LLC, et al.*, No. 25-cv-914-RFB-BNW (D. Nev.), an overlapping putative class action that raises identical claims to *Johnson* but only on behalf of fighters *with* arbitration agreements and class action waivers. Just weeks later, Plaintiffs filed another lawsuit on behalf of another putative class, this one brought by a fighter who left the UFC in 2018, released claims against the UFC as part of the *Le* settlement, and claims that his compensation at the promoter that he chose to join in 2018 is lower than it should be—supposedly because of the UFC. *Davis v. Zuffa, LLC, et al.*, No. 2:25-cv-00946-RFB-BNW (D. Nev.).

### B. Plaintiffs Claim Certain Discovery Is Necessary To Respond To Defendants' Motion To Compel Arbitration In *Cirkunovs*

Because *Cirkunovs* seeks to represent the very same fighters in the putative *Johnson* class with arbitration clauses in their contracts, on August 25, 2025, Defendants filed a motion to compel arbitration. Dkt. No. 38. But rather than respond to the motion to compel arbitration, Plaintiffs leveled a discrete accusation of spoliation that, over the past year, has changed and expanded into an unrecognizable claim spanning 35 custodians and unanchored to their original allegations. *See* Dkt. No. 83.

Their quest for a viable spoliation theory began with two custodians: Dana White and Tracy Long. Plaintiffs claimed they could not respond to the merits of the motion to compel arbitration without certain discovery from Mr. White and Ms. Long. *See e.g.*, *id.*, at 13 ("Thus, obtaining Mr. White's and Ms. Long's text messages and other documents is necessary for Plaintiffs to fully and fairly respond to Defendants' Motion to Compel Arbitration and for the Court to decide it."); *id.* ("Specifically, Defendants appear to have spoliated both Mr. White's and Ms. Long's text messages for critical time periods relating to arbitration."); *id.* at 14 ("These key employees thus lack an important category of documents for the most critical arbitration-related time periods."). The Court confirmed this discrete inquiry sought by Plaintiffs: "There are two individuals where there's missing information that have been identified as part of negotiations and

would be relevant to a decision as relates to the arbitration clause. And so that's who the spoliation issue will focus on." Dkt. No. 137 (Nov. 20, 2025 Hr'g Tr.) at 96:15-19; *see also id.*, at 93:15-16 ("But, yes, right now I'm focused on arbitration-specific."); Dkt. No. 138 (Dec. 4, 2025 Hr'g Tr.) at 65:10-12 ("Because right now, again, I'm just focused on the missing information from those two individuals across the three cases.").

### C. Given Their Massive Liability Hurdles, Plaintiffs Focus On Escalating Allegations of Spoliation While Never Identifying What Is Supposedly Missing

Since their narrow claim of spoliation as to two custodians in *Cirkunovs* in November 2025, Plaintiffs' allegations have spread.[2] Just a month after their first allegations, the spoliation-creep began with Plaintiffs claiming "spoliation issues potentially go far beyond Mr. White and Ms. Long." *Johnson* Dkt. No. 365-2 (Exhibit B (Dec. 19, 2025 Hr'g Tr.) to Petition for Writ of Mandamus) at 12:22-23. Two months later, Plaintiffs filed a motion for sanctions where they sought to further expand their spoliation allegations to four more custodians and dozens of devices and applications. Dkt. No. 180. And to cast their net even wider, Plaintiffs sought discovery into thirty more custodians, and their devices, and over a decade of carrier information for business and personal phones. *See, e.g.*, Dkt. No. 192 (Minutes of Proceedings, Mar. 3, 2026).

While Plaintiffs originally alleged that text messages were missing from Dana White's and Tracy Long's devices, Dkt. No. 83, any claimed gap has since been filled through Defendants' linear review and rolling productions (and thus does not demonstrate "lost" ESI within the meaning of Rule 37). Dkt. No. 271 at 20–22. All told, Defendants have produced more than 106,000 text messages involving Mr. White, collected from his and other custodians' devices. *Id.* at 5. Plaintiffs have not identified anything that is missing after this production as Rule 37 requires. Indeed, the only data that remains unrecoverable is the data that the Court-appointed expert, Mr. Wedin, permanently deleted by wiping Mr. White's iPhone 11 Pro. Dkt. No. 372 at 1–2.

Plaintiffs then further expanded their dragnet, obtaining detailed extraction reports from Defendants' e-discovery vendors for approximately 29 custodians in total. *See Johnson* Dkt. No.

---

[2] *Cirkun*ovs is currently stayed pending appeal. *See Cirkunovs v. Zuffa, LLC*, No. 25-7906 (9th Cir.) (appeal docketed Dec. 17, 2025).

549 (May 16, 2026 Hr'g Tr.) at 162:25–163:5; Dkt. No. 240 (Minutes of Proceedings, May 18, 2026). By May 11, 2026, Defendants had filed 28 extraction reports covering what Plaintiffs called their high-priority custodians and produced an additional 16 supplemental reports covering eight more custodians. Dkt. No. 232; Dkt. No. 245. Plaintiffs then cited RowID gaps identified in the vendor extraction reports to claim that custodians had destroyed between 650,000 and one million text messages. *See Johnson* Dkt. No. 539 at 9–11; *Johnson* Dkt. No. 578 at 1. They did so knowing that "RowID gaps do not equate to the deletion of messages," (*Johnson* Dkt. No. 583 (June 3, 2026 Hr'g Tr.) at 28:19–21).

At each turn, the basis for Plaintiffs' shifting spoliation claims has collapsed. When the Court directed Plaintiffs to specifically identify the categories of information they believed were actually missing from Defendants' productions, Plaintiffs submitted a flawed analysis riddled with errors. Dkt. No. 313 at 6–9. In response, Defendants demonstrated that 96% of Plaintiffs' supposedly "missing" bout agreements were sitting in Fighter Files that Defendants had already produced, that Defendants had produced written evidence of negotiations for nearly 80% of PAR agreements at issue even though many negotiations are conducted orally, and Defendants' search terms had returned responsive documents for every one of Plaintiffs' categories of allegedly missing information. *Id.*

### D. Plaintiffs Instigate A Rule 706 Process And Recommend Eric Wedin To Court; Mr. Wedin Erases The Central Evidence In Spoliation Proceedings

In February 2026, after the testimony of Dana White, Hunter Campbell, and Tracy Long confirmed Defendants' consistent representations regarding digital device usage, Mr. White's changed duties and responsibilities, and the witnesses' document retention practices, Plaintiffs pushed for the appointment of an "independent expert." *Johnson* Dkt. No. 417 (Feb. 5, 2026 Hr'g Tr.) at 90:9–91:23. In response, the Court appointed Plaintiffs' recommended expert, Eric Wedin, to analyze certain of Defendants' devices for "things such as are there text messages on the phone, are there other types of images on the phone, just to give that report to the Court, but also to be able to come in here and answer questions." *Johnson* Dkt. No. 431 (Feb. 11, 2026 Hr'g Tr.) at 14:1–17:18; *see also, e.g.*, Dkt. No. 192 (Minutes of Proceedings, Mar. 3, 2026) (appointment of

Mr. Wedin); Declaration of Joseph D. Axelrad ("Axelrad Decl."), Ex. 1 (Mr. Wedin's Resume). As part of Mr. Wedin's appointment, the Court requested proposed instructions from the Parties. *See Johnson* Dkt. No. 466 (Mar. 3, 2026 Hr'g Tr.) at 68 (Court soliciting instructions); Dkt. No. 194 (Parties' joint submission with competing proposed instructions).

In response to Plaintiffs' proposed instructions (which the Court adopted in full), Defendants objected to the extraordinary expansion of Mr. Wedin's charter sought by Plaintiffs:

> Plaintiffs' proposed instructions far exceed the limited charter established by the Court. Rather than a neutral inventory to determine device ownership and catalog the types, volumes, and time frames of data present on each device, Plaintiffs seek to transform this examination into a one-sided investigative fishing expedition . . . The Court should reject Plaintiffs' proposed instructions as overbroad and untethered to the specific nature of Mr. Wedin's appointment by the Court, and adopt Defendants' Proposed Instructions which faithfully adhere to the Court's directive.

Dkt. No. 194, at 7.

Over Defendants' objections, the Court adopted Plaintiff's Proposal on April 21, 2026. Dkt. No. 229 (Minutes of Proceedings, Apr. 28, 2026) ("[T]he Court addresses the Parties proposed instructions for Mr. Wedin and ADOPTS Plaintiff's Proposal as modified by the Court."). Those instructions expanded Mr. Wedin's charter well beyond the Court's original directive, transforming a narrow device examination into a wide-ranging comparative spoliation analysis. Plaintiffs then obtained leave to "request additional analysis be done by the Court expert," expanding that charter further still. *Johnson* Dkt. No. 583 (June 4, 2026 Hr'g Tr.) at 13:21–14:8.

As part of the Court-ordered process, Defendants transferred various digital devices to Mr. Wedin and he issued several examination reports and testified at multiple hearings regarding his findings. Most notably, he reported that Mr. White's iPhone 11 Pro had been erased, but did not disclose that he had actually erased it, even though Defendants provided evidence that it was not wiped prior to being turned over to Mr. Wedin. *See, e.g.*, Dkt. No. 271 at 27 ("When the phone was found and turned over to the Court-appointed expert Mr. Wedin, the phone was not wiped."); Axelrad Decl. Ex. 2 (CRA Expert Report, June 28, 2026) at 19–20 (detailing Mr. Wedin's wiping of iPhone 11 Pro). Mr. Wedin admitted the truth that he had erased Mr. White's iPhone 11 Pro on

July 1, 2026, only after Defendants' experts spent over $500,000 in time analyzing what Mr. Wedin had done and proved that Mr. White's iPhone 11 Pro had been wiped while in Mr. Wedin's possession. *Johnson* Dkt. No. 651 (Jul. 1, 2026 Hr'g Tr. AM) at 53:2–54:25, 61:2–63:18 (Mr. Wedin admitting to wiping Dana White's iPhone 11 Pro).[3] Despite this admission, Plaintiffs persisted with testimony from Mr. Wedin, which the Court permitted. *Id.*[4] It was not until Mr. Wedin admitted to several *additional* errors in his work that the Court concluded:

> Given the mistakes in the Court expert's report and what I feel are serious concerns about his candor, I think that the Court expert needs to be excluded and the report excluded as well. I don't see any reason to continue this where it appears that he might have potentially wiped the device himself; where it appears the device might have been wiped, we don't know why; where there are mistakes in the report; and where there are indications that he may not have read the report fully. I don't believe that I can, in good faith, rely upon his credibility in terms of the report or his testimony.

Dkt. No. 290 (Jul. 1, 2026 Hr'g Tr. PM) at 5:8-17.

After dismissing its own expert for erasing the central piece of evidence in the spoliation proceedings, the Court denied Plaintiffs' sanctions motion without prejudice, permitting Plaintiffs to refile after the close of discovery. *See* Dkt. No. 293 (July 2, 2026 Hr'g Tr.) at 92:2-5 ("I'm going to deny that without prejudice, and then it can be reraised at the close--now that we've set the discovery completion deadline, it can be filed then."); Dkt. No. 298 (July 9, 2026 Minute

---

[3] Rather than thoughtfully meeting and conferring about the evidence Defendants presented, Plaintiffs reflexively attacked Defendants for raising these concerns *prior to Mr. Wedin's admission that he had wiped Mr. White's iPhone 11 Pro*. *See, e.g.*, Dkt. 281 at 4 (Plaintiffs characterizing Defendants' concerns as "hyperbole," "misdirection," and "plainly inaccurate attacks on [Mr. Wedin]"); *id.* at 21 ("In their haste to attack everyone who presents evidence of their widespread spoliation—even a neutral, Court-appointed expert—Defendants apparently failed to verify the information on which they rely, which has led to their clearly erroneous conclusion."). These characterizations have not aged well, which only underscores the issues with Plaintiffs' approach.

[4] Despite two declarations, a status report, Defendants' forensic experts' analysis, and Mr. Wedin himself confirming he wiped the phone, the Court permitted the examination to continue, and Plaintiffs went further still—suggesting without evidence and through leading questions that Defendants remotely wiped Mr. White's iPhone 11 Pro. *See, e.g.*, *Johnson* Dkt. No. 651 (Jul. 1, 2026 Hr'g Tr.) at 64: 4-5, 11 ([Plaintiffs' Counsel] Q. And as we discussed previously, in terms of a phone being reset, that can occur a few different ways, right[?] . . . Q. Manually or remotely[?]"); *id.* at 77: 2-4 ("THE COURT: But you also said we could find out whether or not someone remotely sent a message to that device to wipe it, correct?").

Order).

Immediately following the Court's termination of its own expert, Plaintiffs complained about "information asymmetry" and claimed to need Defendants' raw forensic images to conduct their own Wedin-like analysis. *See* Dkt. No. 290 (July 1, 2026 Hr'g Tr. (PM)) at 21:2–9. The Court directed the parties to attempt to develop a process for Plaintiffs to obtain Rule 706-level access to Defendants' ESI. *Id.* at 21:10–22:25.

In response, Plaintiffs demand almost total access to the full forensic images of twenty-three of Defendants' digital devices. Plaintiff's Proposal includes all non-responsive and irrelevant information, including sensitive personal communications, competitively sensitive business communications, spousal communications, medical information protected by HIPAA, and, most concerning, the extraordinary risk of disclosure of attorney-client communications. *See* Dkt. No. 332. Defendants opposed Plaintiff's Proposal, noting the risk of disclosing attorney-client communications and other sensitive communications to which Plaintiffs have no right. *Id.*

On August 6, 2026, the Court directed Defendants to submit a counterproposal for access to Defendants' digital devices and noted "If I don't have that within a week, then I'm going to order that the plaintiffs' proposal go forward." *Johnson* Dkt. No. 720 (Aug. 6, 2026 Hr'g Tr.) at 11: 17-18.

## II. LEGAL STANDARD

"Responding parties are best situated to evaluate the procedures, methodologies, and technologies as to their own electronically stored information." *Ashcraft v. Experian Info. Sols., Inc.*, 2018 WL 6171772, at *2 n.2 (D. Nev. Nov. 26, 2018). Ordering a party to submit its devices for forensic examination is an extraordinary and disfavored remedy. *See, e.g.*, *MGA Ent., Inc. v. Nat'l Prods. Ltd.*, 2012 WL 12886446, at *2 n.2 (C.D. Cal. Jan. 26, 2012) (explaining that "courts must consider the significant interests implicated by forensic imaging before ordering such procedures"). Indeed, the Federal Rules do not create a "routine right of direct access to a party's electronic information system." Fed. R. Civ. P. 34(a) advisory committee's note to 2006 amendment.

Even where limited device-level access might otherwise be warranted, Rule 26(b)(1)

requires the Court to consider whether the burden and expense of the proposed discovery outweigh its likely benefit, taking into account the importance of the issues at stake and whether the discovery can be obtained from a less burdensome source. Fed. R. Civ. P. 26(b)(1). That proportionality analysis includes both the tangible costs of compliance—time, money, and delay—and the privacy harm of disclosure. *See, e.g.*, *Henson v. Turn, Inc.*, 2018 WL 5281629, at *5–6 (N.D. Cal. Oct. 22, 2018) ("Courts and commentators have recognized that privacy interests can be a consideration in evaluating proportionality, particularly in the context of a request to inspect personal electronic devices."); *In re Anthem, Inc. Data Breach Litigation*, 2016 WL 11505231, at *1–2 (N.D. Cal. Apr. 8, 2016) (denying request to inspect or forensically image plaintiffs' computers, tablets, and smartphones as "invad[ing] plaintiffs' privacy interests" and "disproportional to the needs of the case").

## III. PLAINTIFF'S PROPOSAL IS DISPROPORTIONATE AND UNDULY BURDENSOME UNDER RULE 26(B)(1)

Plaintiff's Proposal will require the disclosure of reams of protected and highly sensitive personal and business information, and most likely attorney-client privileged material—all for a case Plaintiffs' own counsel has described as an "uphill battle" with "little value" and "very low" odds of generating more than $3,000 in recovery for any plaintiff. Rule 26 does not permit this type of en masse discovery, instead requiring that discovery be

> proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1). Because inspection or testing of a responding party's electronic information system "may raise issues of confidentiality or privacy," courts must "guard against undue intrusiveness resulting from inspecting or testing [ESI] systems." Fed. R. Civ. P. 34(a)(1) advisory committee's note to 2006 amendment; *see also Azenta, Inc. v. Andrews*, 2023 WL 8845604, at *6 (S.D. Cal. Dec. 21, 2023) ("Due to the intrusive and costly nature of a forensic examination, such a request raises significant concerns regarding proportionality and confidentiality," and "the propounding party must demonstrate that the likely benefit is *all the*

*more acute* so as not to be outweighed by the burden.") (emphasis added). Plaintiffs have not shown the extraordinary access they demand is consistent with any accepted understanding of Rule 26.

***First***, Plaintiffs' counsel has already acknowledged the very low odds that Plaintiffs recover more than $3,000 per putative class member. *Johnson* Dkt. No. 139-1 at 6; *Le* Dkt. No. 1036 (July 12, 2024 Hr'g Tr.) at 89:12–15. Courts routinely deny far less burdensome and invasive discovery with comparable amounts in controversy. *See, e.g.*, *Nat.-Immunogenics Corp. v. Newport Trial Grp.*, 2019 WL 3110021, at *8 (C.D. Cal. Mar. 19, 2019) (even where millions in compensatory, statutory, and punitive damages and attorneys' fees were available, the amount in controversy "is not so high as to validate" *in camera* review of 1,700 documents).

***Second***, Plaintiffs have never shown—despite repeated opportunities to do so—that any ESI purportedly missing from Defendants' productions bears on the merits of their claims. The so-called "gaps" Plaintiffs identify either never existed, have been filled which means no ESI was lost within the meaning of Rule 37, or are being filled through ordinary discovery processes. Plaintiffs' quest to establish widespread spoliation by Defendants' custodians is a sideshow designed to try to avoid the admitted weaknesses in their claims. Plaintiff's Proposal is more of the same.

Plaintiffs seek almost unfettered access to twenty-three devices belonging to six custodians, some of whom have never been accused of any data loss. *See, e.g.*, Dkt. No. 332-1 (requesting images of two of Denitza Batchvarova's devices); Dkt. No. 332 at 16. For example, Mr. Wedin's report identified just 57 messages out of more than 700,000 in total that appeared on one of Hunter Campbell's devices but not the next, and the vast majority were DoorDash delivery or valet texts. Dkt. No. 271 at 29. Mick Maynard and Sean Shelby both testified that the isolated examples Plaintiffs pointed to had simple explanations—messages sent to the wrong person or reworded on the spot—rather than widespread, nefarious spoliation. Dkt. No. 291 (June 30, 2026 Hr'g Tr.) at 80:11–81:2 (Maynard); *Johnson* Dkt. No. 655 (July 2, 2026 Hr'g Tr.) at 106:22–107:7 (Shelby). And any effort to establish spoliation through Dana White's devices is fatally undermined by Mr. Wedin's wiping of Mr. White's iPhone 11 Pro. Nothing in this record suggests

that further analysis of these custodians' devices will reveal actual spoliation—meaning relevant ESI that is irretrievably lost—which is precisely the showing Plaintiffs are required to make.

The proposed forensic images will, however, "sweep in documents and information that are not relevant to the issues in this case." *In re Primera Blue Cross Customer Data Sec. Breach Litig.*, 329 F.R.D. 656, 670 (D. Or. 2019) (citations omitted). Rather than aid the parties and the Court in reaching the merits, the discovery Plaintiffs request would only delay dispositive briefing, with no clear account of what Plaintiffs expect to uncover.

### A. Plaintiff's Proposal Cannot Be Completed On Any Reasonable Timeline

The extraordinary time and delay that will be necessary to accomplish the steps in Plaintiff's Proposal is driven by three categories of problems: (1) disparity in make, model, operating system, and applications across the twenty-three devices Plaintiffs seek access to; (2) the need to create bespoke computer code to address the nuances of each device; (3) the technical impossibility of redacting attorney-client privileged information across terabytes of previously unreviewed information.

***First***, the twenty-three devices Plaintiffs seek in their proposal include both iPhones and Android phones of varying makes, models, ages, and operating system versions, with different applications installed. The device images were copied using four different extraction methods—logical, iTunes logical, advanced logical, and full file system—and different forensic tools. *See* Dkt. No. 332 at 15. This diversity means there is no single procedure that can be applied uniformly across all devices; each combination of device, operating system, extraction method, and application presents its own forensic structure. Hart Decl. ¶ 45. Plaintiffs give this nuance the back of their hand and simply suggest a one-size-fits-all approach.[5] While Plaintiff's Proposal is

---

[5] Plaintiffs demand that Defendants *re-extract* all devices using a full file system extraction. But ten of the twenty-three devices were never copied using a full file system extraction, and some ceased being used many years ago. *See Johnson* Dkt. No. 583 (June 3, 2026 Hr'g Tr.) at 162:10–16, 164:8–165:4. Re-copying those devices is likely impossible for phones that were retired years ago and are no longer in the custodians' possession. And for certain devices, re-extraction would serve no purpose at all—Dana White's iPhone 11 Pro, for example, was reset by the Court-

centered entirely on Apple operating systems and terminology, Plaintiffs insist that their Proposal "should be read to encompass Android devices and apps, and the corresponding databases and data for such devices and extractions." Dkt. No. 327-4 at 4. But on Android phones the equivalent databases and file locations are entirely different—different directory structures, different database schemas, and different naming conventions, among numerous other differences. *See* Hart Decl. ¶¶ 43–44. Plaintiff's Proposal does not indicate what the "corresponding databases" actually are, or how the mapping from iOS-specific fields to their Android equivalents should be accomplished. In fact, Plaintiffs are so uncertain how to correctly map the data between the two operating systems that they simply shove this responsibility off to Defendants' forensic experts. Dkt. No. 327-4 at 9–10. But Defendants' experts note, "no examiner could reliably identify, much less certify that they identified, 'every location' where content resides when the mapping process itself remains undefined, nor am I aware of any accepted forensic method that permits an examiner to certify a complete inventory of what does not exist within a device extraction." Hart Decl. ¶ 15.

***Second***, to accomplish the numerous steps in Plaintiff's Proposal, Defendants will need to ***create computer code, that is, develop a separate procedure or software script for every archive from every extraction of every device make, model, and operating system***, and each custom procedure will need to be designed, tested, validated, and reviewed. *Id.* ¶¶ 11(g), 45–46. But Defendants' experts are digital forensic experts who ordinarily rely on existing, validated tools; much of the work entailed by Plaintiff's Proposal would, however, require the development of custom tooling rather than using established forensic methods. *Id.*[6]

***Third***, Plaintiffs' redaction methodology is based on a fundamental misunderstanding of e-discovery and digital forensics. Specifically, Plaintiffs propose that Defendants "use their existing privilege log and coding to identify the messages that are privileged and use that work product to identify the privileged materials in the SMS.db and related databases." Dkt. No. 327-4

---

appointed expert, rendering any new extraction meaningless because the data has already been wiped. This re-extraction would impose further unnecessary time and expense on Defendants.

[6] What is more, since many forensic extraction formats are proprietary (*e.g.*, Cellebrite), the software used to extract a forensic image does not provide any documented method for rebuilding package manifests once the underlying files have been altered. *See id.* ¶ 25.

at 8. In other words, Plaintiffs demand the production of millions of lines of raw forensic data on the erroneous assumption that Defendants can protect against the disclosure of privileged information simply by cross-referencing their existing privilege log. This is wrong for two reasons: (1) Plaintiffs' methodology only considers the SMS.db database, meaning it completely ignores the *other fifteen* databases Plaintiffs demand production from, and (2) Defendants cannot extrapolate their privilege log and apply it to SMS.db data as the two are completely different data-types. Hart Decl. ¶¶ 18, 21.

Plaintiffs' privilege log ("PLOG") methodology offers, at most, a method for the SMS.db database. It assumes that message content in SMS.db records can be identified from the PLOG and replaced with a "[redacted]" token. Yet, Plaintiff's Proposal demands production of fifteen or more additional databases and archives beyond just the SMS.db database. Each forensic artifact (*e.g.* native database rows, transaction logs, deleted records, recovered fragments, notifications, and snapshots) is a distinct type of data that requires its own privilege assessment by counsel. Privileged content appears across all of these databases and artifacts, including SMS.db, Biome data, Powerlog databases, CoreDuet interaction data, KnowledgeC.db, Unified Logs, Signal debug logs, WhatsApp ChatSearch databases, Spotlight data, notifications, KTX snapshot images, and associated WAL/SHM files. *Id.* ¶ 21. Each one of these artifacts is materially distinct, and a methodology for one database cannot be applied to another. *Id.* ¶¶ 18, 21. Each source requires its own privilege assessment by counsel.

Additionally, Plaintiff's Proposal rests on the incorrect assumption that prior work product can be carried over to raw device files. It cannot. Defendants' prior privilege review was conducted on documents that had been processed, uploaded, and displayed in a document review platform, which displays communications in easily readable formats. But the material Plaintiffs now demand is completely different: operating system artifacts, application containers, caches, logs, indexes, thumbnails, notification records, snapshot images, and remnants of deleted data. *Id.* ¶ 13. The consequence is that message content inside a single device extraction is not located in one place. It is scattered across numerous separate locations. *Id.* Because this data comes directly from the custodians' phones without any processing into a review database, it contains none of the

identifiers or formatting applied to the documents that were actually processed, uploaded, and reviewed. *Id.* ¶ 19. A single raw chat record will have completely different identifiers than its counterpart in the review database. *Id.* Without any reasoning, Plaintiffs suggest that Defendants can simply extrapolate from their privilege log and apply it to the SMS.db records, but that is impossible. *Id.* There are no overlapping identifiers between the two datasets and Defendants would be required to review each record, line by line, for privilege. To contextualize the burden, Defendants collected 7,335,154 individual text messages from the six custodians associated with the twenty-three devices Plaintiffs seek (Axelrad Decl. ¶ 3), meaning Defendants will have to review *tens of millions* of lines of data. Prior privilege log work cannot shortcut that process.

Moreover, on several of the databases at issue (*e.g.*, SMS.db, the Biome AppIntent stream, and KnowledgeC.db), message content and metadata are stored in the same fields. Hart Decl. ¶¶ 16–18, 31–37. Plaintiff's Proposal instructs Defendants' examiner to redact "message content" while preserving metadata. Dkt. No. 327-4 at 8–9. But forensic examiners cannot make privilege determinations—only Defendants' attorneys can do so. Hart Decl. ¶ 22. Where a single database field contains both a timestamp and the text of a message, or where sender information is packaged with message body content, separating the two requires a case-by-case judgment call on each individual record. *Id.* ¶ 16. That is precisely the type of manual, record-level decision-making where privileged material is most likely to be inadvertently produced. Defendants' counsel must review each of these fields, line by line. *Id.* ¶ 22. This metadata-and-content commingling makes the required independent review of every other database even more difficult.

Moreover, many messaging applications store content, metadata, reactions, replies, attachments, and threading information in interconnected structures; redacting one element may corrupt others. *Id.* ¶¶ 48–49. Some data structures are not stored in plain text, meaning that substituting content with "[Redacted]" is not technically feasible without altering the underlying data structure or corrupting the databases entirely. *Id.* Plaintiffs acknowledge this problem only in passing, stating that "[w]here the token cannot be applied to a given data type or storage location, the examiner shall apply a documented equivalent method"—but they identify no such method and instead leave the entire burden of inventing one to Defendants' experts. Dkt. No. 327-4 at 10.

Ultimately, Plaintiff's Proposal is akin to throwing spaghetti at the wall to see what sticks—it is not a serious forensic methodology. Plaintiff's Proposal is an attempt to impose an unworkable and boundless burden on Defendants, aimed at restarting mobile device discovery.

**B. Plaintiff's Proposal Seeks Access To Defendants' Legally Protected And Sensitive Information**

Plaintiff's Proposal also seeks numerous categories of legally protected information, including categories that Defendants did not previously review. As a result, even if a privilege log could somehow be extrapolated onto the raw data—which it cannot—Defendants would still need to conduct a full privilege and privacy review of all remaining communications. The targeted devices may contain attorney-client privileged communications not only with counsel in this matter, but also with personal counsel and company counsel on matters entirely unrelated to this action.[7] These communications are also protected from discovery. *See, e.g.*, *United States v. Bauer*, 132 F.3d 504, 510 (9th Cir. 1997) ("It is important to note that the attorney-client privilege is, perhaps, the most sacred of all legally recognized privileges, and its preservation is essential to the just and orderly operation of our legal system."); *Hernandez v. Tanninen*, 604 F.3d 1095, 1101 (9th Cir. 2010) (district court finding of "blanket waiver of the attorney-client and work product privileges" was clear error). Plaintiff's Proposal creates an intolerably high risk of attorney-client privileged information being inadvertently disclosed. *See Admiral Ins. Co. v. U.S. Dist. Ct. for Dist. of Arizona*, 881 F.2d 1486, 1490 (9th Cir. 1989) (discovery order compelling disclosure of attorney-client privileged materials likely inflicts irreparable harm warranting mandamus relief).

Throughout the Rule 706 process, the Court properly took great care to ensure Plaintiffs would not gain access to substantive communications on Defendants' devices. *Johnson* Dkt. No. 513 (Apr. 21, 2026 Hr'g Tr.) (Court stating Mr. Wedin would be "ordered not to disclose whatever content [he] reviewed"). The concern was so significant that the Court appointed Magistrate Judge Paul Grimm (Ret.) to "screen Mr. Eric Wedin's final report to ensure that it does not disclose

---

[7] Several of the targeted devices, moreover, are personal phones that were never used for UFC business and should not be subject to any forensic-examination protocol at all. These include Dana White's iPhone 16 Pro (serial ending -D), iPhone 7 (serial ending -G), and iPhone 6 (serial ending -K). Dkt. No. 332 at 15 n.7.

privileged material." Dkt. No. 258; *Johnson* Dkt. No. 613 (Jun. 16, 2026 Hr'g Tr.) at 15:8-10.

Attorney-client privileged information may exist in countless repositories across terabytes of data on the twenty-three devices sought by Plaintiffs, and the only effective protection is line-by-line attorney review—a project Defendants' expert estimates will take between one to two years to complete. Hart Decl. ¶¶ 12, 50. The same is true of other protected information on the custodians' devices that Plaintiff's Proposal seeks, including:

- **Sensitive health and medical information**, including communications with healthcare providers and health-app data protected by HIPAA. *Montoya v. Mattice-Harris*, 2023 WL 5023394, at *5 (D. Nev. Jan. 23, 2023) ("The Supreme Court has recognized a fundamental privacy right in non-disclosure of personal medical information."); *Spence v. Kaur*, 2019 WL 3842867, at *11-14 (E.D. Cal. Aug. 15, 2019) (sustaining objections to the plaintiffs' document requests relating to the defendant's medical and mental health history as HIPAA protected);

- **Financial information**, including banking communications, investment records, and account credentials. *Nogle v. Beech Street Corp.*, 2012 WL 3687570, at *9–10 (D. Nev. Aug. 27, 2012) (denying motion to compel production of defendants' financial records where financial records lacked any connection to plaintiffs' claims); *F.T.C. v. AMG Servs., Inc.*, 2015 WL 176417, at *10 (D. Nev. Jan. 14, 2015) (denying the FTC's motion to compel production of defendants' tax returns because the Commission failed to demonstrate a compelling need and that the information sought was otherwise unavailable); *Van Westrienen v. Americontinental Collection Corp.*, 189 F.R.D. 440, 441 (D. Or. 1999) (finding that tax returns often contain irrelevant and confidential information); *Valley Bank of Nev. v. Superior Ct.*, 15 Cal. 3d 652, 656 (1975) (holding that the right to privacy extends to one's confidential financial affairs);

- **Marital, spousal, and personal communications (including with custodians' children)**. *See, e.g.*, *United States v. Fomichev*, 899 F.3d 766, 771 (9th Cir. 2018) ("[M]arital communications are 'presumptively confidential[,] the [opposing party] has the burden of demonstrating that they are not.'"); *United States v. Paulin*, 2015 WL 139388, at *3 (D. Nev. Jan. 12, 2015) ("[C]ommunications between spouses privately made, are generally assumed to have been intended to be confidential, and hence they are privileged."); and

- **Confidential, competitively sensitive business information unrelated to this litigation**, including communications concerning mergers and acquisitions, financing transactions, and strategic business planning. *Am. Heavy Moving & Rigging Co. v. Robb Tech., L.L.C.*, 2006 WL 2085407, at *3 (D. Nev. July 25, 2006) (party seeking discovery of trade secrets and confidential business information must "show that the information is relevant to a claim or defense in the lawsuit and is necessary to prepare the case for trial"); *see also Walker v. Univ. Med. Ctr.*, 2009 WL 10693224, at *3 (D. Nev. Nov. 30, 2009) ("Federal courts hold, however, that in order to obtain discovery of trade secrets or other confidential commercial information, a party is required to show not only that it is relevant, but also that the party needs the information in order to prove its claim or defense."); *Sharda v. Sunrise Hosp. & Med. Ctr.*, 2018 WL 11410023, at *2 (D. Nev. Dec. 14, 2018) ("Federal courts hold, however, that in order to obtain discovery of confidential commercial

information, a party is required to show that the information sought is relevant and necessary in order to prove its claim or defense.”).[8]

Ordering forensic examination of devices to access information with no nexus to the claims in this action would serve no legitimate discovery purpose and is ultimately an unwarranted intrusion into the custodians’ personal lives. *Cacique, Inc. v. Robert Reiser & Co.*, 169 F.3d 619, 622 (9th Cir. 1999) (“Enforcing a discovery request for *irrelevant* information is a per se abuse of discretion.”); Fed. R. Civ. P. 34(a) advisory committee’s note to 2006 amendment (“Courts should guard against undue intrusiveness resulting from inspecting or testing [ESI] systems.”); *In re Gasoline Spot Market Antitrust Litigation*, 2021 U.S. Dist. LEXIS 200396, at *9–10 (C.D. Cal. Oct. 18, 2021).

Unlike typical discovery disputes where documents can be reviewed before production and a protective order can limit their use, Plaintiff’s Proposal demands access to raw forensic images that, once disclosed, cannot be “unread” or compartmentalized. Indeed, disclosure of this highly sensitive information from the custodians’ devices would inflict irreversible harm upon their privacy interests and, as importantly, the privacy interests of their families, friends, and others. *See, e.g.*, *In re Williams-Sonoma, Inc.*, 947 F.3d at 540 (granting mandamus relief to prevent compelled disclosure of sensitive customer information because “before a direct appeal could be taken and heard, the disclosure and damage to [privacy] interests would be complete”); *Star Ed., Inc. v. U.S. Dist. Ct. for Cent. Dist. of California*, 7 F.3d 856, 859 (9th Cir. 1993) (recognizing that mandamus relief may be appropriate to “prevent compelled disclosure” of sensitive information). This is exactly backwards and a protective order will not adequately safeguard the custodians’ sensitive and protected information that permeates the twenty-three devices. *Lim*, 2025 WL 3458981, at *5 (holding that a “confidential” designation “does nothing to offset the harm to privacy caused by allowing an adverse third party to comb through more than a decade of personal

---

[8] The concerns regarding disclosure of competitively sensitive business information are heightened here because Plaintiffs’ counsel has a documented track record of sharing information and coordinating with plaintiffs’ counsel in other actions against TKO/Zuffa. This reality makes it all the more imperative that the Court not order wholesale production of raw device images containing such information.

information that is of remote relevance, at best").

## IV. PLAINTIFF'S PROPOSAL IS TECHNICALLY UNWORKABLE

Plaintiff's Proposal is not only legally unsound, but also technically unworkable. As ***Plaintiffs themselves have previously argued in this matter, it is "standard principle" that the "extraction process must not alter the device or the data on it.***" *See* Dkt. No. 281 at 18 n.15 (citing Guidelines on Mobile Device Forensics, National Institute of Standards & Technology, Special Publication 800-101 Revision 1, at 27 (May 28, 2014), https://nvlpubs.nist.gov/nistpubs/SpecialPublications/NIST.SP.800-101r1.pdf). But Plaintiff's Proposal breaches that standard by demanding that Defendants make "[e]ach production [] in native form, with each redacted database returned into its extraction in the same location and form it occupied." Dkt. No. 327-4 at 10. Redacting native databases and reinserting them into the original forensic extraction, as Plaintiffs acknowledge, fundamentally alters evidence such that it no longer represents the original data and cannot reliably support any forensic conclusions. For example, some databases link message content and metadata so closely that redacting one can damage or change the other; likewise, some data is not stored as readable text at all, making it impossible to insert "[Redacted]" without altering the underlying record. Hart Decl. ¶¶ 17, 31, 48–49. Put simply, Plaintiffs aim to take evidence apart and cobble it back together—despite previously acknowledging this would violate basic principles of forensic science and evidence preservation.

Although Plaintiffs claim that "experts and academics routinely analyze altered datasets," they provide no expert support for that assertion in the context of a forensic examination of mobile devices and Plaintiffs are unable to point to a single example of a court ordering the process they propose. Dkt. No. 327 at 3, n.4. And, tellingly, Plaintiffs' own "example" instructions to Defendants state in bold, capitalized letters that redactions must be applied to a "working copy," meaning the native data, rather than on the "best evidence." Dkt. No. 327-5 at 10, 13. Clearly, Plaintiffs are aware that redactions cannot be reliably applied to native files.

Defendants' experts attest that such a proposal is unworkable, unprecedented, and undermines the reliability of the forensic evidence. Hart Decl. ¶¶ 23–36. Defendants' experts are

unaware of any accepted methodology for modifying these databases while keeping extractions functional across forensic platforms. *Id.* Acknowledging their proposal's lack of forensic integrity and Rule 702/*Daubert* concerns, Plaintiffs aim to force Defendants' expert to vouch for it by signing a "completeness statement" for every device, every extraction, and every phase, certifying what was produced, what was not, and why—with "[s]ilent omission" forbidden. Dkt. No. 327-4 at 10–11. Again, Plaintiffs point to no precedent, forensic standard, or industry practice that supports such a requirement, nor are Defendants' experts aware of one. Hart Decl. ¶¶ 23, 25. Plaintiffs also declare that "[d]etermining and performing the correct mapping is the responsibility of Defendants' examiner"—without defining what "correct mapping" is. Dkt. No. 327-4 at 10. This is not a term of art, and Defendants' experts note that many extraction technologies are proprietary and offer no way to rebuild their internal manifests once the underlying data has been changed. Hart Decl. ¶ 25; *see also* Dkt. No. 332 at 18 n.11.

Plaintiffs have invented a process no one has ever performed, refused to explain how to accomplish it, and assigned Defendants' experts both the burden of making it work and the liability if it fails—all at Defendants' expense of over $4 million for 12 to 24 months of forensic examiner work. Hart Decl. ¶¶ 12(h), 50.

## V. DEFENDANTS SHOULD NOT BEAR THE CONSEQUENCES OF THE COURT-APPOINTED EXPERT'S FAILURES AND LACK OF CANDOR

But for the failures of the Court-appointed examiner, Plaintiffs would have no basis to seek—and this Court would have no occasion to consider—the extraordinary access to Defendants' ESI that Plaintiffs now demand. Rather than "information asymmetry," (Dkt. No. 332 at 11), Mr. Wedin's failures have created a ripple effect of prejudice to Defendants. *First*, the data on Dana White's iPhone 11 Pro has been destroyed. The destruction of this particular device permanently deprives all parties and the Court of evidence that is not available from other sources and irreparably harms Defendants' ability to defend against Plaintiffs' spoliation allegations. Critically, it undermines Defendants' ability to demonstrate replaceability pursuant to Rule 37(e) for other custodians who have now been targeted by Plaintiffs' ever-expanding spoliation allegations. *Second*, responding to Mr. Wedin's various claims and accusations, many of which

turned out to be false, erroneous, or incorrect, has cost Defendants over $500,000 just in forensic examiner work with no recourse for recovery because Mr. Wedin was appointed by the Court. Axelrad Decl. ¶ 5.

## VI. ZUFFA AND TKO'S COUNTERPROPOSAL

Defendants' Counterproposal replaces Plaintiffs' open-ended demand with a defined, request-driven process, which addresses privilege and the other categories of legally protected material at issue while preserving the evidentiary integrity of the twenty-three device extractions.

Under Defendants' Counterproposal, Plaintiffs must first identify the specific artifacts, databases, tables, and fields they believe they require to perform a particular analysis. Hart Decl. ¶¶ 53–56. Requests would be addressed one at a time and device by device, rather than across all twenty-three extractions at once. *Id.* Sequencing the work in this way will allow the examiner to identify, for each device, the extraction type, forensic tool, container format, encryption status, operating system, and installed applications, and then to determine how best to effectuate the request as to that device's particular specifications. *Id.* Because the twenty-three devices include many models and operating system versions, different installed applications, application versions, and extraction methods, no single procedure can serve the entire data set and each device and request will need to be addressed individually. *Id.* ¶ 45.

For each request, and for each device extraction within the scope of that request, Defendants' experts will locate the responsive material within the device image. This work will be performed with validated commercial forensic tooling, on working copies, in a forensically accepted manner. *Id.* ¶ 54. Defendants' counsel will then review the located material for privilege and other sensitive information and redact as appropriate. *Id.* Because Defendants' Counterproposal will yield a discernible set of records rather than terabytes of complete device copies, the attorney review necessary to protect that material is achievable—as opposed to the line-by-line attorney review of all twenty-three extractions, across terabytes of information, that Plaintiff's Proposal would require before anything could be produced. *Id.* ¶¶ 11(b), 22, 53–54.

Following this screening, Defendants' experts will export the responsive, screened data. Every original extraction and copy will remain fully intact and unaltered: No file would be

removed from a container, and no database would be modified. *Id.* ¶ 55. Because nothing is written back into the evidentiary copies, every export remains traceable to its documented source, including the source extraction, acquisition hash, extraction criteria, and export hash. This maintains the integrity of what is produced while preserving the original extraction in its collected state. *See id.* ¶ 56.

Each export will be delivered in a format that loads into Relativity, together with the metadata and load files Plaintiffs' expert will need to search, sort, cross-reference, and analyze the data independently. *Id.* ¶ 55. Each export would identify the source device and image to which it corresponds, so that the provenance of every produced record is traceable to a single, identified device copy. *Id.* ¶ 56. Plaintiffs' expert will, therefore, receive both the records themselves as well the information necessary to confirm what was searched, how it was searched, and what the search returned.

During this process, Plaintiffs will remain free to request additional specific artifacts, databases, tables, and fields, and Defendants will evaluate each such request on a case-by-case basis. *Id.* To the extent the parties are unable to agree as to a particular request, the disagreement will be presented to the Court for resolution. *Id.*

**CONCLUSION**

For the foregoing reasons, the Court should reject Plaintiff's Proposal and if it concludes that any proposal is warranted, order Defendants' Counterproposal.

Dated: August 20, 2026

Respectfully Submitted,

WILLIAM A. ISAACSON (*Pro hac vice*)
wisaacson@dirllp.com
JESSICA PHILLIPS (*Pro hac vice*)
jphillips@dirllp.com
AGBEKO PETTY (*Pro hac vice*)
apetty@dirllp.com
BENJAMIN J. CABRANES (*Pro hac vice*)
bcabranes@dirllp.com
DUNN ISAACSON RHEE LLP
401 Ninth Street NW
Washington, DC 20004
Tel: (202) 240-2900

YOTAM BARKAI (*Pro hac vice*)
ybarkai@dirllp.com
DUNN ISAACSON RHEE LLP
11 Park Place
New York, NY 10007

SAMUEL R. MIRKOVICH (No. 11662)
srm@cwlawlv.com
CAMPBELL & WILLIAMS
710 South 7th Street
Las Vegas, NV 89101
Tel: (702) 382-5222

By: */s/ Christopher S. Yates*
CHRISTOPHER S. YATES (*Pro hac vice*)
chris.yates@lw.com
AARON T. CHIU (*Pro hac vice*)
aaron.chiu@lw.com
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Tel: (415) 391-0600

SEAN M. BERKOWITZ (*Pro hac vice*)
sean.berkowitz@lw.com
LATHAM & WATKINS LLP
330 North Wabash Ave, Suite 2800
Chicago, IL 60611
Tel: (312) 876-7700

JOSEPH AXELRAD (*Pro hac vice*)
joseph.axelrad@lw.com
DANIELLE LENECK (*Pro hac vice*)
danielle.leneck@lw.com
LATHAM & WATKINS LLP
10250 Constellation Blvd, Suite 1100
Los Angeles, CA 90067
Tel: (424) 653-5500

DAVID L. JOHNSON (*Pro hac vice*)
david.johnson@lw.com
LATHAM & WATKINS LLP
555 11th Street NW, Suite 1000
Washington, DC 20004
Tel: (202) 637-1061

*Attorneys for Defendants Zuffa, LLC and TKO Group Holdings. Inc.*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing **Zuffa, LLC, And TKO Group Holdings, Inc.'s Counterproposal To Plaintiff's Proposed Protocol For Production Of 23 Mobile Device Extractions From Defendants' Custodians** was served on August 20, 2026, via the Court's CM/ECF electronic filing system addressed to all parties on the e-service list. The documents filed under seal were subsequently served on the appropriate counsel of record via electronic mail.

/s/ *Christopher S. Yates*
Christopher S. Yates (Pro hac vice) of
LATHAM & WATKINS LLP